UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DAVID A. JOFFE,**<br><br>**Plaintiff,**<br><br>v.<br><br>**KING & SPALDING LLP,**<br><br>**Defendant.** | Civil Action No. 17-3392<br><br>ECF CASE<br><br>JURY TRIAL DEMANDED<br><br>COMPLAINT |

Plaintiff David A. Joffe, Esq., by way of Complaint against Defendant King & Spalding LLP, alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff is an attorney and a former employee of Defendant, which is a law firm. He brings this action to recover damages and remedies for the defendant's violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, and for the wrongful termination of his employment in violation of the implied-in-law obligation of a law firm to refrain from erecting or countenancing disincentives to compliance with the core rules of professional conduct, as set forth in Wieder v. Skala, 80 N.Y.2d 628, 609 N.E.2d 105 (1992), and its progeny.

## PARTIES

1. Plaintiff David A. Joffe, Esq. ("Plaintiff" or "Mr. Joffe") is an individual residing in Brooklyn, New York.

2. Upon information and belief, Defendant King & Spalding LLP ("K&S" or "the Firm") is a limited liability partnership organized pursuant to the laws of the State of Georgia with its principal place of business at 1180 Peachtree Street N.E., Atlanta, Georgia 30309-3521 and with an additional address at 1185 Avenue of the Americas, New York, New York 10036-2601.

## JURISDICTION AND VENUE

3. Plaintiff has asserted a claim under Section 510 of ERISA, 29 U.S.C. § 1140. As such, this Court has exclusive jurisdiction pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e). Because this action arises under the laws of the United States, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

4. Supplemental jurisdiction is asserted over plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

5. Because K&S resides in this judicial district and/or has contacts with this judicial district which would be sufficient to subject it to personal jurisdiction if this district were a separate state, venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (d).

6. Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### I.  FACTS COMMON TO ALL COUNTS

7. Mr. Joffe is an attorney who earned his law degree from Harvard Law School in 2008.

8. Subsequent to his graduation, Mr. Joffe completed a one-year clerkship for the Honorable Kathleen Cardone of the United States District Court for the Western District of

Texas. He then worked as an associate in the New York litigation practice of Davis Polk & Wardwell LLP.

9. From January 23, 2012 until his termination on December 7, 2016, Mr. Joffe worked as an associate in K&S' New York commercial litigation group.

10. At all times during his employment with K&S, Mr. Joffe's performance, including without limitation as measured by his billable hours, met or exceeded K&S' reasonable expectations.

11. At no point in his tenure did Mr. Joffe receive any negative performance reviews regarding his billable work for the Firm's clients.

12. In each year through 2014, Mr. Joffe received the standard "lock-step" bonus and annual compensation increase afforded to K&S associates on the basis of their years of practice.

13. In July 2014, the Chinese telecommunications company ZTE Corporation ("ZTE") engaged K&S to represent it in Vringo Inc. v. ZTE Corp., No. 14-cv-4988, a contract action brought in the Southern District of New York before the Honorable Lewis A. Kaplan (the "ZTE Matter").

14. The K&S partners who handled the ZTE Matter were Robert F. Perry, Esq. and Paul A. Straus, Esq.

15. Mr. Joffe was also staffed on the ZTE Matter.

16. The ZTE Matter arose out of an alleged wrongful disclosure by ZTE of confidential information provided to it by Plaintiff Vringo Inc. ("Vringo") in connection with settlement negotiations in an international patent litigation.

17. After Vringo sought a temporary restraining order ("TRO"), K&S partner Mr. Straus appeared before the Court for a hearing on July 7, 2014 (the "July 7, 2014 Hearing").

18. At the July 7, 2014 Hearing, Mr. Straus stated: "Your Honor, my client didn't share this [confidential information] with competitors. They did one thing with it. They filed it in a litigation in court..." ZTE Matter, July 7, 2014 Tr. (Doc. No. 19) at 15:6-10.

19. Mr. Straus' statement as set forth in paragraph 18, supra, was untrue.

20. ZTE had done more than just file the confidential information in a litigation in a Chinese court. ZTE had in fact also shared the confidential information with Chinese regulators and with at least one competitor.

21. Nevertheless, upon the July 7, 2014 Hearing at which Mr. Straus made, inter alia, the false statement set forth in paragraph 18, supra, "the Court granted a TRO much more limited than the one Vringo had sought." ZTE Matter, 2015 WL 4743573, at *4 (S.D.N.Y. Aug. 12, 2014) ("Aug. 12, 2014 Memorandum Opinion").

22. Soon after the ZTE Matter commenced, Judge Kaplan issued a series of warnings regarding K&S' practice of making unsubstantiated factual assertions which were later revealed to be false.

23. Thus, at a hearing at the end of July 2014, Judge Kaplan stated to Mr. Straus: "You folks leapt to a conclusion. ... [S]omebody drafted an affidavit ... and got [the client] to declare under penalties of perjury that it was a fact, and nobody knew what the fact was, and everybody acted in, at least, reckless disregard of the truth of what was sworn to in this declaration submitted to this Court and made a centerpiece of your opposition to this motion." ZTE Matter, July 24, 2014 Tr. (Doc. No. 36) at 38:1-18.

24. Judge Kaplan also subsequently noted that, "[i]n view of what already has occurred in this case ... I would not feel it appropriate to act on the basis of unsworn statements by a U.S. lawyer [Mr. Straus] as to his understanding." ZTE Matter, August 6, 2014 Memo

4

Endorsement (Doc. No. 46) at 2; see also id. (noting that, "in light of the unfortunate and perhaps more culpable and certainly material misrepresentation in [a prior, see supra] declaration ... truthful affidavits and declarations from persons having personal knowledge of the facts are greatly preferable to unsworn second-hand and even more remote assertions of 'understandings' by counsel lacking such knowledge").

25. In December 2014, K&S again represented to the Court that ZTE had disclosed confidential information only to the Chinese court, characterizing the opposing party's allegation to the contrary as an "unseemly amount of speculation." ZTE Matter, ZTE Reply Mem. (Dec. 1, 2014) (Doc. 73) at 6.

26. The representation set forth in paragraph 25, supra, was untrue.

27. In or about the week of January 26-30, 2015, Mr. Joffe learned that Mr. Straus sought to obtain a sworn declaration from ZTE. Mr. Straus intended to rely on this document as the basis for his representations to opposing counsel and submissions to the Court. As written, the proposed declaration would have reaffirmed Mr. Straus' own prior assertions to the Court that ZTE had not disclosed confidential information in any context other than in a filing in a Chinese court.

28. The proposed declaration was prepared at Mr. Straus' direction for an individual who appeared to lack any personal knowledge of the facts declared therein, which caused Mr. Joffe to question its veracity. Mr. Joffe raised his objections to the proposed declaration with Mr. Straus.

29. After Mr. Straus made clear that, despite Mr. Joffe's objections, he nevertheless intended to have the declaration signed by the proposed declarant, Mr. Joffe stated to Mr. Straus:

"If you go through with this, I will personally report you to the Bar."  Mr. Straus replied, presumably with sarcasm: "Thanks for your support."

30. As a result of Mr. Joffe's insistence, the proposed declaration was not filed with the Court.

31. Had the proposed declaration been submitted, it would have been, yet again, false.

32. As Judge Kaplan noted in his June 3, 2015 Memorandum Opinion: "While discovery remains ongoing, ZTE now has admitted that it 'submitted the [confidential information] to the NDRC [a Chinese administrative agency] in or about April 2014.'"  ZTE Matter, 2015 WL 3498634 (S.D.N.Y. June 3, 2015), at *3 ("June 3 Memorandum Opinion").

33. As the ZTE Matter progressed into fact discovery in the second quarter of 2015, Mr. Joffe, as he had done previously, discussed with Mr. Perry and Mr. Straus whether K&S could continue ethically to represent ZTE.  Specifically, Mr. Joffe expressed concern that, during the discovery process, K&S would fail to ensure compliance with ZTE's disclosure obligations and/or that K&S had already made prior misrepresentations on the basis of insufficient information.

34. In a series of increasingly clear admonitions to K&S, Judge Kaplan echoed the concerns raised by Mr. Joffe.  In a May 14, 2015 Memorandum and Order, Judge Kaplan noted that "ZTE's refusal to produce documents does not appear to have been performed in good faith" and further sought "to make clear to defendants and their counsel that [the Court] does not exclude the possibility of imposing sanctions on either or both."  ZTE Matter, 2015 WL 2380061 (May 14, 2015) ("May 14 Memorandum and Order"), at *3.

35. Subsequently, at a hearing on June 23, 2015, Judge Kaplan stated to Mr. Straus: "[Y]ou are compiling quite a track record in this case here. I see obstruction all over the place, not in a technical obstruction of justice criminal case sense, but obstruction of legitimate discovery, and I am not going to stand for it for much longer." ZTE Matter, Hearing Tr. (Doc. No. 143) at 13:2-25.

36. The documents that K&S produced in discovery on behalf of ZTE revealed that the latter had shared the confidential information, not only with a Chinese court and with a Chinese administrative agency, but also with Google. See ZTE Matter, Mot. to De-Designate (Nov. 10, 2015) (Doc. No. 285) (documents show, inter alia, "that ZTE sent Google ZTE's draft EU and Chinese antitrust complaints").

37. Accordingly, Mr. Straus' aforementioned representation to the Court on July 7, 2014—"Your Honor, my client didn't share this [confidential information] with competitors. They did one thing with it. They filed it in a litigation in court"—was false in at least two respects.

38. In or around July 2015, a dispute arose between the parties in the ZTE Matter regarding the deposition of ZTE's chief counsel.

39. In connection with this dispute, K&S made additional false statements and also advanced arguments that the Court considered frivolous.

40. For this reason, on July 24, 2015, Judge Kaplan issued an order (the "Sanctions Order") demanding that Mr. Perry and Mr. Straus show cause why they should not be sanctioned.

41. Although Mr. Joffe was listed, along with Mr. Perry and Mr. Straus, as counsel of record in the ZTE Matter, the Sanctions Order specifically excluded Mr. Joffe from the contemplated sanctions.

42. After Judge Kaplan issued the Sanctions Order, K&S General Counsel M. Robert Thornton, Esq. engaged outside counsel Philip R. Forlenza, Esq. to enter an appearance in the ZTE Matter on behalf of K&S.

43. On August 7, 2015, K&S, through Mr. Forlenza, filed its motion to withdraw as counsel, as well as its opposition to the Sanctions Order.

44. K&S' withdrawal motion, as well as the Sanctions Order, remained sub judice when Vringo and ZTE reached a settlement and the ZTE Matter closed later in 2015.

45. Mr. Joffe believed that the July 24, 2015 Sanctions Order against the K&S partners, the preceding admonitions in Judge Kaplan's orders and statements, and the misrepresentations advanced by the K&S partners, triggered his ethical duty pursuant to New York Rule of Professional Conduct (RPC) 8.3 to report potential attorney misconduct.

46. In or about the end of July 2015 and the beginning of August 2015, Mr. Joffe reported to Mr. Thornton and Mr. Forlenza the actual or narrowly-averted ethical breaches in the ZTE Matter that culminated in the Sanctions Order.

47. Soon thereafter, K&S took a number of retaliatory actions against Mr. Joffe.

48. In December 2015, Mr. Joffe received his annual performance review from K&S partner David Tetrick, Esq. At his 2015 performance review, Mr. Joffe was informed that he had been removed from the Firm's partnership track and that his pay would be frozen. It was represented to Mr. Joffe that this freeze in pay would initially be for the three-month period from January through March 2016.

49. In his conversations with Mr. Joffe, Mr. Tetrick attributed the Firm's decisions to Mr. Joffe's late timesheets in the prior review period, as well as Mr. Joffe's non-completion of a personal business-development plan.

50. On April 12, 2016, and notwithstanding that Mr. Joffe had billed more than seven hundred (700) hours in the first three months of 2016, Mr. Joffe was informed that his salary would remain frozen at the prior year's level.

51. On May 4, 2016, Mr. Tetrick informed Mr. Joffe that "[a]ll decisions concerning 2015 bonuses ... ha[d] been made," and that bonuses in respect of 2015 "ha[d] been paid" to other associates. Mr. Joffe was told that, for his work in 2015—a period primarily devoted to the ZTE Matter—he would receive a bonus of zero.

52. This decision confirmed for Mr. Joffe that his supervisors were penalizing him for the actual or narrowly-averted ethical breaches in the ZTE Matter that he had reported to Mr. Thornton and Mr. Forlenza, and caused him to question whether the Firm's management intended to satisfy its ethical duty to report attorney misconduct and ensure that all lawyers at the Firm conduct themselves in accordance with the ethical standards of the profession.

53. Between June 2016 and August 2016, Mr. Joffe made several inquiries to Mr. Tetrick regarding the proper manner to raise Mr. Straus' and Mr. Perry's conduct in the ZTE Matter with the Firm.

54. In August 2016, after Mr. Tetrick failed to respond to any of Mr. Joffe's inquiries, Mr. Joffe forwarded his email exchange with Mr. Tetrick to Mr. Thornton. In a cover note to Mr. Thornton, Mr. Joffe explained that the issues he had inquired about concerned the ZTE Matter and asked what he could do "to ensure that the issues raised ... are addressed."

55. In September 2016, Mr. Thornton informed Mr. Joffe that he had discussed "the ZTE situation" with Mr. Tetrick, who, in turn, stated that he would discuss this matter at Mr. Joffe's annual performance review. Mr. Tetrick further stated that that he was re-evaluating Mr. Joffe's 2015 bonus in light of the issues Mr. Joffe had raised, and that he "expect[ed] to make a decision" regarding Mr. Joffe's 2015 bonus by the end October 2016.

56. On or about October 12, 2016, Mr. Joffe received his annual performance review.

57. At the time of his performance review, Mr. Joffe was on pace to significantly exceed the Firm's two thousand one hundred (2,100) hour billable-hour target for associates. Moreover, in various matters for the Firm's clients over the preceding months, Mr. Joffe had, among other things, taken and defended depositions and briefed and argued dispositive motions.

58. Nevertheless, Mr. Tetrick told Mr. Joffe, during the latter's performance review, that the Firm believed Mr. Joffe's career had "stagnated" and that he should give thought to how he would regain an "ascending trajectory."

59. During this discussion, Mr. Joffe raised his concerns about the ZTE Matter and again asked Mr. Tetrick whether he may consult with others at the Firm.

60. Mr. Tetrick instructed Mr. Joffe to place a "ring" around the ZTE Matter and not to disclose any non-public information about the ZTE Matter to anyone, including internally at K&S. In particular, Mr. Tetrick instructed Mr. Joffe not to discuss what the latter had indicated were "red flags" in the ZTE Matter with anyone at the Firm.

61. Mr. Joffe asked Mr. Tetrick and K&S partner Wendy H. Waszmer, Esq., who was also present at Mr. Joffe's performance review, whether Mr. Joffe may meet again with one

or both of them to discuss these issues further. Mr. Tetrick responded that, for now, Mr. Joffe should "focus on your cases," and that they would meet again in December 2016.

62. At a meeting on December 7, 2016, K&S terminated Mr. Joffe's employment. Mr. Joffe was escorted from the building immediately after the December 7, 2016 meeting.

63. Mr. Joffe was not given any advance notice of his termination. Indeed, at the very time K&S terminated Mr. Joffe's employment and escorted him from its offices, Mr. Joffe was lead counsel of record for the Firm's clients in several active, pending federal cases in the Southern and Eastern Districts of New York.

64. Mr. Joffe was terminated notwithstanding the fact that, by December 7, 2016, he had accrued more than two thousand two hundred (2,200) billable hours for 2016, which exceeded the Firm's annual bonus target for associates.

65. Mr. Joffe's termination purportedly made him ineligible for any annual bonus, therefore making it a second straight year that he would not receive any incentive compensation.

66. During the course of his employment, Mr. Joffe had made contributions to the King & Spalding LLP Profit Sharing—401(k) Plan ("the K&S Plan"), a defined-contribution plan covering all partners, associates, and non-attorney employees of K&S, which was subject to the provisions of ERISA.

67. In a memorandum dated April 12, 2016, K&S informed Mr. Joffe that, pursuant to the K&S Plan, he would "receive profit-sharing contributions to [his] retirement account totaling approximately $20,000." The memorandum further stated that these contributions would vest on January 1, 2017.

68. On December 29, 2016, seventy-two (72) hours before the scheduled vestment date, the Firm clawed back these contributions in their entirety.

### FIRST CAUSE OF ACTION
### ERISA § 510 (29 U.S.C. § 1140)—
### Wrongful Termination

69. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70. ERISA § 510 provides that it is unlawful to discharge "a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan]." 29 U.S.C. § 1140.

71. As a participant and/or beneficiary of the K&S Plan, Plaintiff belonged to a group protected by ERISA § 510.

72. Although Plaintiff was qualified for his position, he was discharged a little over three weeks before K&S' contributions were scheduled to vest, and those contributions were clawed back by K&S seventy-two (72) hours prior to the scheduled vestment date.

73. As evidenced by the temporal proximity between the date of Plaintiff's termination and the date K&S' contributions were scheduled to vest, K&S terminated Plaintiff with the specific intent of depriving him of benefits to which he was entitled under the K&S Plan.

74. As a direct and proximate result of K&S' wrongful termination carried out in order to prevent Plaintiff's attainment of a right under the K&S Plan, Plaintiff has been damaged.

### SECOND CAUSE OF ACTION
### Claims pursuant to Wieder v. Skala, 80 N.Y.2d 628
### 609 N.E.2d 105 (1992)

75. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76. Pursuant to the holding in Wieder v. Skala, 80 N.Y.2d 628, 609 N.E.2d 105 (1992) and its progeny, the terms of Plaintiff's employment contained an implied-in-law obligation that both Plaintiff and the Firm would act in accordance with the ethical standards of the legal profession.

77. The implied-in-law obligation set forth in Wieder prohibited the Firm from taking adverse employment actions in retaliation for Plaintiff's insistence on compliance with the ethical standards of the profession and/or to prevent or discourage Plaintiff's attempts at compliance with the ethical standards of the profession.

78. As noted supra, and as described in detail in Judge Kaplan's opinions and statements on the record, K&S i) made several false statements of material fact to the Court that were never corrected; ii) sought to reiterate one of these false statements through an unsubstantiated sworn statement by a declarant lacking personal knowledge; and iii) on more than one occasion, engaged in a pattern of conduct that was prejudicial to the administration of justice ("K&S' Ethical Breaches").

79. Plaintiff reasonably believed that some or all of K&S' Ethical Breaches were in violation of the rules of professional conduct, including RPC 8.4(c), which prohibits a lawyer or law firm from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"; RPC 8.4(d), which prohibits engaging in "conduct that is prejudicial to the administration of justice"; or RPC 8.4(h), which prohibits engaging in "conduct that adversely reflects on the lawyer's fitness as a lawyer."

80. RPC 8.3(a) provides that "[a] lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer shall report such knowledge to a

tribunal or other authority empowered to investigate or act upon such violation." *See also* RPC 5.1(a) ("A law firm shall make reasonable efforts to ensure that all lawyers in the firm conform to these Rules.").

81. Plaintiff rightly believed that both he and K&S were ethically required to report K&S' Ethical Breaches, to the extent they met the standard set forth in RPC 8.3(a).

82. In retaliation for Plaintiff's insistence on compliance with the ethical standards of the profession and/or in order to prevent or discourage Plaintiff's compliance with the duty to report potential ethical breaches, K&S took the following adverse employment actions: (i) removed Plaintiff from partner track; (ii) froze Plaintiff's salary; (iii) awarded Plaintiff a zero-bonus for his 2015 work; (iv) terminated Plaintiff's employment without notice; (v) prevented Plaintiff from receiving a bonus for his already completed 2016 work; and (vi) prevented vesting of the Plaintiff's pension contributions.

83. In taking a series of adverse measures against Plaintiff in retaliation for his attempts to report his concerns and determine the proper manner to ensure these concerns were addressed pursuant to RPC 8.3(a), and/or in order to prevent or discourage Plaintiff from making any such attempts at the time or in the future, K&S breached the implied-in-law obligation set forth in <u>Wieder</u>.

84. As a direct and proximate result of K&S' numerous breaches of the implied-in-law obligation set forth in <u>Wieder</u>, Plaintiff has suffered significant damages as alleged herein, including back pay damages for earned amounts withheld as well as additional damages resulting from his termination.

WHEREFORE, Plaintiff David A. Joffe, Esq., demands judgment against Defendant King & Spalding LLP as follows:

A.  For the First Cause of Action, judgment as follows: (a) compensatory damages; (b) attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); (c) prejudgment interest; and (d) such other relief as the Court may deem just and appropriate under the circumstances.

B.  For the Second Cause of Action, judgment as follows: (a) compensatory damages for loss of wages (back pay and front pay) and lost benefits; (b) attorneys' fees; (c) costs of suit; and (d) prejudgment interest of 9% as required under the civil practice law and rules.

## JURY DEMAND

Plaintiff David A. Joffe, Esq. demands trial by jury on all claims and issues so triable.

Dated: Springfield, New Jersey
May 8, 2017

**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**

/s/ Andrew Moskowitz
Andrew M. Moskowitz, Esq.

505 Morris Avenue
Springfield, NJ 07081
(973) 379-4200
amoskowitz@lawjw.com

Attorneys for Plaintiff David A. Joffe