UNITED STATES DISTRICT COURT                    **Oral argument is requested**
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| **DAVID A. JOFFE,** |
| **Plaintiff,** |
| **v.** |
| **KING & SPALDING LLP**, |
| **Defendants.** |

Case No. 17-cv-3392 (VEC)

---

# MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

JAVERBAUM WURGAFT HICKS KAHN
WIKSTROM & SININS, P.C.
505 Morris Ave.
Springfield, NJ 07081
(973) 379-4200

589 Eighth Avenue, 21st Floor
New York, NY 10018
(212) 596-7657

Attorneys for Plaintiff David A. Joffe

*Of Counsel and On the Brief:*
Andrew M. Moskowitz, Esq.

\*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS.................................................................................................2

I.     PLAINTIFF'S BACKGROUND ...........................................................................2

II.    K&S'S INTERNAL ETHICS REPORTING POLICY...........................................2

III.   THE ZTE MATTER ..............................................................................................2

       A.   TRO hearing..........................................................................................3

       B.   Wang Declaration..................................................................................3

       C.   Hu Declaration; NDRC disclosure ......................................................4

       D.   Document discovery; Guo deposition; sanctions order ........................6

       E.   K&S's ethical breaches ........................................................................7

IV.    PLAINTIFF'S INITIAL INTERNAL REPORTING ..............................................7

V.     INITIAL ADVERSE EMPLOYMENT ACTIONS .................................................8

       A.      Plaintiff's uninterrupted positive record prior to the sanctions order ...........8

       B.      2015 performance review; removal from partner track; salary freeze ...........8

       C.      2016 performance; zero bonus.........................................................9

VI.    RED FLAGS EMAIL .........................................................................................10

VII.   RETALIATION FOR RED FLAGS EMAIL .......................................................11

       A.      Termination decision .......................................................................11

       B.      Business plans.................................................................................12

VIII.  DELAY IN TERMINATION; OCTOBER 2016 MEETING;
       SURVEILLANCE...............................................................................................13

IX.    PLAINTIFF'S TERMINATION .........................................................................14

       A.      Zero notice and escorted from premises .......................................14

**B.**     **Inaccuracies/inconsistencies in "Talking Points" memorandum for termination** .......................................................................................**14**

**C.**     **Clawback of contribution to ERISA plan**.......................................**15**

**D.**     **Post-termination**.............................................................................**15**

**ARGUMENT** .......................................................................................................**15**

**I.**     **SUMMARY JUDGMENT SHOULD BE DENIED ON THE <u>WIEDER</u> CLAIM**.......................................................................................**16**

**A.**     **Implied-in-law obligation set forth in <u>Wieder</u>** ...........................**16**

**B.**     **Plaintiff had actual knowledge and a clear belief that RPC 8.4 had been violated**........................................................................**17**

       **1.**   **Conduct "involving dishonesty, fraud, deceit or misrepresentation" (RPC 8.4(c)).** .......................................................**17**

       **2.**   **"Conduct that is prejudicial to the administration of justice" (RPC 8.4(d))** ..................................................................**18**

**C.**     **Plaintiff properly sought to satisfy his RPC 8.3(a) reporting duty internally**...........**19**

**D.**     **Plaintiff *did* question K&S partners Straus's and Perry's "honesty, trustworthiness or fitness"** ...................................................**20**

**E.**     **The misconduct Plaintiff reported did not require revealing client confidences**....................................................................................**21**

**F.**     **A reasonable jury could find K&S's actions violated the implied duty in <u>Wieder</u>**....................................................................................**21**

**II.**     **SUMMARY JUDGMENT SHOULD BE DENIED ON THE ERISA CLAIM** .........**24**

**CONCLUSION** ..................................................................................................**25**

## **TABLE OF AUTHORITIES**

**Cases**                                                                              **Page**

In re Altomerianos,
160 A.D.2d 96 (1st Dep't 1990) ...............................................................18

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ...............................................................................16

Dister v. Continental Group Inc.,
859 F.2d 1108 (2d Cir. 1988) ................................................................24

In re Doe,
847 F.2d 57 (2d Cir. 1988) .....................................................................17

Dufort v. City of New York,
874 F.3d 338 (2d Cir. 2017) ...................................................................16

Horn v. New York Times,
100 N.Y.2d 85, 790 N.E.2d 753, 760 N.Y.S.2d 378 (2003) ....................... 16

Kelly v. Hunton & Williams,
No. 97-CV-5631 (JG), 1999 WL 408416,
1999 U.S. Dist. LEXIS 9139 (E.D.N.Y. June 17, 1999) ............................19

Kulhawik v. Holder,
571 F.3d 296 (2d Cir. 2009) ...................................................................25

Lawford v. New York Life Ins. Co.,
739 F. Supp. 906 (S.D.N.Y. 1990) .........................................................24

Lichtman v. Estrin,
282 A.D.2d 326, 723 N.Y.S.2d 185 (1st Dep't 2001) ...............................10

In re Liu,
664 F.3d 367 (2d Cir 2011) ...................................................................18

Quinby v. WestLB AG,
No. 04 Civ. 7406, 2007 WL 1153994 (S.D.N.Y. Apr. 19, 2007) ................24

Soto v. Gaudett,
862 F.3d 148 (2d Cir. 2017) ..............................................................15, 16

Sullivan v. Harnisch,
19 N.Y.3d 259, 969 N.E.2d 758, 946 N.Y.S.2d 540 (2012) .......................16

iii

Wieder v. Skala,
80 N.Y.2d 628, 609 N.E.2d 105, 593 N.Y.S.2d 752 (1992) .................................................. passim

**Statutes and Rules**

RPC 5.2 .....................................................................................................................18

RPC 8.3......................................................................................................................... passim

RPC 8.4......................................................................................................................... passim

**Secondary Sources**

2 Geoffrey C. Hazard, Jr. et al., <u>The Law of Lawyering</u>
(4th ed. & 2017 supp.) ..............................................................................................19

Susan R. Martyn & Lawrence J. Fox, <u>Traversing the Ethical Minefield: Problems,</u>
<u>Law, and Professional Responsibility</u> (2004 ed.) ........................................................18

New York City Bar Association Professional Ethics Committee's Formal Opinion
82-79 (1982) ..............................................................................................................20

Nassau County Bar Association Ethics Opinion 13-3 (2013) .......................................17

New York County Lawyers Association Ethics Institute,
[RPC] Rules and Commentary 772 (Winter 2012) .....................................................17

New York State Bar Association Ethics Committee Opinion No. 822 (2008) .............................19

New York State Bar Association Ethics Committee Opinion No. 854 (2011) .............................17

<u>Wieder v. Skala</u>, No. 88/17278 (N.Y), Brief for Plaintiff-Appellant
Howard L. Wieder (July 6, 1992) ...............................................................................19

*

## <u>PRELIMINARY STATEMENT</u>

Plaintiff David A. Joffe, while an associate at Defendant King & Spalding LLP ("K&S" or "the Firm"), faced a difficult ethical situation.  Two partners with whom he worked had recklessly placed several—and, but for Mr. Joffe's intervention, would have placed additional—materially false statements before a federal judge.   Seeking to report these ethical breaches internally, Mr. Joffe emailed K&S partner David Tetrick and described "several instances of poor judgment" by those partners in the face of "ever more glaring red flags."

On the day he received Mr. Joffe's email, Mr. Tetrick forwarded it to K&S HR Chief Chris Jackson.  Mr. Tetrick testified that Mr. Joffe had "ma[de] serious allegations about two of our partners," that he had "accused them of exercising poor judgment," and that he "count[ed] on Mr. Jackson to handle personnel issues like that."  Mr. Jackson, who is not a lawyer, recognized that the email concerned "ethical issues."

Neither Mr. Tetrick nor Mr. Jackson had ever previously considered terminating Mr. Joffe's employment.  But, only several weeks thereafter, the Firm made the decision that Mr. Joffe should be discharged.  K&S then proceeded to surreptitiously monitor Mr. Joffe's email and security key card and instructed him not to share the "red flags" with anyone.  On December 7, 2016, the Firm discharged Mr. Joffe with zero notice, had him immediately escorted from the building, and warned him, "You don't want to make lots of noise."

Because a reasonable jury could conclude that K&S discharged Mr. Joffe in retaliation for his complying with his reporting obligations under the Rules of Professional Conduct, K&S is not entitled to summary judgment on Mr. Joffe's <u>Wieder</u> claim.  In addition, because K&S fails to demonstrate why Mr. Joffe's discharge occurred mere days before his pension benefits were set to vest, summary judgment should be denied on Plaintiff's ERISA claim as well.

## STATEMENT OF FACTS

### I.    PLAINTIFF'S BACKGROUND

Plaintiff is an attorney admitted in New York since October 2009.  See Pl.'s Statement of Additional Material Facts ("SAMF") ¶ 219; id. ¶¶ 220-24 (describing educational background and prior work history).  From January 2012 until December 2016, Plaintiff worked as a litigation associate in K&S's New York office.  Id. ¶ 225.

### II.   K&S'S INTERNAL ETHICS REPORTING POLICY

K&S's General Counsel, Robert Thornton, testified that K&S attorneys' internal reporting of potential ethical violations is governed by the Firm's claims policy.  SAMF ¶ 226. According to Mr. Thornton, this policy applies even where the circumstances do not give rise to a claim or potential claim but instead involve only potential violations of the Rules of Professional Conduct.  Id.  K&S's claims policy (Ex. 14)[1] **requires the Firm's lawyers to report ethics concerns only orally, not in writing**.  Id. ¶ 227.  The policy further provides that, absent specific directions to the contrary, K&S attorneys' ethics concerns "**should not be discussed** with other firm personnel," and, shockingly, that "**[n]o substantive emails, memoranda, notes, or other written reports should be generated**."  Id. (emphasis added).

K&S does not have a procedure for attorneys to report ethics concerns confidentially. SAMF ¶¶ 228, 229.  While Mr. Thornton testified there "could be a situation" where an internal report would be kept confidential, he did not specifically recall any such situation.  Id. ¶ 230.

### III.  THE ZTE MATTER

In July 2014, K&S was engaged to represent ZTE Corporation in a matter (the "ZTE Matter") brought before the Honorable Lewis A. Kaplan, U.S.D.J.   SAMF ¶ 231; Def.'s

---

[1] Unless otherwise indicated, references to Exhibits are to those documents attached to the Declaration of Andrew Moskowitz.

Statement of Material Facts ("SOF") ¶¶ 1, 2.  Partners Robert Perry and Paul Straus, along with Plaintiff, handled the ZTE Matter for K&S.  SAMF ¶ 232; SOF ¶¶ 3, 4.  The ZTE Matter arose out of ZTE's alleged breach of a non-disclosure agreement with Vringo, Inc. ("Vringo") by ZTE's "fil[ing] an antitrust action against Vringo in China based on [a] confidential settlement proposal ... and attach[ing] the proposal as an exhibit to its complaint."   SAMF ¶ 233.

## A.    TRO hearing

On July 3, 2014, Vringo applied for a temporary restraining order ("TRO") and preliminary injunction.  SAMF ¶ 234.  At a hearing on July 7, 2014, Mr. Straus stated, "Your Honor, my client didn't share this [confidential information] with competitors.  They did one thing with it.  They filed it in a litigation in court...."  Id. ¶ 235.  At the end of this hearing, "the Court granted a TRO much more limited than the one Vringo had sought."  Id.  ¶¶ 236, 237.

As acknowledged by K&S, "Straus's statement was not accurate."  Def.'s Mem. at 3.  In fact, ZTE had shared the confidential information with, among others, a Chinese administrative agency (the "NDRC") and Google.  SAMF ¶ 238.

## B.    Wang Declaration

On July 17, 2014, K&S filed a declaration (the "Wang Declaration") with the Court that was signed without personal knowledge and that contained false information.  SAMF ¶ 239. This false information formed the "centerpiece" of K&S's opposition to preliminary injunctive relief.  Id. ¶ 240.  In admonishing K&S for its submission, Judge Kaplan stated: "[N]obody knew what the fact was, and everybody **acted in, at least, reckless disregard of the truth** of what was sworn to in this declaration submitted to this Court...."  Id. ¶ 241 (emphasis added).

Mr. Straus stated that the false information in the Wang Declaration was based on "an understanding" from European counsel.  SAMF ¶ 242.  When Judge Kalan requested the counsel's name, Mr. Straus stated that he could not recall it.  Id.

On August 5, 2014, K&S filed a request to withdraw a document that related to the false portions of the Wang Declaration.  SAMF ¶ 243.  Mr. Joffe testified that he had to "beg Mr. Straus to at least include this [European] counsel's name" in the request.  Id. ¶ 244.  Although Mr. Straus acceded to Mr. Joffe's entreaty, he did not provide an affidavit.  Id.  Judge Kaplan denied K&S's request the next day, stating that, "in light of the unfortunate and **perhaps more culpable and certainly material misrepresentation** in [the Wang Declaration]," the Court could not accept "unsworn statements by a U.S. lawyer as to his understanding..."  Id. ¶ 245 (emphasis added).  Recalling this incident, Plaintiff testified: "I think [if] the name of counsel, after the insistence of what Judge Kaplan asked, wasn't included, in my mind at the time that terrified me.  I think I would classify that as, certainly, [a] near miss."  Id. ¶ 244.

## C.    Hu Declaration; NDRC disclosure

On August 13, 2014, Vringo filed an amended complaint alleging that ZTE had sought to provide the Chinese administrative agency NDRC with access to Vringo's confidential information.  SAMF ¶ 247.  In the subsequent months, the K&S team discussed whether the NDRC had in fact received confidential material from ZTE.  Id. ¶ 248.  In January 2015, Vringo's counsel informed K&S in writing that the NDRC had opened an investigation of Vringo on the basis of certain information the agency had received.  SOF ¶¶ 20-23; SAMF ¶¶ 248-50.  During the week of January 26-30, 2015, given the "virtual certainty" that Vringo would file a motion to compel relating to ZTE's communications with the NDRC, K&S sought a sworn declaration from ZTE.  SAMF ¶¶ 252, 253.

The K&S team knew that the ZTE employee with personal knowledge of any disclosures of confidential information to the NDRC was a Chinese lawyer in ZTE's legal department, Mr. Hu Xin.  SAMF ¶ 254.   Nevertheless, Mr. Straus inexplicably directed that the declaration concerning ZTE's disclosure to the NDRC be prepared for a different individual, a junior employee in ZTE's legal department, id. ¶ 256, who Mr. Straus recalled "had helped [K&S] collect documents."  Id. ¶ 257.[2]  Mr. Straus did not know whether this proposed declarant was a lawyer.  Id.  Mr. Joffe therefore confronted a scenario in which an individual who clearly lacked "personal knowledge" would be signing a declaration in place of "the person who d[id] have the personal knowledge."  Id. ¶ 259.  This incongruity caused Mr. Joffe "to very much question [the proposed declaration's] veracity."  Id.

Mr. Joffe testified that Vringo's counsel's letter "made it, in my mind, a very strong possibility that ... this information was received [by the NDRC] from ZTE."  SAMF ¶ 251.  However, as then drafted, the declaration would have confirmed Mr. Straus's false statement that ZTE had only disclosed the confidential information once, to a Chinese court.  Id. ¶¶ 258, 266.

Mr. Joffe ran into Mr. Straus's office "to tell him that [he] thought this was going to be a false Declaration, and the fact that this [junior] person is signing it makes it obvious that it would be false."  SAMF ¶ 260.  Mr. Straus initially "resist[ed]" Mr. Joffe's attempts to dissuade him. Id. ¶ 261.  Plaintiff then stated, "If you go through with this, I will personally report you to the Bar."  Id. ¶ 262.  This statement caused Mr. Straus to discontinue his efforts.  Id. ¶ 263.

As a result of Plaintiff's insistence, K&S instead obtained and then, on March 25, 2015, filed with the Court a declaration from Mr. Hu, the individual who did have personal knowledge.

---

[2] K&S acknowledges that all of this occurred, but provides the following anodyne characterization: "During the declaration drafting process, Straus proposed, based on discussions with the client, that the declaration be executed by a different ZTE employee."  Def.'s Mem. at 4.

SAMF ¶ 265.  This document materially contradicted the declaration initially proposed by Mr. Straus.  Rather than reaffirm Mr. Straus's prior false statement to the Court, the Hu Declaration stated that "**no confidential materials were shared with … the NDRC, <u>on</u> <u>or</u> <u>after</u> <u>July</u> <u>7,</u> <u>2014</u>**," which was the date that the TRO went into effect.  <u>Id.</u> ¶ 267 (emphasis added).  Eventually, it emerged that ZTE had in fact previously shared the information with both the NDRC and Google.  <u>Id.</u> ¶ 238.

**D.      Document discovery; Guo deposition; sanctions order**

In the second quarter of 2015, Plaintiff discussed with Mr. Perry and Mr. Straus his concerns about compliance with discovery obligations and the possibility of making or having already made false statements to the Court.  SAMF ¶¶ 273-75.  On May 14, 2015, Judge Kaplan noted "the possibility of imposing sanctions" on K&S.  <u>Id.</u> ¶ 268.  At a June 23, 2015 hearing, Judge Kaplan stated to Mr. Straus: "[Y]ou are compiling quite a track record in this case here.  I see **obstruction all over the place** … obstruction of legitimate discovery, and I am not going to stand for it for much longer."  <u>Id.</u> ¶ 276 (emphasis added).

In June 2015, Vringo filed a motion to compel the deposition of ZTE executive Guo Xiaoming.   SAMF ¶ 277.  In opposing Vringo's motion, K&S did not inform the Court of the central reason why Mr. Guo sought to avoid traveling to the U.S., which was his fear of arrest or detention.  <u>Id.</u> ¶ 278.  Mr. Straus acknowledged that, "[i]f we had known that it was an issue at the time we filed the opposition, we would have included that."  <u>Id.</u> ¶ 279.  On July 24, 2015, Judge Kaplan issued an order granting Vringo's motion and also demanding that Mr. Straus and Mr. Perry—but not Mr. Joffe—"show cause ... why they should not be sanctioned."  <u>Id.</u> ¶¶ 280-82; SOF ¶ 51.  K&S thereafter engaged Philip Forlenza as outside counsel to respond to the

6

sanctions order and moved to withdraw as counsel.   Id. ¶ 285.[3]

**E.      K&S's ethical breaches**

Mr. Joffe testified that it was "clear to [him] at the time" that K&S's conduct in the ZTE

Matter had violated RPC 8.4(c) ("conduct involving dishonesty, fraud, deceit or

misrepresentation") and 8.4(d) ("conduct that is prejudicial to the administration of justice").

SAMF ¶ 288.  Mr. Joffe further testified (id. ¶ 289):

> I believe … the incorrect statements that were made[,] whether they were made
> intentionally or unintentionally, that the actual misrepresentations and the
> cumulative effect of the misrepresentations … prejudice[d] the administration of
> justice.

Plaintiff also testified that Mr. Straus's and Mr. Perry's conduct reflected "poor

judgment" and a "desire not to take reasonable steps to [e]nsure that the record ha[d]n't been

obscured."   SAMF ¶¶ 292, 293.   Due to the "multiple misrepresentations …  it became

impossible to know what we had said that was false [and] whether what we would be saying next

w[ould be] false … [T]hat distort[ed] the process, that prejudice[d] the administration of justice."

Id. ¶ 294.   In addition, Mr. Straus's false statement that ZTE had not shared confidential

information with competitors "must have prejudiced the administration of justice" because it

"affected the strength of or the brea[d]th of the temporary restraining order and preliminary

injunction issued."  Id. ¶ 295.

**IV.     PLAINTIFF'S INITIAL INTERNAL REPORTING**

After the sanctions order was entered, Plaintiff worked with K&S's outside counsel Mr.

Forlenza and its General Counsel Mr. Thornton.   SAMF ¶ 298.    Mr. Thornton's and Mr.

---

[3] On December 7, 2015, Vringo and ZTE reached a settlement.  SOF ¶ 68; SAMF ¶ 287.  When the case
was formally dismissed ten days later, K&S's motion to withdraw, as well as the sanctions contemplated
against Mr. Perry and Mr. Straus, remained *sub judice*.  SAMF ¶ 287.

Forlenza's involvement was not limited to preparing a response to the sanctions order.  Id. ¶¶ 299-302.  Rather, both Mr. Joffe and Mr. Thornton testified that their discussion concerned issues of malpractice liability and, in Mr. Thornton's words, "professional conduct."  Id. ¶ 300.

Plaintiff believed that the ethical breaches in the ZTE Matter "should potentially be reported" pursuant to RPC 8.3(a).  SAMF ¶ 296.  Accordingly, over several phone conversations in or about the end of July and the beginning of August 2015, he reported those ethical breaches to Mr. Thornton and Mr. Forlenza.  Id. ¶¶ 297-302.

## V.      INITIAL ADVERSE EMPLOYMENT ACTIONS

### A.      Plaintiff's uninterrupted positive record prior to the sanctions order

From 2012 to 2014, Plaintiff was fully utilized and received uniformly positive performance reviews.  SAMF ¶¶ 303-08 (describing billable hours and performance reviews).

### B.      2015 performance review; removal from partner track; salary freeze

In 2015, Plaintiff accrued 1,824 billable hours and 86 hours of creditable pro bono work, for a total of 1,922 hours.  SAMF ¶ 309.  More than half of these hours related to work on the ZTE Matter.  Id.  Plaintiff's 2015 performance report contained evaluations from three attorneys who rated Plaintiff as meeting, exceeding, or far exceeding expectations, while one—K&S partner Meredith Moss, who acknowledged her "limited experience" with Plaintiff's work on a non-billable matter—rated Plaintiff as far below expectations.  Id. ¶¶ 310, 311.

During the relevant time period, K&S partner David Tetrick was the Chair of the Business Litigation Associates Committee.  Def.'s SOF ¶¶ 89-90.  In December 2015, Plaintiff received his annual performance review from Mr. Tetrick.  SAMF ¶ 312.  Mr. Tetrick conveyed K&S's decision to remove Plaintiff from partnership track, citing Plaintiff's failure to complete a business plan, his late time entries and Ms. Moss's criticism.  Id. ¶¶ 312-14.  Mr. Tetrick

emphasized that it was "not the quantity or the quality of [Mr. Joffe's] work, but [his] failures in terms of corporate citizenship," and that he needed to show "improvement in his administrative duties (chiefly, getting his time in each week)."  Id. ¶¶ 314, 316; Def.'s Mem. at 10.  Mr. Tetrick stated that returning to partnership track the following year was a possibility.  SAMF ¶ 315.

**C.      2016 performance; zero bonus**

In the first quarter of 2016, Plaintiff "redoubled [his] efforts" and accrued billable time on an annualized basis "total[ing] nearly 3,000 hours."  SAMF ¶ 320.  As acknowledged by K&S, Mr. Joffe "was a good firm citizen in the first quarter of 2016" and had no further issues with regard to late time sheets.  Id. ¶¶ 321, 322; see also Def.'s Mem. at 12 n.5.

K&S established associates' compensation according to a "lock-step" model used at peer firms.  SAMF ¶¶ 317, 318.  Although the full bonus amount was subject to a 2,000-hour threshold, attorneys whose billable hours were close to but slightly below this threshold typically received a portion of the bonus in the Firm's discretion.  Id. ¶ 318.  In 2015, the standard bonus for associates with Plaintiff's seniority was approximately $100,000.  SAMF ¶ 327.

Mr. Joffe was awarded a zero bonus for 2015.  Id. ¶ 325.  Mr. Tetrick testified that, in a prior instance where a New York associate "had not met the billable-hour threshold," K&S nevertheless awarded the associate 50% of the "lock-step" bonus for that year.  Id.  ¶ 328.

In the second quarter of 2016, Plaintiff continued to maintain a high billable workload. As of June 22, 2016, his annualized total billable hours were 2,527.  SAMF ¶ 329.

**VI.     RED FLAGS EMAIL**

Plaintiff considered a bonus of zero to be "punitive."  SAMF ¶ 330.  "[G]iven [that] the overwhelming percentage of … [his 2015] time [had been] taken out by [the ZTE Matter]," Plaintiff had the "strong impression" that the Firm concluded he was at fault for "what [had]

happened in ZTE." <u>Id.</u>  Accordingly, Mr. Joffe sought to "re-raise the ethical issues which [he] realized seemed not to have been adequately, or at all, addressed in the first instance." <u>Id.</u>

On July 25, 2016, Plaintiff wrote Mr. Tetrick an email ("the Red Flags Email") stating:

… Judge Kaplan issued [an opinion] … allud[ing] to K&S's potential culpability for "*deliberate concealment*," before ultimately concluding that "*[i]t is unnecessary for purposes of the [pending] motion to determine exactly what King & Spalding knew or whether its actions were culpable*. …"

… To be clear, I do not believe that Bob or Paul intentionally misled the Court, nor that they engaged in any other culpable[4] conduct.  However, I do believe the Sanctions Order was an entirely understandable, and entirely foreseeable, result of **several instances of poor judgment by the partners, in the face of ever more glaring red flags**, that occurred over the prior year in which the matter had been pending.  While I had raised my concerns with the partners throughout that period (which, I believe, helped prevent **several other near-misses**) as the associate on the matter, the ultimate decisionmaking was, largely, outside my personal control.

SAMF ¶ 331 (bold added; italics in original).  Plaintiff also asked Mr. Tetrick if he could reference the ZTE Matter in his business plan, which was due shortly.  <u>Id.</u> ¶ 334.

When asked why, if he was seeking to internally re-raise his ethics concerns, he used the terms "red flags" and "instances of poor judgment," Plaintiff stated: "I, obviously, was conscious of the fact that every partner at the firm is my boss and I want[ed] to tread gingerly and [didn't] want to say something that sounds like an accusation directly in an e-mail."  SAMF ¶ 333 (testifying further that "I could not imagine what I could have done short of say something in an e-mail that I thought would cause me problems for my employment, to get someone's attention so that they could speak to me about it.").  **K&S HR Chief Mr. Jackson testified that, when he originally received the Red Flags Email in July 2016, he quickly discerned that it raised an issue of professional conduct, stating, "I'm not a lawyer ... Any time there is a mention of**

---

[4] Plaintiff testified that the "use[] [of] the term 'culpable' was in reference to the italicized portion of the prior paragraph where Judge Kaplan … [s]uggested that King & Spalding's actions were culpable," meaning something "that would have been akin to a crime or fraud on the court. … I do not believe that [Straus or Perry] are or were criminals."  SAMF ¶ 332.

conflicts, or ethical issues, that's way beyond my pay grade." Id. ¶ 342 ("[I] saw [Mr. Joffe's email] as a Bob Thornton legal issue...").

On August 29, 2016, Plaintiff forwarded the Red Flags Email to K&S General Counsel Mr. Thornton.  SAMF ¶ 336.  In his cover note, Plaintiff explained that ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Id. ¶¶ 336, 337.  Mr. Thornton responded: ████████████████████████████████ Id. ¶ 336.  On September 21, 2016, Mr. Tetrick wrote to Plaintiff, copying Mr. Thornton, and stated: "I am the correct person to address the issues you raised below."  Id.  ¶ 338.  As discussed infra, at this time, Mr. Tetrick made the decision to terminate Mr. Joffe's employment.  Id. ¶¶ 349, 356.

## VII.   RETALIATION FOR RED FLAGS EMAIL

### A.   Termination decision

**Prior to July 25, 2016, neither Mr. Tetrick nor K&S HR Chief Mr. Jackson had ever considered terminating Mr. Joffe's employment.**  SAMF ¶¶ 339; 343.  Thus, while Defendant seeks to portray Mr. Joffe's Red Flags Email as simply "regarding [Plaintiff's] compensation ... [and] la[ying] out some of the history of the ZTE Matter," Def.'s Mem. at 10, as set forth below, Mr. Tetrick's swift and visceral reaction to the email belies this description.

Mr. Tetrick testified that, upon receiving the Red Flags Email on July 25, 2016, he forwarded it to Mr. Jackson.  SAMF ¶ 340.  Mr. Tetrick explained that "**Mr. Joffe made allegations about two of our partners ... accus[ing] them of exercising poor judgment, amongst other things.  And I thought it was important that Mr. Jackson have notice of that.**"  Id. (emphasis added). Mr. Tetrick added: "**[I]t's an associate who is making serious**

**allegations** about two of our partners ... **I count on Mr. Jackson to handle personnel issues like that**.**"** Id. ¶ 341 (emphasis added).

In "[l]ate July or early August of [20]16," Mr. Jackson spoke with Mr. Tetrick regarding Plaintiff's employment. SAMF ¶ 343. This was the <u>first</u> occasion that Mr. Jackson had had discussions about Mr. Joffe with anyone at the firm. Id. Mr. Tetrick also forwarded the Red Flags Email to K&S partner Mike Johnston, "in [the latter's] capacity as the firm's employment lawyer." <u>Id.</u> ¶ 345; <u>id.</u> ¶ 347 (Mr. Johnston previously "never had any involvement with the ZTE matter"). On August 15, 2016, Mr. Tetrick consulted Mr. Johnston, copying Mr. Jackson, regarding Mr. Joffe's "performance." <u>Id.</u> ¶ 346.

Thereafter, Mr. Tetrick had several "conversations with [General Counsel] Thornton about the ZTE Matter," each "at the direction of Mr. Johnston, as the firm's employment lawyer." SAMF ¶ 347. Mr. Tetrick also emailed Mr. Thornton and Mr. Johnston several times concerning Plaintiff and the Red Flags Email. <u>Id.</u> ¶ 348. On or before September 21, 2016, K&S made the decision to terminate Mr. Joffe's employment. <u>Id.</u> ¶¶ 349, 356.

**B.      Business plans**

K&S asserts that Plaintiff's failure to submit a business plan in prior years led to his termination. However, **K&S HR Chief Mr. Jackson, who has worked at K&S for seventeen (17) years, was not aware of <u>any</u> attorney who had ever been disciplined for failing to submit a business plan**. SAMF ¶ 355.

In fact, K&S did not even contemporaneously track whether associates had submitted business plans in prior years. SAMF ¶ 352. Thus, in August or September 2016, at the direction of its employment counsel, K&S, for the first time, reviewed all Firm associates' business plans for the preceding three years to determine which associates had failed to submit the documents.

Id. ¶ 353.  In an email summarizing these findings—captioned "**RE: do you have a way**"—a K&S administrator wrote: "Based on everything I can find, we never received one for David for either 2014 and 2015.  **We flagged it for David J in his 2014 AEC review but he [sic] certainly didn't say it was required**."  Id. ¶ 354 (emphasis added).

## VIII.   DELAY IN TERMINATION; OCTOBER 2016 MEETING; SURVEILLANCE

K&S contends that Mr. Joffe "fail[ed] to develop his skills and create internal demand for his work…"  Def.'s Mem. at 1.  However, in direct contradiction of this statement, K&S delayed Mr. Joffe's termination because a K&S partner deemed Mr. Joffe integral to a "critical piece of work for a client … and [said] he wanted, if at all possible, for Mr. Joffe's employment to continue until after that event occurred."  SAMF ¶ 357; SOF ¶ 205.  On October 14, 2016, Mr. Tetrick and then-K&S partner Wendy Waszmer delivered Plaintiff's annual performance review. SAMF ¶¶ 358-60.  Although K&S had already decided to fire Mr. Joffe, Mr. Tetrick did not inform him of this decision.  Id. ¶ 370.  Instead, Mr. Tetrick directed him to give thought to how he could regain an "ascending trajectory."  Id. ¶ 361.  Plaintiff's 2015 bonus was not discussed. Id. ¶ 369.

During the performance review meeting, Plaintiff again raised his concerns about the ZTE Matter.  SAMF ¶ 362.  Mr. Tetrick instructed Plaintiff to place a "ring" around the ZTE Matter and not to discuss the "red flags" in the July 25, 2016 email with anyone at the Firm.  Id. ¶¶ 363-65.  Upon receiving these instructions, Plaintiff stated that he intended to submit his business plan.  Id. ¶ 366.  Mr. Tetrick rejected this request, explaining: "I told him it was too late … He had his opportunity.  He didn't do it."  Id.  When Plaintiff asked Mr. Tetrick and Ms. Waszmer if he may meet with them to discuss further the issues he had raised concerning the ZTE Matter, Mr. Tetrick stated they would meet again in December 2016.  Id. ¶¶ 367, 368.

During the fall of 2016, K&S surreptitiously monitored Mr. Joffe's use of the Firm document system; his entry into the office as reflected by his security key card; his use of the Firm email system; and his billing entries.  SOF ¶ 203; SAMF ¶¶ 371-74, 376.  This was the one and only occasion that Mr. Tetrick had accessed another employee's email.  SAMF¶ 375.

## IX.    PLAINTIFF'S TERMINATION

### A.    Zero notice and escorted from premises

On December 7, 2016, K&S terminated Mr. Joffe's employment.   SAMF ¶ 377.[5] Although K&S's standard practice is to provide associates with notice—usually three months— so that they can "get a job," Plaintiff was terminated immediately and told that he would be escorted from the premises.  Id. ¶¶ 378-81; 399.   K&S engaged security to be present in the adjoining conference room during Plaintiff's termination.  Id. ¶ 382.  Neither Mr. Tetrick nor Mr. Perry, a prior managing partner of K&S's New York office, had ever previously engaged security during a termination.  Id. ¶¶ 382, 383.   Mr. Perry testified, "I didn't know we had security."  Id. ¶ 383.  Mr. Marooney, a 22-year K&S veteran, could not recall another attorney who had been escorted out of the premises.  Id. ¶ 384.

### B.    Inaccuracies/inconsistencies in "talking points" memorandum for termination

K&S prepared a set of talking points for Plaintiff's termination meeting.  SAMF ¶ 385. Mr. Tetrick testified that that "[t]he reasons that David was terminated are set forth in this document … I didn't leave [] out any of the reasons."  Id. ¶¶ 386-87.

Notably, despite the significant emphasis now placed by Defendant on Ms. Moss's negative 2015 performance review, Def.'s Mem. 13-15, **the talking points document made no reference to Ms. Moss.**  SAMF ¶ 388.  It also contained a number of factual inaccuracies and

---

[5] At the time of his termination, Mr. Joffe had accrued 2,071 billable hours, SAMF ¶ 398, thus exceeding, in a little over eleven months, the Firm's annual target for associates.  Id. ¶¶ 396. 397.

inconsistencies.  First, it stated that Plaintiff "failed to turn in self-evaluations in both 2014 and 2015."  SAMF ¶ 389.  In fact, Plaintiff submitted self-evaluations in both years.  Id. ¶ 390 (citing Ex. 34, Ex. 64).   The talking points also refer to an adversary proceeding and a PwC matter that had settled/concluded, and to Equifax matters on which Plaintiff was purportedly replaced.  Id. ¶ 391.  However, in September 2016—when K&S made the decision to terminate Plaintiff, id. ¶¶ 204, 349—both the adversary proceeding and the PwC matter remained active.  Id.  ¶¶ 392, 393.  Moreover, Plaintiff had not been replaced on any of the Equifax matters in which he was counsel of record.  Id. ¶ 394.  In fact, even on the day of his termination, Plaintiff remained sole counsel of record in several active, pending federal cases for Equifax.  Id. ¶ 395.

## C.      Clawback of contribution to ERISA plan

A $20,000 employer contribution to Plaintiff's retirement account, deposited in mid-2016, was scheduled to vest on January 1, 2017.  SOF ¶ 177; SAMF  ¶ 323.   At the December 7, 2016 termination meeting, Mr. Tetrick informed Plaintiff that he would not retain this $20,000 contribution.  SAMF ¶ 401.  On December 29, 2016, seventy-two (72) hours before the vesting date, K&S clawed back the entirety of its employer contribution.  Id. ¶ 403.

## D.      Post-termination

After his termination, Plaintiff consulted with ethics attorney Ronald Minkoff about his "ethical responsibilities" in connection with "[his] employment at King & Spalding."  SAMF ¶ 404.  Plaintiff testified that he believed that he "fulfilled fully … [his] reporting duty" with the filing of the Complaint in the instant case.  Id. ¶ 405.

# ARGUMENT

Summary judgment is appropriate where "when 'there can be but one reasonable conclusion as to the verdict.'"  Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).  "On a motion for summary judgment, the court must resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Dufort v. City of N.Y., 874 F.3d 338, 347 (2d Cir. 2017) (internal quotations omitted).  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  Soto, 862 F.3d at 157 (quoting Anderson, 477 U.S. at 255).

## I.  SUMMARY JUDGMENT SHOULD BE DENIED ON THE WIEDER CLAIM

The evidence adduced in discovery permits a reasonable jury to conclude that (i) Plaintiff had knowledge of ethical breaches that triggered his reporting duty under RPC 8.3(a); and (ii) Plaintiff was discharged for making an internal report.  Because such conduct would squarely violate the Firm's implied-in-law obligation set forth in Wieder v. Skala, 80 N.Y.2d 628, 609 N.E.2d 105, 593 N.Y.S.2d 752 (1992), summary judgment should be denied.

### A.  Implied-in-law obligation set forth in Wieder

In Wieder v. Skala, the New York Court of Appeals held that a law firm may not discharge an associate in retaliation for the associate's compliance with the rules of professional conduct—including, specifically, compliance with the duty to report attorney misconduct.  See Wieder, 80 N.Y.2d at 635-36.  In so holding, the Court explained that, where the law firm "[e]rect[s] or countenanc[es] disincentives to compliance with the [ethics rules]," its conduct violates the implied-in-law obligation "that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession."  Id.  The Court of

16

Appeals has subsequently reaffirmed <u>Wieder</u>. <u>See</u> <u>Sullivan v. Harnisch</u>, 19 N.Y.3d 259, 969 N.E.2d 758, 946 N.Y.S.2d 540 (2012); <u>see also</u> <u>Horn v. N.Y. Times</u>, 100 N.Y.2d 85, 790 N.E.2d 753, 760 N.Y.S.2d 378 (2003).

**B.     Plaintiff had actual knowledge and a clear belief that RPC 8.4 had been breached**

The New York Rules of Professional Conduct govern the ethical obligations of attorneys and law firms in New York.  RPC 8.4 prohibits lawyers from engaging in conduct "involving dishonesty, fraud, deceit or misrepresentation," RPC 8.4(c), or that "that is prejudicial to the administration of justice."  <u>Id.</u>(d).  RPC 8.3 provides that a lawyer must report potential violations "that raise[] a substantial question as to [another] lawyer's honesty, trustworthiness or fitness as a lawyer."  RPC 8.3(a).  The RPC 8.3 duty is triggered upon an attorney's "clear belief" that a violation has been committed.  NYS Ethics Op. 854 (2011).  There is no requirement "that an attorney 'must wait until he has proof beyond a moral certainly.'"  Nassau Cnty. Ethics Op. 13-3 (2013) (quoting <u>In Re Doe</u>, 847 F.2d 57, 63 (2d Cir. 1988)).[6]

Defendant's brief addresses only RPC 8.4(c) and, in so doing, simply ignores RPC 8.4(d).  Plaintiff had knowledge of and has identified violations of both subsections of RPC 8.4.

**1.   Conduct "involving dishonesty, fraud, deceit or misrepresentation" (RPC 8.4(c))**

In making numerous misrepresentations and omissions, SAMF ¶¶ 235-46, K&S "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"  RPC 8.4(c).  "Rule 8.4 is analogous to a strict liability tort statute.  Negligent as well as intentional violations

---

[6] Defendant notes Plaintiff's reference to a duty to report "potential attorney misconduct," declaiming: "[T]here is no such duty."  Def.'s Mem. at 20 (quoting Compl. ¶ 45).  Defendant is incorrect.  "DR 1-103(a) [currently codified as RPC 8.3(a)] places upon each lawyer … the duty to report to the Disciplinary Committee of the Appellate Division any ***potential*** violations of the Disciplinary Rules that raise a substantial question as to … honesty, trustworthiness or fitness."  <u>Wieder</u>, 80 N.Y.2d at 636 (emphasis added).

of the disciplinary rules will expose a lawyer or law firm to potential disciplinary action." N.Y. Cnty. Lawyers' Assoc. Ethics Institute, [RPC] Rules and Commentary 772 (Winter 2012) (Ex. 65) (citing, inter alia, In re Liu, 664 F.3d 367, 372 (2d. Cir 2011) (RPC 8.4(c) requires finding that attorney "knew, or should have known" of falsity) (collecting cases)).

Defendant argues that K&S's false statements could not have violated RPC 8.4(c) because they were made without "scienter" or "venal intent." Def.'s Mem. at 19 (citing In re Altomerianos, 160 A.D.2d 96, 559 N.Y.S.2d 712 (1st Dep't 1990)). However, the Altomerianos case involved an attorney's alleged misappropriation of escrow funds. Accordingly, the Court addressed the definition of fraud, *not* misrepresentation. In re Altomerianos, 559 N.Y.S.2d at 716 ("[t]hat venal intent is a necessary element to [the predecessor to RPC 8.4(c)] we think is compelled by the definition of **fraud**" in the Rules of Professional Conduct) (emphasis added).

Defendant asks this court to find that "misrepresentation" and "fraud" encompass the exact same conduct. However, RPC 8.4(c) specifically delineates "dishonesty, fraud, deceit or misrepresentation" as constituting separate, prohibited conduct. According to the prevailing view, "these provisions include all intentional, reckless, and negligent misrepresentations." Susan R. Martyn & Lawrence J. Fox, Traversing the Ethical Minefield: Problems, Law, and Professional Responsibility 103 (2004 ed.) (Ex. 67).

## 2. "Conduct that is prejudicial to the administration of justice" (RPC 8.4(d))

Plaintiff has identified numerous instances in which K&S engaged in conduct "prejudicial to the administration of justice." RPC 8.4(d). First, Mr. Straus's false statement that his client did not share confidential information "with competitors" and only filed this information "in a litigation in court," SAMF ¶ 235, affected the scope of the TRO and preliminary injunction entered by the Court. Id. ¶ 295. In addition, as a result of K&S's pattern

of material misrepresentations and omissions, id. ¶¶ 235-46, the Court could not determine "what [K&S] had said that was false [and] whether what [K&S] would be saying next w[ould be] false … [thereby] distort[ing] the process [and] prejudice[ing] the administration of justice."  Id. ¶¶ 289, 294.  For this reason, Judge Kapan initially stated that he did not "exclude the possibility of imposing sanctions"; warned K&S the following month that it was "compiling quite a track record" and "obstruct[ing] legitimate discovery"; and then, finally, requested that Mr. Straus and Mr. Perry show cause why they should not be sanctioned.  Id. ¶¶ 268, 276, 280-82.

**C.   Plaintiff properly sought to satisfy his RPC 8.3(a) reporting duty[7] internally**

An associate may satisfy a RPC 8.3(a) reporting duty by raising the issue internally, within the firm.  See RPC 5.2(b) (subordinate lawyer may rely on "supervisory lawyer's reasonable resolution of an arguable question of professional duty"); 2 Geoffrey C. Hazard, Jr. et al., The Law of Lawyering § 68-10 (4th ed. & 2017 supp.) (Ex. 66) ("Because L is a subordinate lawyer in the firm … it was appropriate for L to have referred [misconduct] initially to a committee of partners.").  Such internal reporting is, accordingly, subject to the implied-in-law obligation set forth in Wieder.  See, e.g., Kelly v. Hunton & Williams, 97-CV-5631 (JG), 1999 WL 408416, 1999 U.S. Dist. LEXIS 9139, at *27 (E.D.N.Y. June 17, 1999) (associate's discharge in retaliation for reporting a lawyer's misconduct to the firm is "inherently coercive"; "[t]hus, a cause of action is available under Wieder"); accord Lichtman v. Estrin, 282 A.D.2d 326, 328, 723 N.Y.S.2d 185, 187 (1st Dep't 2001) (attorney discharged after "he made known to

---

[7] Defendant avers that Mr. Joffe "would not have had a reporting obligation here with respect to matters that were already known to Judge Kaplan."  Def.'s Mem. at 21 (citing N.Y.S. Ethics Op. No. 822 (2008)) (emphasis in original).  Opinion No. 822 states only that "a violation in the course of litigation *could* be reported to the tribunal before which the action is pending."  (emphasis added).  At no time did Mr. Joffe or anyone else make an ethics report to Judge Kaplan.  See SOF ¶ 76.  Moreover, the ethical breaches Plaintiff sought to report included numerous matters not known to Judge Kaplan—i.e., the "near misses" referred to in Plaintiff's Red Flags Email and discussed supra.

[law firm] his concerns about ... unethical conduct" stated a claim under <u>Wieder</u>).

By setting forth his concerns both orally to K&S General Counsel Mr. Thornton and K&S outside counsel Mr. Forlenza, <u>see</u> SAMF ¶¶ 299-302, and then in the Red Flags Email to K&S partner Mr. Tetrick and then to Mr. Thornton, <u>id.</u> ¶¶ 331-38, Mr. Joffe complied with RPC 8.3 in the manner set forth in the New York City Bar Association's Professional Ethics Committee's Formal Opinion 82-79 (1982) (Ex. 15).   In that opinion, the Committee "address[ed] the duties of an associate confronted by the professional misconduct of a supervising lawyer…"  <u>Id.</u> at 1.   The Committee noted that "in particular cases, there may be room for honest disagreement as to whether certain activity is 'misconduct' and a corresponding danger that a less experienced lawyer may not easily distinguish between good faith zealous representation and unethical behavior by a more experienced lawyer."  <u>Id.</u> at 8.   Accordingly, the Committee recommended "that the associate endeavor to raise any dispute over the propriety of a partner's conduct **within the firm <u>before</u>** reporting any alleged ethical violation to a tribunal or disciplinary committee."  <u>Id.</u> (emphasis added).[8]

**D.      Plaintiff *did* question the K&S partners' "honesty, trustworthiness or fitness"**

As noted <u>supra</u>, a lawyer must report potential violations "that raise[] a substantial question as to [another] lawyer's honesty, trustworthiness or fitness as a lawyer."  RPC 8.3(a). Defendant alleges that Mr. Joffe "admittedly did not have such concerns about Straus or Perry." Def.'s Mem. at 22.   However, **Defendant has omitted the portion of the transcript in which Plaintiff stated that the partners' conduct in ZTE "raised a question" about their fitness to practice law.**  <u>See</u> Joffe Tr. 186:11-18 (Ex. 6) ("Q.  Did you consider them to be fit to be

---

[8] The Court of Appeals was aware of Ethics Op. 82-79 when it wrote its opinion in <u>Wieder</u>.  <u>See</u> <u>Wieder v. Skala</u>, No. 88/17278 (N.Y), Br. for Pl.-App. Howard L. Wieder (July 6, 1992) at 5 (Ex. No. 69) ("In accordance with the guidelines set forth in Opinion 82-79 … Wieder went to the firm's partners…").

lawyers?    A.   On  the  whole,  in  my  view,  yes;  that  being  said,  I  think  that  these—**the**

**circumstances  of  the  ZTE  case  raised  a—in  my  mind—raised  a  question  about  that**  that

someone … who's more experienced and [] not involved should look at.") (emphasis added).

The  pattern  of  false  statements  discussed  <u>supra</u>,  as  well  as  K&S's  unwillingness  to  "take

reasonable  steps  to  [e]nsure  that  the  record  ha[d]n't  been  obscured,"  SAMF  ¶¶  292,  293,  were

amply  sufficient  to  trigger  Plaintiff's  reporting  duty  under  RPC  8.3(a).    Indeed,  but  for  Plaintiff's

intervention,  Mr.  Straus  would  have  orchestrated  the  execution  of  a  <u>second</u>  false  declaration  by  a

declarant  without  personal  knowledge—even  after  the  Court,  only  months  earlier,  found  that  he

had  acted  at  least  recklessly  in  doing  exact  same  thing.    <u>Id.</u>  ¶¶  241,  252-67.    This  conduct  clearly

raised a "substantial question" about Mr. Straus's "fitness as a lawyer."  RPC 8.3(a).

## E.    The misconduct Plaintiff reported did not require revealing client confidences

Defendant  alleges  that  Plaintiff  admitted  that  "he  could  not  have  made  a  report  without

revealing  confidential  client  information…"    Def.'s  Mem.  at  22.    Mr.  Joffe  made  no  such

admission.    Rather,  Plaintiff  testified  that  there  were  <u>additional</u>  episodes  that  reflected  ethical

breaches,  but  because  those  additional  instances  "implicate  confidentiality  and  privilege,"  he  did

not include them in the complaint or refer to them in his testimony.  Joffe Tr. 77:6-15 (Ex. 6).

K&S  also  argues  that  "even  if  Joffe  had  complained  about  ethical  violations  in  his

'internal'  report  to  Thornton  and  Forlenza  …  the  content  of  such  communications  would  be

protected  by  the  attorney-client  privilege."    Def.'s  Mem.  at  22-23.      To  the  extent  K&S's

privilege  attached  to  Plaintiff's  report,  the  Firm  would  have  an  ethical  duty  to  waive  that

privilege  in  order  to  report  attorney  misconduct  to  "a  tribunal  or  other  authority."  RPC  8.3(a).

<u>See</u>  Hazard,  <u>supra</u>,  §  68-10  (Ex.  66).    K&S's  <u>own</u>  privilege  is  no  bar  to  reporting.

21

**F.      A reasonable jury could find K&S's actions violated the implied duty in <u>Wieder</u>**

Prior to Plaintiff sending the Red Flags Email on July 25, 2016, Mr. Tetrick had not previously considered terminating Mr. Joffe's employment.  SAMF ¶ 339.  Upon receiving the Red Flags Email, however, Mr. Tetrick quickly determined that Mr. Joffe had made "serious allegations" by "accus[ing] [the partners] of exercising poor judgment."  <u>Id.</u> ¶¶ 340, 341.  Only several weeks thereafter, in or around mid-September 2016, K&S made the decision to discharge Mr. Joffe.  <u>Id.</u> ¶¶ 349, 356.  During that period, Mr. Tetrick i) forwarded the Red Flags Email to K&S's HR Chief Mr. Jackson and spoke with Mr. Jackson about Plaintiff; <u>id.</u> ¶¶ 340, 341; ii) forwarded the Red Flags Email to K&S partner Mr. Johnston "in his capacity as the firm's employment lawyer," <u>id.</u> ¶¶ 345, 346; iii) "at the direction of Mr. Johnston, as the firm's employment lawyer," had several conversations with K&S General Counsel Mr. Thornton, <u>id.</u> ¶ 347; and iv) engaged in a number of email exchanges with Mr. Thornton and Mr. Johnston concerning the Red Flags Email.  <u>Id.</u> ¶ 348.

In setting forth his concerns in writing and discussing the matter with Mr. Tetrick and Ms. Waszmer, Plaintiff acted in apparent violation of K&S's draconian claims policy.  This policy (<u>see</u> SAMF ¶¶ 226, 227) required firm employees to report ethics issues <u>orally</u> (not in writing).  Absent specific directions to the contrary, the policy prohibited K&S lawyers from discussing the matter with "other firm personnel" or generating any "substantive emails, memoranda, notes, or other written report[s]…"  <u>Id.</u>  It is difficult to imagine a policy which goes to greater lengths than K&S's claims policy to create "disincentives to compliance with the applicable rules of professional conduct."  <u>Wieder</u>, 80 N.Y.2d at 635.

Consistent with this policy, Mr. Tetrick instructed Plaintiff in October 2016 to place a "ring" around the ZTE Matter and not to discuss the "red flags" referred to in Mr. Joffe's email

with anyone at K&S.  SAMF ¶¶ 363-65.   K&S then surreptitiously monitored Mr. Joffe's use of the firm document and email system and his entry into the office.  Id. ¶¶ 371-74, 376.   On December 7, 2016, despite the Firm's standard practice of providing three months' notice, Plaintiff was terminated immediately and escorted from the building, with security engaged on standby.  Id. ¶¶ 378-81; 399.  As described by Mr. Joffe, "I was told I must immediately leave the building, [that] my employment is terminated right now, and [was] given a severance agreement that would have bound me or was represented would bind me to complete silence with a ten-day period to decide."  Joffe Tr. 251:20-24 (Ex. 6).  Indeed, the proposed agreement would have required Mr. Joffe, in addition to waiving any claims, to separately certify that he was "not aware of any fact, situation or circumstance which might reasonably be expected to result in a claim being made against [K&S]."  Letter dated December 7, 2016 at 4, 5 (copy attached to Declaration of Joseph Baumgarten as Ex. W).  K&S partner Mr. Marooney told Plaintiff, "You don't want to make lots of noise."  SAMF ¶ 402.

Finally, because K&S's account of why Mr. Joffe was terminated is riddled with inconsistencies and contradictions, its purported legitimate, non-prohibited reason is, at best, a matter for a jury to consider.  First, although K&S refers to Mr. Joffe's failure to submit a business plan as a cause of his termination, its HR Chief Mr. Jackson, in 17 years of service, was unaware of any K&S attorney to have been disciplined—let alone discharged—for this reason.  SAMF ¶ 355.  When Mr. Joffe did not submit a business plan in 2014, it was "flagged" but he was not told it was "required."  Id. ¶ 354.  In fact, K&S did not even contemporaneously track whether associates had submitted business plans in prior years.  Id. ¶ 352.

In addition, although K&S refers to Mr. Joffe's allegedly subpar performance, it delayed his termination due to the indispensable role he played on a matter.  SOF ¶ 205; SAMF ¶ 357.

Although K&S devotes much of its memorandum to partner Ms. Moss's negative review of Mr. Joffe, it did not initially list Ms. Moss as an individual with relevant knowledge. See Def.' Rule 26 Initial Disclosures (Ex. 3). Similarly, its "talking points" memorandum—which allegedly set forth the reasons for Mr. Joffe's termination, SAMF ¶¶ 385-87—makes no reference to Ms. Moss. Finally, providing Mr. Joffe with zero notice and escorting him from the building—an unprecedented manner of terminating an associate, id. ¶¶ 378-84; 399—is inconsistent with K&S' claim that it terminated him for "failure to participate in his own career development." Def.'s Mem. at 1.

From this evidence, a reasonable factfinder could determine that K&S's stated reason for termination is a mere pretext and that, rather, it decided to discharge Plaintiff in retaliation for his efforts to comply with the RPCs and in order to prevent such efforts in the future.

## II.   SUMMARY JUDGMENT SHOULD BE DENIED ON THE ERISA CLAIM

Claims under § 510 of ERISA are analyzed under the McDonnell Douglas burden-shifting framework. Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1111 (2d Cir. 1988). Because Plaintiff has established a prima facie case under § 510 and Defendant fails to identify evidence of its legitimate reason for the date of Plaintiff's discharge, summary judgment should be denied.

First, Plaintiff's termination and his last date of employment were, respectively, three and two weeks prior to the January 1, 2017 pension vesting date. SAMF ¶¶ 323, 377, 385. Where, as here, "the [p]laintiff was terminated a mere two weeks before her pension was to vest," courts have found such time proximity "sufficient to establish an inference of discrimination." Quinby v. WestLB AG, No. 04 Civ. 7406, 2007 WL 1153994, at *15 (S.D.N.Y. Apr. 19, 2007).

Second, Defendant argues that the $20,000 contribution it clawed back from Plaintiff's pension account is not, as a matter of law, a "substantial amount[] of money." See Def's Mem. at 14. But, as Defendant reveals, terminating Plaintiff shortly before the vesting date allowed

K&S to net its $20,000 clawback from Plaintiff's pension against the $132,000 it offered in severance pay.  The question whether $20,000 is a "substantial" cost savings for K&S against its $132,000 severance offer, Plaintiff respectfully submits, is one of fact not law.

Finally, Defendant's purported legitimate reason for the date chosen for Mr. Joffe's no-notice termination—December 7, 2016, mere days before the vesting date—consists of a single sentence:  *"[B]ecause that was the earliest date on which Tetrick ... would otherwise be in New York ... and Tetrick wanted to have the termination meeting in person*."  Def.'s SOF ¶ 207.  **This statement is not supported by any citation to the record, including in Mr. Tetrick's own accompanying affidavit.**  Because "an attorney's unsworn statements in a brief are not evidence," Kulhawik v. Holder, 571 F.3d 296, 298 (2d Cir. 2009), Defendant has failed to meet its burden of producing a legitimate, non-prohibited reason rebutting Plaintiff's prima facie case.  Accordingly, summary judgment should be denied.

## CONCLUSION

Plaintiff David A. Joffe respectfully requests that the Court deny Defendant's motion for summary judgment in its entirety and grant such other relief as the Court deems proper.

Dated: February 1, 2018              **JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**


                                     By:    /s/ Andrew M. Moskowitz
                                            Andrew M. Moskowitz

                                     505 Morris Ave.              589 Eighth Ave.
                                     Springfield, NJ 07081        New York, NY 10018
                                     (973) 379-4200                (212) 596-7656

                                     Attorneys for Plaintiff David A. Joffe