UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
DAVID A. JOFFE,                            :
                                           :
                              Plaintiff,   :
                                           :          17-CV-3392 (VEC)
                  -against-                :
                                           :          OPINION AND ORDER
KING & SPALDING LLP,                       :
                                           :
                              Defendant.   :
------------------------------------------------------------X
```

VALERIE CAPRONI, United States District Judge:

Plaintiff David A. Joffe was formerly a litigation associate at the law firm King & Spalding LLP ("King & Spalding"). Joffe contends that he was fired by King & Spalding for reporting ethical concerns regarding King & Spalding's representation of the Chinese telecommunications firm ZTE Corporation ("ZTE"). Joffe brings two claims: a common-law claim for breach of contract under *Wieder v. Skala*, 80 N.Y.2d 628 (1992), premised on his alleged retaliatory discharge, and a claim for wrongful discharge under Section 510 of ERISA, 29 U.S.C. § 1140, related to the timing of his discharge relative to the vesting of the firm's contribution to his 401k account. King & Spalding has moved for summary judgment on both claims arguing that Joffe was terminated for legitimate, performance-related reasons.

For the reasons that follow, King & Spalding's motion for summary judgment is DENIED.

## DISCUSSION

### 1. Background

Joffe joined King & Spalding in January 2012. *See* Def.'s Rule 56.1 Stmt. of Material Facts ("Def.'s Rule 56.1 Stmt.") (Dkt. 61) ¶ 84. By 2014, Joffe was a sixth year associate and

was eligible for promotion to "senior associate," the penultimate stop on King & Spalding's partner track. In July 2014, King & Spalding was hired to defend ZTE against allegations it had improperly shared confidential information that was subject to a non-disclosure agreement between ZTE and Vringo, Inc. ("Vringo"). *See* Def.'s Rule 56.1 Stmt. ¶¶ 1-2, 5. Joffe was staffed on the ZTE case and worked with two King & Spalding partners, Robert Perry and Paul A. Straus. *See* Def.'s Rule 56.1 Stmt. ¶¶ 3-4.

At a hearing before Judge Lewis Kaplan on July 7, 2014, Straus categorically denied the allegations against ZTE and stated on the record that ZTE had shared the confidential information at issue with a Chinese court and no one else. *See* Def.'s Rule 56.1 Stmt. ¶ 7; *see also* Decl. of Joseph Baumgarten ("Baumgarten Decl.") (Dkt. 52) Ex. JJJ (June 7, 2014 Hr'g Tr.) at 15:6-10. King & Spalding mounted a counteroffensive in support of which it filed a declaration from Zhou Wang, a ZTE employee, stating that Vringo had shared the confidential information at issue with the European Commission without ZTE's permission. *See* Def.'s Rule 56.1 Stmt. ¶ 9; *see also* Baumgarten Decl. (Dkt. 52) Ex. O ("Zhou Decl.") ¶ 14.[1] Two weeks later, at a hearing on July 24, 2014, King & Spalding had to acknowledge that it had no factual basis for its counteroffensive because no one at ZTE, including Mr. Zhou, knew whether Vringo had in fact disclosed the confidential information to the European Commission. *See* Def.'s Rule 56.1 Stmt. ¶ 12; *see also* Baumgarten Decl. Ex. LLL (July 24, 2014 Hr'g Tr.) at 37:7-38:24. Judge Kaplan described Zhou's statement as "unfortunate and perhaps more culpable and certainly [a] material misrepresentation." Pl.'s Rule 56.1 Stmt. ¶ 245. And to Straus he said:

> You folks leapt to a conclusion, I don't know exactly who personally, we may get there. And then either Mr. Zhou on his own hook, which I doubt but it's possible, decided to swear that the conclusion that he or somebody else had jumped to was the fact without actually knowing at all or somebody drafted an affidavit for him to sign, a declaration

---

[1] Wang also echoed Straus's statement that ZTE had not shared Vringo's confidential information with anyone other than the Chinese court. *See* Zhou Decl. ¶ 11. That statement was false.

based on the same assumption and got this man to declare under penalties of perjury that it was a fact, and nobody knew what the fact was, and everybody acted in, at least, reckless disregard of the truth of what was sworn to in this declaration submitted to this Court and made a centerpiece of your opposition to this motion.

July 24, 2014 Hr'g Tr. at 38:6-18.

Things did not improve for King & Spalding and ZTE. Vringo amended its complaint to allege that, far from disclosing the information to a Chinese court and no one else, ZTE had shared the confidential information with a Chinese regulatory agency, the NDRC, which had begun an investigation of Vringo. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 247, 249-250, 269. On March 23, 2015, Vringo sought discovery from ZTE to substantiate Straus' representation to the Court that ZTE had not shared the confidential information with anyone other than a Chinese court and that ZTE had not shared the confidential information with anyone since July 2014. *See* Def.'s Rule 56.1 Stmt. ¶ 39. Over ZTE's objections, Judge Kaplan ordered ZTE to respond to Vringo's discovery requests. *See* Def.'s Rule 56.1 Stmt. ¶¶ 40, 42. In response, on May 28, 2015, ZTE admitted that it had shared Vringo's confidential information with the NDRC and implicitly conceded that Straus's original statement to the Court had been false. *See* Def.'s Rule 56.1 Stmt. ¶ 43. Vringo sought (for the second time) to depose ZTE's general counsel, which King & Spalding opposed on a variety of grounds. Judge Kaplan ordered the deposition; months later, it came to light that ZTE's general counsel feared arrest by U.S. authorities and therefore would refuse to appear in the United States to be deposed.[2] *See* Pl.'s Rule 56.1 Stmt. ¶ 278; *see also* Declaration of Paul Straus ("Straus Decl.") Ex 31 ¶ 6. On August, 7, 2015, ZTE admitted that,

---

[2]  Judge Kaplan was again critical of ZTE and King & Spalding. He wrote: "ZTE obviously instructed its lead U.S. counsel in this litigation (King & Spalding) to seek to avoid Mr. Guo being deposed at all . . . . King & Spalding knew that Mr. Guo was most reluctant to come to the United States . . . . Whether it knew all of the reasons for that reluctance or, indeed, that he would refuse to come if ordered are other matters. It is unnecessary for purposes of this motion to determine exactly what King & Spalding knew or whether its actions were culpable. . . ." Pl.'s Rule 56.1 Stmt. ¶ 284.

subsequent to the July 7, 2014 hearing, it had disclosed Vringo's confidential information to Google —contradicting a declaration from a ZTE lawyer that had been prepared by King & Spalding and filed on March 25, 2015.[3]  *See* Def.'s Rule 56.1 Stmt. ¶ 62; *see also* Pl.'s Rule 56.1 Stmt. ¶ 267, 269, 271.

On July 24, 2015, Judge Kaplan entered an order to show cause why ZTE, Straus, and Perry should not be sanctioned pursuant to Federal Rules of Civil Procedure 11 and 37.  *See* Def.'s Rule 56.1 Stmt. ¶ 51.  Judge Kaplan wrote that it "preliminarily" appeared that ZTE's opposition had been "entirely frivolous and, in any case, interposed for purposes of delay and harassment."  Def.'s Rule 56.1 Stmt. ¶ 51.  At that point, Clifford Chance LLP stepped in to represent ZTE and King & Spalding hired Philip Forlenza—a partner at Patterson Belknap Webb & Tyler LLP—to respond to the order to show cause.  *See* Pl.'s Rule 56.1 Stmt. ¶¶ 285-86.  ZTE and Vringo settled their differences in December 2015, and Judge Kaplan's order to show cause was never resolved.  *See* Pl.'s Rule 56.1 Stmt. ¶ 287.

According to Joffe, Judge Kaplan's order to show cause and this series of misstatements and corrections led him to believe that Straus and Perry may have violated the ethical rules governing the practice of law in New York State.  *See* Pl.'s Rule 56.1 Stmt. ¶¶ 288- 292; *see also* Declaration of Andrew Moskowitz ("Moskowitz Decl.") (Dkt. 55) Ex. 6 (Joffe Tr.) at 28:4-18 (stating, in reference to statements by King & Spalding that were later corrected, that "certainly I

---

[3]      That declaration itself was the product of what Joffe characterized as an ethical "near miss."  Consistent with Straus' representation to Judge Kaplan in July 2014, King & Spalding initially prepared a declaration stating that ZTE had not shared any confidential information, other than with a Chinese court.  Pl.'s Rule 56.1 Stmt. ¶ 258. The declaration as initially formulated was to be executed by a junior employee in ZTE's legal department who had assisted King & Spalding in collecting documents.  Pl.'s Rule 56.1 Stmt. ¶ 257.  Joffe was concerned that this declaration would be false and that the proposed deponent lacked personal knowledge whether ZTE had provided information to the NDRC.  Pl.'s Rule 56.1 Stmt. ¶¶ 259-60.  Joffe's concerns were well-founded, as Vringo's counsel had previously informed King & Spalding that the NDRC was investigating Vringo based on a complaint from an unspecified source.  Pl.'s Rule 56.1 Stmt. ¶¶ 248-50.  Joffe told Straus that "if you go through with this [the proposed declaration], I will personally report you to the Bar."  Pl.'s Rule 56.1 Stmt. ¶ 262.  Ultimately, King & Spalding prepared a declaration on behalf of a more senior ZTE employee stating that ZTE had not disclosed confidential information to the NDRC since July 7, 2014.  Pl.'s Rule 56.1 Stmt. ¶ 267.

think that reflected [ethical] violations . . . . [B]y the point of the sanctions order, it was clear that enough things turned out not to be true that there was a problem."). In particular, Joffe was concerned that King & Spalding may have engaged in conduct that involved "dishonesty, fraud, deceit or misrepresentation," N.Y. R. of Prof'l Conduct 8.4(c), or, that, cumulatively, these errors, even if not intentional falsehoods, were "prejudicial to the administration of justice," N.Y. R. of Prof'l Conduct 8.4(d). Joffe testified at his deposition that he did not believe Straus or Perry had engaged in intentional misconduct or lied to Judge Kaplan, but he believed they may not have adequately scrutinized information provided by ZTE, even after it became clear that ZTE had repeatedly provided false information. *See* Joffe Tr. at 112:4-12; *see also* Joffe Tr. at 110:12-111:21 (recounting his concern that Perry was too quick to believe ZTE's representations, even after some statements were revealed to be false), 182:7-18 ("the actual misrepresentations and the cumulative effect of the misrepresentations . . . it seemed to me, and in particular from the Judge's comments, prejudice[sic] the administration of justice"); *but see* Moskowitz Decl. ex. 12 (Perry Tr.) at 40:5-15 (denying Joffe ever expressed these concerns to him). Joffe considered their reliance on ZTE, without sufficient verification, to be "poor judgment" and reflective of a "desire not to ascertain or take reasonable steps to [e]nsure that the record hasn't been obscured." Pl.'s Rule 56.1 Stmt. ¶¶ 292-93.

Whether Joffe made any contemporaneous report of his concerns to more senior attorneys at King & Spalding is unclear. According to Joffe, he felt that Straus's and Perry's conduct in the ZTE matter "should potentially be reported," Joffe Tr. at 194:6-8, so that "someone . . . who's more experienced and who's not involved" could look at it, Joffe Tr. at 186:13-18. The parties agree that Joffe discussed the ZTE matter with King & Spalding's outside counsel and King & Spalding's general counsel, R. Robert Thornton. Joffe answered their questions about the case, and described the "history of the case," and "the background of the various statements

and orders by Judge Kaplan." Pl.'s Rule 56.1 Stmt. ¶ 298. The parties also agree that

"professional liability" and "potential malpractice liability" were at issue in these conversations.

*See* Pl.'s Rule 56.1 Stmt. ¶¶ 299-300. But the specifics of the conversations among Thornton,

Joffe, and Forlenza are privileged, and it is unclear whether they discussed these issues

specifically as an ethical problem. *See* Joffe Tr. at 36:4-37:8. According to Joffe, they did not

discuss Rule 8.4 by "caption" but did discuss the "substance" of the Rule. Joffe Tr. at 37:5-8.

Joffe contends that King & Spalding began retaliating against him for his expression of

ethical reservations almost immediately after the ZTE case settled. In December 2015, Joffe was

removed from the partnership track, and his pay was temporarily frozen. *See* Pl.'s Rule 56.1

Stmt. ¶ 313. In April 2016, Joffe was awarded no bonus for 2015. *See* Pl.s' Rule 56.1 Stmt. ¶

325. Joffe was concerned that he was being penalized for his involvement in the ZTE matter and

sought to raise the issue with David Tetrick, a partner in the Business Litigation Department who

was in charge of the Business Litigation Associates Committee. *See* Pl.'s Rule 56.1 Stmt. ¶ 90,

331.

Joffe contends that his email to Tetrick constitutes another instance in which he

attempted to report unethical conduct to more senior attorneys at King & Spalding. But the

record is open to interpretation. In relevant part, Joffe wrote:

> To be clear, I do not believe that Bob [Straus] or Paul [Perry] intentionally misled the
> Court, nor that they engaged in any other culpable conduct. However, I do believe the
> Sanctions Order was an entirely understandable, and entirely foreseeable, result of
> several instances of poor judgment by the partners, in the face of ever more glaring red
> flags, that occurred over the prior year in which the matter had been pending. While I
> had raised my concerns with the partners throughout that period (which, I believe, helped
> prevent several other near-misses), as the associate on the matter, the ultimate decision-
> making was, largely, outside my personal control.

Pl.'s Rule 56.1 Stmt. ¶ 331; Baumgarten Decl. Ex. X (the "July 25, 2016 Email") at

K&S_0000572. According to Joffe, he chose not to characterize King & Spalding's conduct in

the ZTE case as a reportable ethical violation because he "want[ed] to tread gingerly and [didn't]
want to say something that sounds like an accusation directly in an e-mail." Pl.'s Rule 56.1
Stmt. ¶ 333; Joffe Tr. at 219:12-220:4. On the other hand, Joffe also prefaced his email as
providing "relevant circumstances" to the firm's decision relative to his 2015 compensation, July
25, 2016 Email at K&S_0000511, suggesting that his intent was to complain about being
blamed, unfairly, for the outcome in the ZTE case, rather than to report unethical conduct.[4]
Tetrick testified that although he did not understand the July 25, 2016 Email to raise an ethical
concern, he viewed it as "making serious allegations about two of our partners" and therefore
forwarded it to the head of human resources at King & Spalding. Moskowitz Decl. Ex. 7
(Tetrick Tr.) at 85:4-7, 94:16-95:2; *see also* Pl.'s Rule 56.1 Stmt. ¶ 340-341. The head of human
resources testified that he read the email to raise a "legal issue" for the firm's general counsel.
*See* Pl.'s Rule 56.1 Stmt. ¶ 342; Moskowitz Decl. Ex. 9 (Jackson Tr.) at 25:14-22, 34:17-20.[5]

Whether the July 25, 2016 Email was an attempt to report ethical violations or simply to
complain about perceived unfair treatment, it was poorly received by Tetrick. A week later, on
August 3, 2016, Tetrick requested a report on Joffe's billable hours. *See* Pl.'s Rule 56.1 Stmt. ¶
344. In September 2016, Tetrick decided to fire Joffe. He consulted with the firm's employment
lawyer, Michael W. Johnston, and Thornton, the general counsel. The content of those

---

[4]     Thornton testified that he interpreted the email to be about compensation, not about ethics. Thornton Tr.
81:20-24, 84:16-85:4.

[5]     King & Spalding's internal policies appear to require ethical issues to be raised orally, and never in writing.
Pl.'s Rule 56.1 Stmt. ¶ 227. King & Spalding's insurance policy provides that reports of actual or threatened claims
should not be discussed with other firm personnel" and "no substantive emails, memoranda, notes, or other written
reports should be generated." Moskowitz Decl. Ex. 14 at K&S_0003544. Thornton testified that he believed this
policy would apply to a report of unethical conduct. *See* Moskowitz Decl. Ex. 10 (Thornton Tr.) at 33:12-34:2.
Notwithstanding the insurance carrier's preference, a policy that reports of professional misconduct should not be
put in writing is curious (attorneys in the firm might view such a policy as being designed to give the firm plausible
deniability regarding reported ethical concerns). Joffe does not contend he was deterred from reporting unethical
behavior by this policy, however, and there is no evidence that he was even aware of it.

communications is unknown because they are privileged and there has been no waiver.  *See* Pl.'s Rule 56.1 Stmt. ¶ 348.  Tetrick also discussed firing Joffe with several partners in New York, Pl.'s Rule 56.1 Stmt. ¶ 350, and forwarded the July 25, 2016 Email to other members of the King & Spalding Associates Evaluation Committee.  Tetrick Tr. at 97:5-21.

Before Joffe was fired but after Tetrick had made the decision that he would be fired, Joffe received his 2015 annual performance review from Tetrick and another partner.  *See* Pl.'s Rule 56.1 Stmt. ¶ 358. According to Joffe, Tetrick told him during the review that he should not share the "red flags" identified in the July 25, 2016 Email with others at the firm.  Pl.'s Rule 56.1 Stmt. ¶ 365.  In contrast, Tetrick and the other partner  do not remember discussing the so-called "red flags" email during Joffe's performance review, *see* Tetrick Tr. at 167:14-16; Moskowitz Decl. Ex. 60 (Waszmer Tr.) at 57:3-25.  On December 7, 2016, Joffe was fired in a meeting attended by Joffe, Tetrick and another partner.  *See* Pl.'s Rule 56.1 Stmt. ¶¶ 377, 402; *see also* Joffe Tr. at 272:21-22.  Joffe was also presented with a proposed severance agreement, which offered him six months' salary in exchange for a general release of claims against the firm.  *See* Pl.'s Rule 56.1 Stmt. ¶¶ 209, 400.

King & Spalding contends Joffe was moved off the partnership track and then terminated for a combination of administrative shortcomings, a lackluster review, and limited internal demand for his time.  *See* Joffe Tr. at 142:10-22; *see also* Def's Rule 56.1 Stmt. ¶ 208.  King & Spalding requires each associate to complete a self-evaluation and a practice plan—a business case for his or her future at the firm—but Joffe did not complete a practice plan for 2014, 2015, or 2016, and submitted his 2015 self-evaluation late.  Def.'s Rule 56.1 Stmt. ¶¶ 109, 119-20, 127.  Joffe also received a quite negative review in 2015 from Meredith Moss, who is a partner in King & Spalding's Washington, DC office and a member of the Associates Evaluation Committee.  In 2015, Joffe had been tasked with preparing King & Spalding's weekly Auditor

Liability Bulletin for distribution to firm clients. Def.'s Rule 56.1 Stmt. ¶ 133. On two occasions, Joffe turned in drafts of the bulletin late and on one of those occasions turned in work product that included factual errors and was otherwise subpar in Moss's view. *See* Def.'s Rule 56.1 Stmt. ¶¶ 137, 140, 156. In his 2015 review (prepared on Aug. 12, 2015), Moss characterized Joffe as having done a "truly appalling job"; in a section on Joffe's strengths, Moss wrote "none that are apparent to me"; and she stated that she would "never staff him on another matter." Def.'s Rule 56.1 Stmt. ¶¶ 155-56; Baumgarten Decl. Ex. BB at KS_0000388. In August 2015, Moss recommended that Joffe be removed from the partnership track on account of his poor work on the bulletin and because he failed to submit a practice plan and self-evaluation. Def.'s Rule 56.1 Stmt. ¶¶ 157, 159. King & Spalding also noted that Joffe had regularly submitted his time-sheets late during 2015. Pl.'s Rule 56.1 Stmt. ¶ 314.

According to talking points prepared by Tetrick in advance of Joffe's termination, King & Spalding had decided to fire Joffe for two reasons. Tetrick referenced Joffe's failure to prepare practice plans. *See* Moskowitz Decl. Ex. 17 at K&S_0002607. Tetrick also told Joffe that his career at King & Spalding had "plateaued"—in the sense that he was no longer developing new skills—and that there was an insufficient internal market for his work. Moskowitz Decl. Ex. 17 at K&S_0002608. Tetrick described Joffe's existing matters as coming to a close and told him that the firm did "not foresee any realistic possibility of your [Joffe's] being staffed on new matters and returning to full utilization." Moskowitz Decl. Ex. 17 at K&S_0002608.

Joffe contends that none of this adds up and that King & Spalding's proffered rationale for removing him from the partnership track and then terminating him is pretextual. Addressing first the decision to remove him from the partnership track: Joffe acknowledges that Moss was critical of his work product but points out that his time working for Moss was brief and involved

a non-billable matter on which he was one of a rotating cast of associates. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 133, 311. And Moss herself acknowledged that her experience working with Joffe was limited. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 159, 311. It is true that Joffe failed to submit practice plans in 2014, 2015, and 2016 and submitted his self-evaluation late in 2015,[6] but there is conflicting evidence whether these documents were of such importance at King & Spalding that Joffe's failure to do so was grounds to demote and then fire him. At the time, King & Spalding did not even keep track of which associates failed to submit self-evaluations or practice plans—Tetrick had to task an employee with generating this data for purposes of Joffe's review. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 352-353. King & Spalding's head of HR testified that he was unaware of any attorney—other than Joffe—who had been disciplined for failing to submit a practice plan. *See* Pl.'s Rule 56.1 Stmt. ¶ 355. Moreover, Joffe received a positive review for 2014, and was promoted to senior associate, despite having failed to submit a practice plan for the year. During his 2014 review, King & Spalding "flagged" the issue, but "certainly didn't say it was required." Pl.'s Rule 56.1 Stmt. ¶ 354. Tetrick was aware of Joffe's history of positive reviews and expressed surprise at Moss's recommendation that Joffe be removed from the partnership track. *See* Pl.'s Rule 56.1 Stmt. ¶ 158 (Quoting Tetrick as saying "I'm a little surprised to see David Joffe go off the cliff so quickly. I don't think he got a bad review last year."). Even accepting that there was a legitimate basis to remove Joffe from the partnership track, King & Spalding's decision to award him no bonus for 2015 was unusually punitive. Joffe's creditable hours in 2015 were 1,922, just below King & Spalding's 2000-hour threshold for a market rate bonus. Moskowitz Decl. Ex. 45 at K&S_0003033-34. Under similar circumstances, Tetrick's

---

[6]     Although Joffe did not submit a practice plan in 2016, he flagged issues relevant to the practice plan in his 2016 self-evaluation on the theory he could revisit the practice plan later. *See* Def.'s Rule 56.1 Stmt. ¶¶ 127-28; Joffe Tr. 144:10-24, 222:24-223:24 (explaining that he felt he needed answers regarding the ZTE case before he could produce a practice plan).

experience (and Joffe's impression) was that the firm would award an associate near the billable-hours threshold a reduced bonus. *See* Tetrick Tr. 70:22-72:7; Joffe Tr. 127:10-21. Despite that experience, Joffe was awarded no bonus.

Joffe also questions King & Spalding's performance-based rationale for his termination. In 2016, Joffe was reviewed by five partners. Four out of five rated Joffe's overall performance as "meets expectations." Baumgarten Decl. Ex. EE at K&S_0000398. Joffe's qualitative feedback was also largely positive. *See, e.g.*, *id.* (Straus described him as "sensitive to the need to provide excellent work to clients and also to work efficiently"), (another partner said "the client liked David a lot and relied on him without hesitation"), *id.* at K&S_0000396 (a third partner said "while I worked with David, he was very responsive and did very good work"). Two of the five partners were more lukewarm and included comments like "he is smart but sometimes does not see the forest from the trees" or "requir[es] more hand-holding and direction than I would expect at this stage of his career." *Id.* at K&S_0000397. The comments suggest an associate who was perceived by all as smart but seen by some as lacking in self-confidence. Contrary to Tetrick's assertion that Joffe was essentially unstaffable, all five partners said they would work with Joffe again; three on a matter of any size and two under the right circumstances, i.e., a discovery issue or a "modest size[d]" matter.[7] *Id.* at K&S_0000396. Joffe's billable hours and workflow in 2016 also do not support Tetrick's stated rationale for discharging him. Tetrick initially planned to terminate Joffe shortly after receiving the July 25, 2016 Email (in September or October 2016), but delayed at another partner's request because Joffe was "the only associate on an important client matter being handled" by that partner. Pl.'s

---

[7] Tetrick's talking points for Joffe's discharge are also factually inaccurate in part. Tetrick wrote that Joffe had not submitted a self-evaluation in 2014 or 2015. In fact, Joffe submitted self-evaluations in both years (albeit late), but he did not prepare practice plans. Pl.'s Rule 56.1 Stmt. ¶¶ 389-90.

Rule 56.1 Stmt. ¶ 205.[8]  At the time of his termination, Joffe had billed 2,071 hours for 2016, which was above King & Spalding's minimum billable hours threshold for on-track associates to receive a market rate bonus.  Pl.'s Rule 56.1 Stmt. ¶ 398.  Tetrick's talking points reference three of Joffe's matters that were coming to an end, but none of those matters was near completion at the time the firm decided to terminate Joffe in September 2016, creating a question of fact whether this was an *ex post* rationale.  *See* Rule 56.1 Stmt. ¶¶ 392-94.  Finally, the decision to terminate Joffe without notice was itself unusual.  Tetrick could not recall ever firing an associate without any period of notice.  *See* Tetrick Tr. 19:4-21:25 (Tetrick was aware of only two attorneys who ended their employment on the spot: one was a staff attorney and the other resigned).  Perry, who previously served as King & Spalding's managing partner in New York, testified that it was customary to provide associates with three months' notice so they could find a new job.  Pl.'s Rule 56.1 Stmt. ¶ 381.

Joffe was escorted from the building on December 7, 2016, and his employment was formally terminated on December 14, 2016.  Pl.'s Rule 56.1 Stmt. ¶ 399.  Because Joffe was terminated before January 1, 2017, on December 29, 2016, King & Spalding clawed back a $20,000 contribution to Joffe's 401k account, 3 days before it would otherwise have vested.  Pl.'s Rule 56.1 Stmt. ¶ 403.

This lawsuit followed.

---

[8]      King & Spalding's Rule 56.1 Stmt. includes additional details regarding Joffe's poor reaction to his 2016 review and subsequent observations from partners in the New York office that Joffe seemed "increasingly withdrawn and even hostile."  Def.'s Rule 56.1 Stmt. ¶ 200; *see also* Def.'s Rule 56.1 Stmt. ¶¶ 196-203.  King & Spalding had already decided to terminate Joffe so these facts are of limited relevance to the reasons for Joffe's termination.

## 2. Analysis

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted)). Courts "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79-80 (2d Cir. 2009) (alterations omitted)).

### a. Joffe's *Wieder* claim

The New York Court of Appeals has not formalized the elements of a claim under *Wieder*, and there are few cases applying the doctrine to claims brought by a law firm associate. Unsurprisingly, King & Spalding argues that the cause of action under *Wieder* is extremely narrow and applies only to law firm associates who are faced with plainly unethical conduct and therefore face a "Hobson's choice" between complying with their own obligation to report unethical conduct under New York Rule of Professional Conduct 8.3 and their job.[9] Def.'s

---

[9]    Rule 8.3(a) provides that "a lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation." N.Y. R. of Prof'l Conduct 8.3(a). The New York State bar association has interpreted Rule 8.3 to require reporting if an attorney has a "clear belief" misconduct has occurred. *See* N.Y.S. Bar Assoc. Ethics Op. 854 (2011). Joffe contends that he was concerned that Straus, Perry, and King & Spalding may have committed a violation of New York Rule of Professional Conduct 8.4. *See* Pl.'s Rule 56.1 Stmt. ¶ 288. Rule 8.4(c) prohibits conduct involving "dishonesty, fraud, deceit or misrepresentation," while Rule 8.4(d) prohibits "engag[ing] in conduct that is prejudicial to the administration of justice." N.Y. R. of Prof'l Conduct 8.4. The parties dispute whether Rule 8.4(c) can be violated by reckless or negligent conduct. *Compare* Def.'s Mem. at 19; Pl.'s Opp'n (Dkt. 60) at 17-18. The Court need not resolve this issue because the question under Rule 8.3(a) is whether Joffe had a "clear belief" that a violation had occurred and not whether he was correct. Likewise, and for the reasons

Mem. at 16-17. Under King & Spalding's reading, to bring a *Wieder* claim, the plaintiff must

show that (1) he had an actual reporting obligation pursuant to Rule 8.3—meaning that the

plaintiff must also establish that he had "actual knowledge" or a "clear belief" there had been an

underlying ethical violation; (2) he reported the ethical violation, and (3) he was retaliated

against. Def.'s Mem. at 18-20. As refined in King & Spalding's reply memorandum, King &

Spalding contends Joffe must prove "[that] a reportable ethical violation occurred." Def.'s Reply

Mem. (Dkt. 63) at 1. The corollary to this argument would be that an associate who suspects

unethical conduct, but is not certain, or believes he has an obligation to report unethical behavior

but is ultimately proven wrong, has no protection under *Wieder*. In King & Spalding's view,

every *Wieder* claim implicitly requires the Court to conduct a mini-trial into whether, in fact, the

ethical rules were violated. *See* Def.'s Mem. at 19-22 (arguing that King & Spalding never

violated the ethical rules and that, therefore, Joffe could not have had knowledge of an actual

violation of the rules).

 The Court is not persuaded that *Wieder* requires a plaintiff to prove an actual underlying

ethical violation or that he was, in fact, under an obligation to report unethical conduct. Instead,

and borrowing from the framework applicable to analogous retaliation claims under federal law,

a plaintiff establishes a *prima facie* case under *Wieder* by demonstrating that he reported,

attempted to report, or threatened to report suspected unethical behavior and that he suffered an

adverse employment action under circumstances giving rise to an inference of retaliation. It is

then the defendant-employer's burden to come forward with evidence that shows either that the

plaintiff's attempted, threatened or actual report was not in good faith or that, regardless of the

employee's good faith, any adverse action taken against the employee was not connected to the

---

explained below, the Court rejects King & Spalding's argument that *Wieder* only protects lawyers who correctly
identify misconduct. *See supra* at 14-16.

attempted, threatened, or actual report. If a defendant-employer can identify a *bona fide*, non-retaliatory reason for the adverse action, it is the plaintiff's burden to demonstrate that the purported non-retaliatory reasons are pretextual.[10]

Under this structure of the elements and burdens of proof, it is immaterial whether, with the benefit of hindsight, the underlying suspected unethical conduct may not amount to a violation of the disciplinary rules.[11] This understanding of *Wieder* is consonant with Rule 8.3(a) and with guidance from the state bar association. Rule 8.3(a) imposes a reporting obligation on lawyers who have a "clear belief" there has been unethical conduct, even if they are not "certain" that there has been a violation. *See* N.Y.S. Bar Assoc. Ethics Op. 854 (2011). The Rule focuses on what the attorney knows (or believes) at the time, and not, as King & Spalding would have it, on whether it appears to a court examining the facts cold two years later that the attorney correctly identified actual unethical conduct. King & Spalding's position is also inconsistent with the New York State Bar Association's ethical guidance, which permits (and even encourages) reporting of ethical concerns when an attorney has a "suspicion" or "good faith belief" that there has been attorney misconduct. *See* N.Y.S. Bar. Assoc. Ethics Op. 854 ("Even if Lawyer A determines that he is not *required* to report Lawyer P, he is nevertheless *permitted*

---

[10]     Although the Court of Appeals has not laid out the precise elements of a *Wieder* claim, or the applicable burdens of proof, the Court believes that the framework applied to federal retaliation claims under *McDonnell Douglas* provides a helpful structure. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see also Balko v. Ukrainian Nat. Fed. Credit Union*, No. 13-CV-1333 (LAK)(AJP), 2014 WL 1377580, at *11 (S.D.N.Y. Mar. 28, 2014) (applying the *McDonnell Douglas* framework to a whistleblower claim under the federal Fair Credit Union Act). As under *McDonnell Douglas*, it is ultimately the plaintiff's burden to prove retaliation. Although the parties did not brief this motion under the *McDonnell Douglas* structure, they agreed at oral argument that it was an appropriate framework and their briefs address the substance of each step in the framework. *See* May 22, 2018 Hr'g Tr. (Dkt. 72) at 8:17-9:2, 23:7-17.

[11]     The Court assumes that *Wieder* requires that an associate have a sincerely held, good faith belief that there has been an ethical violation. An associate who files a frivolous report may themselves run afoul of the ethical rules. *See Wieder*, 80 N.Y.2d at 637 (associate and law firm impliedly agree to practice in accordance with the Rules of Professional Conduct).

to report his reasonable suspicions of misconduct . . . ."); N.Y.S. Bar Assoc. Ethics Op. 635 ("As a general proposition, a lawyer is always free to report evidence of what may constitute improper conduct by another attorney . . . ."). In King & Spalding's view, a law firm may punish attorneys for reporting misconduct under these circumstances, despite the fact that the state bar association encourages them to do so.[12] Although neither side cites to it, the First Department has rejected an almost identical argument. *See Lichtman v. Estrin*, 723 N.Y.S.2d 326, 327 (1st Dep't 2001) (rejecting defendants' argument that "plaintiff's employment could not have impeded or discouraged his compliance with an ethical obligation because he had no ethical obligation based on [a defendant's] conduct as alleged"). Additionally, King & Spalding's position is at odds with the Court of Appeals's rationale in *Wieder*. *Wieder* recognizes as an implied term of the employment agreement between an attorney and law firm that both will practice in accordance with New York's disciplinary rules. *See Wieder*, 80 N.Y.2d at 637-38. There is an "implied understanding . . . that in their common endeavor of providing legal services [the attorney] and the firm [will] comply with the governing rules and standards and that the firm [will] not act in any way to impede or discourage [the attorney's] compliance." *Id.* at 638. A law firm that punishes an attorney for reporting conduct that the attorney mistakenly (but sincerely) believes to be unethical, "impede[s] or discourage[s] . . . compliance" with the rules of professional conduct, regardless of whether the attorney is proven correct. Adopting King & Spalding's crabbed reading, associates who suspect unethical conduct would be forced to choose between reporting their concerns, and risking dismissal if it turns out they are wrong, and staying silent, and risking themselves violating their personal reporting obligation if it turns out their concerns are correct.

---

[12]     This case does not require the Court to address what qualifies as an impermissible impediment to compliance. Taking the facts in the light most favorable to the non-movant, Joffe was fired for reporting his concerns.

The cases cited by King & Spalding do not support its narrow reading of *Wieder,* and they are distinguishable in any case. In *Rojas v. Debevoise & Plimpton*, a Debevoise associate was fired after she told the firm she had acted as an informant for the FBI, which was investigating an individual the associate met through her work at the firm. 167 Misc. 2d 451, 456 (N.Y. Sup. Ct. N.Y. Cty. 1995). Distinguishing *Wieder*, the New York Supreme Court explained that Debevoise had never asked the plaintiff to work as a confidential informant and her work with the FBI had no connection to her practice at Debevoise. "Her actions were, in fact, unrelated or extrinsic to the central purpose" of her employment at Debevoise. *Id.* at 455. And the firm "did not insist that she act unethically, nor did they act in any way to impede or discourage the ethical practice of law." *Id.* at 456. In *Curry v. Ahmuty*, the New York Supreme Court dismissed a former associate's complaint under *Wieder* because the associate resigned and accepted a severance agreement from the firm, and made only "conclusory assertions, bereft of supporting factual averments that the resignation letter was the product of" improper pressure. 2010 N.Y. Slip Op. 30622(U), 2010 WL 1219504 (N.Y. Sup. Ct. Nassau Cty. Mar. 16, 2010).

Applying the proper legal standard, and taking the facts in the light most favorable to Joffe as the non-movant, the Court finds that a reasonable jury could find that Joffe had a good faith belief that he had a duty to report his ethical concerns to King & Spalding's partners and that he attempted to do so. Joffe testified that he viewed the series of false statements made by King & Spalding, or filed by King & Spalding on ZTE's behalf, to constitute misrepresentations within the meaning of Rule 8.4(c), which he was obligated to report under Rule 8.3(a). *See* Joffe Tr. 186:13-188:24; *see also id.* at 194:4-9. Joffe further testified that he viewed the cumulative effect of King & Spalding's misstatements to be prejudicial to the administration of justice, violating Rule 8.4(d). *See* Joffe Tr. at 182:7-18 ("the cumulative effect of the misrepresentations and the inability to—proactively or quickly enough retroactively correct the misrepresentations,

it seemed to me, and in particular from the Judge's comments, prejudice[d] the administration of justice"); *see also id.* at 190:22-192:2.

A reasonable jury could find that Joffe reported his concerns to more senior attorneys at King & Spalding, although this is a close question. Joffe testified that he reported or attempted to report this conduct twice: first to Thornton and Forlenza, and then to Tetrick in his July 25, 2016 Email. The details of what Joffe told Thornton and Forlenza about the ZTE matter are murky. But, according to Joffe, he told them "all of the facts that I believed I had a duty to report," Joffe. Tr. 32:5-12, answered their questions about the case, and provided them with background on Judge Kaplan's rulings, Joffe Tr. at 33:4-13. Joffe testified that he did this "so that people internally [*i.e.*, Thornton] could make the call about any reporting or about whether there should be reporting to the disciplinary committee," Joffe Tr. at 31:15-32:2, and because he recognized that "more experienced lawyers, who maybe are better than I am at distinguishing zealous advocacy from ethical violations, could come to a different conclusion." Joffe Tr. 187:6-19. In other words, Joffe appreciated that the situation was a close call, and presented the facts to the firm's general counsel *and* the firm's outside attorney. To the extent Joffe was required explicitly to tell the partners that he believed there was an ethical issue,[13] it is not clear from the record that he did not do so. Joffe testified that his conversations touched on Rule 8.3 (the reporting requirement) and matters of professional liability.

A reasonable jury might also view the July 25, 2016 Email as an attempt to report ethical concerns to more senior attorneys at King & Spalding. According to Joffe, at the time he wrote the July 25, 2016 Email he believed the firm had already penalized him for his involvement in

---

[13] The Court does not believe that *Weider* requires an attorney to say, *in haec verba*, "this is an ethics issue," so long as the basis for the attorney's concerns are provided. Neither side has cited to any case interpreting what constitutes a report or attempted report under Rule 8.3.

the ZTE matter—and perhaps for describing his ethical concerns to Thornton—by demoting him from senior associate to associate, freezing his pay, and awarding him no bonus for 2015. He wrote the July 25, 2016 Email in an effort to raise this unfair, potentially retaliatory treatment. The fact that the email explicitly refers to conduct that Joffe deemed "reckless" in the face of "ever increasing red flags" also suggests that he intended to alert the firm to his concerns—albeit out of concern for his compensation rather than from a desire to report Straus and Perry to the disciplinary committee. Testimony from King & Spalding's head of human resources and the partner responsible for terminating Joffe confirms this. Tetrick testified that he understood the email to make "serious allegations about two of our partners." Tetrick Tr. at 85:4-7, 94:16-95:2; *see also* Pl.'s Rule 56.1 Stmt. ¶ 341. Chris Jackson, the head of HR testified that he viewed the same allegations as raising a "legal issue" for Bob Thornton, the general counsel who spearheaded the firm's response to Judge Kaplan's show-cause order. *See* Pl.'s Rule 56.1 Stmt. ¶ 342; Jackson Tr. at 25:14-22, 34:17-25.

In short, the Court finds that the Plaintiff has established a *prima facie* case of breach of contract under *Weider*. King & Spalding attempts to rebut Plaintiff's *prima facie* case with evidence that could suggest a lack of good faith on Joffe's part. Specifically, King & Spalding notes that Joffe participated in the firm's defense in front of Judge Kaplan and points to his testimony that he did not believe Straus or Perry intentionally misled the court.[14] *See* Def.'s Mem. at 6 (citing Joffe Tr. 38:17-39:2, 197:10-15), 18 (citing Joffe Tr. 25:17-26.10, 31:10-19, 38:12-16). Joffe's involvement in defending King & Spalding is not inconsistent with his belief that King & Spalding partners may have engaged in unethical conduct. To state the obvious,

---

[14] King & Spalding also notes that Joffe did not report Straus or Perry to the disciplinary committee or to Judge Kaplan. This fact is irrelevant. Associates such as Joffe are permitted to raise their ethical concerns internally. *See* N.Y. R. of Prof'l Conduct 5.2(b); Geoffrey C. Hazard, Jr. et al., 2 The Law of Lawyering § 68-10 (4th ed.).

Joffe could believe the partners' conduct was ethically questionable and also cooperate in advocating on behalf of King & Spalding relative to sanctions. *See* Joffe Tr. at 184:12-184:22 (Joffe did not believe Straus and Perry should be sanctioned). King & Spalding's reliance on Joffe's repeated acknowledgment that he did not think Straus and Perry acted intentionally or were unfit to be lawyers masks the nuance in Joffe's testimony. *See* Def.'s Mem. at 19 (quoting Joffe Tr. at 182:20-25). Joffe explained that he believed the partners did not act intentionally, Joffe Tr. 182:17-25—the concern expressed by Judge Kaplan—but also believed that they had engaged in reckless or negligent conduct that was potentially reportable, *see* Joffe Tr. at 186:11-187:12; Pl.'s Rule 56.1 Stmt. ¶¶ 288-295. There is, at a minimum, a question of fact whether Joffe was acting in good faith relative to his ethical concerns.

King & Spalding also argues that it did not retaliate against Joffe but instead terminated him for legitimate, non-retaliatory reasons related to his poor performance. The evidence shows that Joffe was removed from the partnership track shortly after the ZTE case settled. At the time, Joffe's reviews were overwhelmingly positive—with the sole exception of Meredith Moss, who acknowledged that her experience with Joffe was limited. Pl.'s Rule 56.1 ¶¶ 303-11. It may be that Moss's opprobrium was so damning that Joffe was demoted on the basis of her feedback alone, but, if true, that is not King & Spalding's contention. In explaining Joffe's demotion, Tetrick primarily cited administrative shortcomings, such as Joffe's failure to turn in a practice plan and to enter his time sheets on schedule. If Joffe had truly been demoted for failing to turn in his time or failing to submit a practice plan, he would be the only associate at King & Spalding to have been demoted for those reasons. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 352-55. The fact that Joffe was promoted to senior associate in 2015 despite having failed to submit a practice plan that year casts additional doubt on this explanation. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 109, 132; Pl.'s Rule 56.1 Stmt. ¶¶ 352-53 (King & Spalding did not regularly track whether associates had

submitted a practice plan and self-evaluation). The decision not to award Joffe a bonus for 2015 also lacks a non-retaliatory justification. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 326-28 (in the past, associates who did not meet the billable-hour threshold were awarded a half bonus). Tetrick's explanation, that the firm was uninterested in retaining Joffe, Tetrick Tr. at 75:20-76:4, simply begs the question why Joffe had suddenly become a pariah.

King & Spalding's reasons for terminating Joffe also present a question of material fact. According to Tetrick, Joffe was fired because the partners in New York were unwilling to work with him. *See* Pl.'s Rule 56.1 Stmt. ¶¶ 391. This justification is belied by the facts that: each of the partners who reviewed Joffe in 2016 said that he would staff Joffe again; four of five rated his performance as "meets expectations;" and his hours in 2016 were above King & Spalding's bonus threshold. *See* Baumgarten Decl. Ex. EE at K&S_0000396-98; Pl.'s Rule 56.1 Stmt. ¶ 398. The timing of Tetrick's decision to fire Joffe also raises an inference of retaliation. Tetrick first discussed Joffe's employment with King & Spalding's head of HR shortly after Joffe sent the July 25, 2016, Email, and Tetrick requested access to Joffe's hourly reports at about the same time. Pl.'s Rule 56.1 Stmt. ¶¶ 343-46. Although Tetrick told Joffe he was fired because the firm did not believe he could return to full utilization, at the time Tetrick made the decision to fire Joffe (in September 2016), Joffe was staffed on at least three active matters and was on track to bill at or near King & Spalding's bonus threshold. Pl.'s Rule 56.1 Stmt. ¶¶ 392-98; *see also* Pl.'s Rule 56.1 Stmt. ¶ 205 (Joffe's termination was delayed because he was working on an important matter for a partner).

King & Spalding's remaining arguments are unpersuasive. King & Spalding contends that nobody involved in the ZTE matter "contributed to the reasons for Joffe's demotion and termination." Def.'s Mem. at 24. Tetrick discussed the ZTE case "on more than one occasion" with Thornton and King & Spalding's employment lawyer in connection with his decision to fire

Joffe, which suggests that there is a dispute of fact whether ZTE played a role in Tetrick's decision making.[15]  Pl.'s Rule 56.1 Stmt. ¶¶ 346-47; *but see* Thornton Tr. 134:24-135:3 (Thornton testified that he was not involved in the decision to terminate Joffe).  It is inapposite in any case.  It would make little sense for Joffe to attempt to report unethical conduct to the same partners he intended to report.  Other partners at the firm, to whom Joffe reported his concerns, were equally capable of retaliating.

In sum, there are questions of fact regarding whether Joffe reported or attempted to report ethical concerns and whether King & Spalding retaliated against him for doing so.  The evidence that Joffe reported unethical conduct is not overwhelming, but it is sufficient, taken in the light most favorable to Joffe, to survive summary judgment.  It may be that King & Spalding demoted and fired Joffe for unrelated, legitimate reasons, but there is adequate evidence that the justifications proffered by King & Spalding are pretextual for the case to go to a jury.

**b. Joffe's ERISA claim**

King & Spalding's failure to advance a legitimate, non-pretextual basis for Joffe's termination is also grounds to deny King & Spalding's motion for summary judgment on Joffe's ERISA claim.  ERISA Section 510 forbids the discharge of employees "for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan]."  29 U.S.C. § 1140.  The familiar *McDonnell Douglas* burden shifting framework applies to Section 510 claims.  *See Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111 (2d Cir. 2008).  To prevail, Joffe must establish a *prima facie* case by showing that he was

---

[15]     These conversations are privileged so their content is unknown, but the fact that Thornton was consulted by Tetrick, even though Thornton was not a member of the Associate Evaluation Committee, suggests that the ZTE case and Joffe's July 25, 2016 Email were relevant to Tetrick's decision.  Without more information, it is impossible to know whether Tetrick consulted Thornton because he wanted to ensure that King & Spalding had acted appropriately in the ZTE case, or as Joffe alleges, because King & Spalding intended to retaliate against him for raising ethical concerns.

qualified for his position, that he was protected by ERISA, and that he was terminated under

circumstances giving rise to an inference of discrimination. *Quinby v. WestLB AG*, No. 04-CV-

7406 (WHP), 2007 WL 1153994, at *15 (S.D.N.Y. April 19, 2007) (citing *Dister*, 859 F.2d at

1114-15). If Joffe can state a *prima facie* case, the burden shifts to King & Spalding to bring

forth a legitimate, non-discriminatory reason for his termination. *Dister*, 859 F.2d at 1111. If

King & Spalding is able to do so, it is then Joffe's burden to show that this legitimate reason is

pretextual. *Id.*

Joffe has established a *prima facie* case: King & Spalding does not dispute that Joffe was

qualified for his position and that he was protected by ERISA. The fact that Joffe was

terminated two weeks before a contribution to his 401k account was due to vest is sufficient to

support an inference of discrimination. *See Quinby*, 2007 WL 1153994, at *15 (inference of

discrimination established where employee was terminated two weeks before pension was to vest

and collecting cases); *see also Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*,

252 F.3d 545, 554 (2d Cir. 2001) ("A plaintiff can indirectly establish a causal connection to

support a discrimination or retaliation claim by 'showing that the protected activity was closely

followed in time by the adverse [employment] action.'" (quoting *Reed v. A.W. Lawrence & Co.*,

95 F.3d 1170, 1178 (2d Cir. 1996))). For the reasons already stated, the Court finds that Joffe

has adequately rebutted King & Spalding's purported legitimate explanation for his termination.

Although Joffe has not put forth any affirmative evidence tending to show King & Spalding

terminated him to evade a contribution to his 401k account, rebutting King & Spalding's

explanation for his termination is sufficient to survive summary judgment. *See Zann Kwan v.*

*Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("evidence of [defendant's] inconsistent

explanations for [plaintiff's] termination and the very close temporal proximity between

[plaintiff's] protected conduct and her termination are sufficient to create a triable issue of fact");

*Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination.").

King & Spalding's motion for summary judgment on Joffe's ERISA claim is denied.

## CONCLUSION

King & Spalding's motion for summary judgment is DENIED. The parties are directed to appear for a status conference with the Court at **10:00 a.m. on August 10, 2018**, so that a trial may be scheduled.

The Clerk of the Court is respectfully directed to close the open motion at docket entry 34.

**SO ORDERED.**

Date: **June 8, 2018**                **VALERIE CAPRONI**
**New York, New York**     **United States District Judge**