# EXHIBIT 2

EXPERT REPORT OF GORDON A. KAMISAR
*Joffe v. King & Spalding, LLP., S.D.N.Y.  Civil Action No. 17-cv-3392*

Background & Qualifications:

As the President of Kamisar Legal Search, Inc., I have operated as a full-time legal search consultant who has recruited and placed attorneys at law firms and corporations nationally for the past 27 years. In the course of my practice I have placed well over 300 attorneys at law firms and corporations throughout the nation.

I received a B.A., *with Distinction*, from the University of Michigan in 1982. I graduated from Duke University Law School in 1985. After graduation from law school, I started my legal career working as an associate at McCutchen, Doyle, Brown & Enersen, one of the five largest firms in San Francisco at the time. This firm later became Bingham, McCutchen, which was then absorbed by Morgan Lewis, one of the world's largest law firms.

After working at McCutchen, Doyle I joined a smaller law firm based in Washington, D.C. where I was on the Hiring Committee. As part of my position on the Hiring Committee, among other activities, I interviewed lateral (experienced) attorneys and law students for consideration for associate and partner-level positions at my firm. In 1989, I moved to Seattle to practice at a midsized firm.

In June of 1990 I founded Kamisar Legal Search, Inc. becoming the first attorney based in the Pacific Northwest to enter the legal search profession. A Legal Search Consultant is a term used to describe an executive search consultant or executive recruiter who specializes in the recruitment and placement of attorneys. As part of my education and training as an executive search consultant, I received live recruitment training from Anthony R. ("Tony") Byrne, a nationally known and highly regarded trainer of executive recruiters very early in my career. A strong confirmation of my expertise as an executive and legal recruiter is the fact that I was recognized in 2017 as a Certified Personnel Consultant (CPC) by the National Association of Personnel Services (NAPS), believed to be the largest and oldest organization of executive recruiters, including legal recruiters, in the United States. NAPS grants this recognition to professionals who meet peer established criteria. Those criteria establish that the certified professional has mastered a body of knowledge or set skills determined to be important or essential to the practice of his or her profession. Mastery of the specific body of knowledge is determined by passing a certification examination, and certified consultants agree to abide by the professional and ethical standards.

Corporations where I have placed attorneys have included Microsoft, Amazon, AT&T Wireless, Hewlett Packard, Intel, Starbucks, IBM, AT&T Bell Labs, Real Networks, Tommy Bahama, Corbis Corporation, Nintendo, and the Bill & Melinda Gates Foundation. I placed the General Counsel for a number of companies, including the Bill & Melinda Gates Foundation, Real Networks, Claircom Corporation, Ventritex, Therox Corporation, Primus Knowledge Solutions, XO Communications, and Corbis Corporation.

As part of my practice I also provide career counseling and assist attorneys throughout the nation in finding new positions, so I am keenly aware of the challenges that attorneys face in searching for and finding a suitable position.

While the volume of work that I handle is largest in the Seattle area, my legal and executive search practice is national in scope and I have placed numerous attorneys in the following 16 states: Arizona, California, Colorado, Georgia, Idaho, Illinois, Massachusetts, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Texas, Utah, Virginia, Washington, and Washington, D.C. I am currently conducting searches in New York and have previously placed attorneys in New York. My work includes conducting searches for New York-based law firms and New York-based candidates, as well as for the New York offices of my national law firm clients, and placing attorneys practicing in New York law firms in positions in other cities. I am also providing career counseling advice to attorneys based in New York or the metropolitan area.

It is important to understand that executive recruiters, including attorney recruiters like myself, conduct many more searches on behalf of employers and candidates than those reflected in the tally of fee-generating placements. A legal or executive search consultant's search experience is far broader and deeper than the placements that are ultimately consummated. The reason for this actuality is that search consultants are usually engaged to conduct searches on a contingent-fee basis: they conduct the search, sometimes for months, but receive a fee only if they make the actual placement. Many of the searches I and other consultants work on do not result in placements, oftentimes because the prospective employer has engaged multiple recruiters simultaneously to fill one opening. In the end, the one recruiter with the successfully placed candidate is the only one who gets credit for the placement and collects the fee. Sometimes, no one collects a fee because the candidate has a change of heart about a job move or the law firm suspends or cancels a search. I have conducted job searches on behalf of many candidates who are eventually placed by another recruiter. Similarly, I have worked on many job orders that are ultimately filled by another recruiter. Thus, the breadth of my recruiting experience in New York and other cities outside the Pacific Northwest is far greater than the relative number of consummated placements suggests.

Expert Witness Experience:

I have previously been qualified and testified as an expert witness in cases related to attorney search and executive search matters such as attorney employability, attorney marketability, attorney compensation, mitigation of damages in employment dismissal situations, and the extent to which negative allegations by an employer may harm the future job prospects of an attorney or other executive.

In Wadler v. Bio-Rad Laboratories, Inc., N.D. Cal. Case No. 15-cv-02356-JCS, in the United States District Court in San Francisco, tried in January 2017, I was qualified as an expert on attorney recruiting and executive recruiting matters including, among other things, the precise issue in this case: whether an employer's well-publicized dismissal of and negative allegations about an attorney employee, and the related reputational damage, would have an adverse effect on the dismissed attorney's future employment prospects and career. I offered expert testimony, in the form of deposition testimony and two expert reports, in support of the plaintiff, the

dismissed Executive Vice President and General Counsel attorney. The jury found that the plaintiff's firing was in retaliation for protected whistleblowing activity and awarded him approximately $11 million in damages, plus attorney's fees.

In 2017, I was retained by the plaintiff, a dismissed hedge fund portfolio executive, in Joshua Terry v. Highland Capital Management, LP, and ACIS Capital Management, LP, a Dallas, Texas arbitration. The hedge fund portfolio manager alleged wrongful dismissal, among other issues.  I testified in a deposition on the issue of the future employability of the dismissed executive. Similar to the Wadler case and the case before us now, the primary issue my testimony addressed was the effect the public dismissal of the employee would have on the executive's future career and job opportunities. In August of 2017, the arbitration panel awarded the dismissed executive $8 million.

In Chism vs. Tri-State Construction, Inc., Case No. 12-2-32541-3 SEA (2014), I testified both in deposition and trial for the employer defendant corporation in a dispute with its former General Counsel attorney on the issues of attorney compensation, accepted hiring practices, and attorney employability.  In that case the judge issued an opinion in which the Court found me to be a "credible and knowledgeable" "expert in the field of placing attorneys." The court was the Superior Court of the State of Washington in King County.

In prior cases, I served as an expert witness on the issues of attorney employability, mitigation of damages, and attorney job search analysis.

My resume is attached to this report.

Statement of Opinions:

1.  As a result of Mr. Joffe's termination from King & Spalding, it will be nearly impossible for Mr. Joffe to obtain another legal position comparable to either the associate or senior associate position he held at King & Spalding in New York, and he will most certainly be excluded from firms in the AmLaw 200, as well as from mid-sized and boutique firms that draw from the same or similar talent pools (as the AmLaw 100 and 200 firms) and that offer compensation roughly comparable to that offered by AmLaw 200 firms. With reasonable diligence, Mr. Joffe might be able to find an attorney position at a firm that does work for clients at a relatively low billable rate, and thus offers much lower compensation to its attorneys, such as a firm that defends insurance companies against routine personal or property damage claims. Even that type of law firm is highly unlikely to hire Mr. Joffe while his case is pending, and likely would not hire him unless and until he prevails in this present litigation.

2.  But for King & Spalding's termination of Mr. Joffe under circumstances alleged to be retaliatory, Mr. Joffe would likely have at least maintained his Senior Associate position at King & Spalding, and quite possibly have been offered a Counsel or Partner position with the firm. Alternatively, he would have been well positioned to

3

land a comparable position at another AmLaw 100 or 200 firm, or some other law
firm that offers compensation roughly equivalent to that offered by AmLaw 200
firms, such as a top mid-sized or boutique law firm that hires attorneys from the same
candidate pool as the AmLaw 100-200 firms.

Analysis:

I.      Mr. Joffe Had Excellent Future Career Prospects Before King & Spalding's Alleged
        Retaliation.

By 2014, David Joffe was a 6th year associate at King & Spalding LLP ("King & Spalding") who
was on partnership track and who, after a positive review that year, had been recently promoted
to Senior Associate, effective January 2015. As Judge Caproni noted in her July 8, 2018 Opinion
and Order (Opinion and Order), the Senior Associate position was "the penultimate stop on King
& Spalding's partner track." (Order at 2).

Mr. Joffe also has several important credentials that made him the type of litigation attorney
candidate that top law firm and other legal employers strongly desire. He is a 2008 Harvard Law
School graduate, had a district court clerkship with a federal judge, and started his career
practicing at one of the country's preeminent law firms, Davis Polk.

Before his alleged retaliatory termination, Mr. Joffe would have had no problem finding a new
position with another top-tier, high-paying Manhattan law firm practicing high billable rate
litigation work. He had stellar credentials, was employed by a prestigious, AmLaw 100 firm, and
had received, in the words of Judge Caproni, "overwhelmingly positive" reviews.  (Opinion and
Order at 20). Moreover, he was highly productive and consistently billed a high number of hours
every year.

        A.      Mr. Joffe's Future Career Prospects Were Gutted by King & Spalding's Alleged
                Retaliatory Firing.

According to Mr. Joffe's Complaint, in 2015 Mr. Joffe started raising ethical concerns about the
actions of two King & Spalding partners in the ZTE case. On or around the week of January 26-
30, 2015, when Mr. Joffe learned that King & Spalding Partner Paul Strauss was seeking to
obtain a sworn declaration from the firm's client ZTE, Mr. Joffe raised his ethical objections to
the proposed declaration. Mr. Joffe warned Mr. Strauss that if he went through with his
intentions, Mr. Joffe would personally report him to the Bar (Complaint ¶ 29).

On July 24, 2015, Judge Kaplan, who presided in the ZTE case, issued an order (the "Sanctions
Order") demanding that King & Spalding Partners Robert Perry and Paul Strauss show cause
why they should not be sanctioned. (Complaint ¶ 40). In or about the end of July 2015, and the
beginning of August 2015, Mr. Joffe reported to King & Spalding General Counsel, M. Robert
Thornton, Esq., and King & Spalding's engaged outside counsel, Philip Forlenza, Esq., the
"actual or narrowly-averted ethical breaches in the ZTE matter" by Mr. Perry and Mr. Strauss
that culminated in the Sanctions Order. (Complaint ¶ 46).

Almost immediately after the ZTE case settled in December of 2015, Mr. Joffe's career at King & Spalding collapsed, allegedly in retaliation for the reporting of his ethical concerns. In December of 2015, King & Spalding removed Mr. Joffe from its partnership track and temporarily froze his pay. In April 2016, King & Spalding awarded Mr. Joffe no bonus for 2015, a decision that was "unusually punitive." (Opinion and Order at 20.)  In September 2016, David Tetrick, the King & Spalding partner in charge of the Business Litigation Associates Committee, decided to fire Mr. Joffe but delayed the actual firing until December 7, 2016. From December of 2015, when the ZTE case settled, to the day that Mr. Joffe was actually fired, Mr. Joffe saw his otherwise luminous career prospects crumble, and whatever prospects he had of landing a comparable position at another firm were obliterated on December 7, 2016, when Mr. Joffe was fired with no notice and escorted from the building, with security on standby. (Opinion and Order at 12; Defendant's Reply, document 64, at ¶382).  At that point, Mr. Joffe was unemployed and stuck with the stigma of allegedly being fired for poor performance.

1. <u>King & Spalding's termination of Mr. Joffe, alone, dramatically diminished his career prospects.</u>

Once Mr. Joffe was terminated, escorted from the building, and removed from the King & Spalding website, he became an unemployed lawyer looking for work. Any resume he presented to a prospective employer would have to reflect that he was no longer employed, and that unemployed status alone, regardless of cause, was sufficient to drastically limit Mr. Joffe's future career prospects. It is well known maxim among recruiters across all fields that it is easier to get a job when you already have one, and numerous articles support that view. See, for example, Isadore, 2010 (noting that "[e]mployment experts say they believe companies are increasingly interested only in applicants who already have a job" and pointing out that some job postings include explicit restrictions such as "unemployed candidates will not be considered" or "must be currently employed."); and  Rampell, 2011 (a review of job vacancy postings on popular sites like Monster.com, CareerBuilder, and Craigslist revealed "hundreds" of postings, from businesses of all sizes, specifying that employers would consider (or at least strongly prefer) only people currently employed or recently laid off.) See also Ydstie, ("Some employers are saying if you're out of work, we don't want to hire you.")

The substantial disadvantage experienced by unemployed job seekers applies regardless of the reasons for their unemployment. A study conducted by a doctoral candidate at the UCLA Anderson School of Management concluded that even candidates who may have left their jobs voluntarily or were downsized for economic reasons and not performance reasons, were disadvantaged in their job searches as a result of their employment status alone: "[I]t doesn't matter whether the workers quit voluntarily or were laid off through no fault of their own." (Delaney, 2012).

Based on my own experience as a legal recruiter for more than 25 years, I can affirm that attorneys who are currently unemployed are at a substantial disadvantage in looking for new positions and are often shut out of consideration all together. In fact, some of my clients have explicitly stated that their firm's policy is not to consider attorney candidates who are currently unemployed, regardless of the reasons for their present unemployment. This experience is shared

by other legal recruiters, who routinely advise unhappy lawyers never to quit their jobs without first obtaining another. See, for example, Barnes ("If you quit a job without having another one it becomes excruciatingly difficult to get a new job.") In my experience, employers' reluctance to hire unemployed workers has only grown in the last few years as the economy has picked up and the job market as a whole has improved. As hiring at law firms has increased, and lay-offs decreased, legal employers have become more skeptical of claims by unemployed candidates that they were laid off for economic or other non-performance reasons.

Knowing how difficult it can be for unemployed attorneys to find new positions, law firms have customarily given associates notice that they are going to be terminated, thus affording the attorneys some time to seek new employment without the damaging stigma of being unemployed. King & Spalding did not extend that consideration to Mr. Joffe. The firm's decision to fire Mr. Joffe without notice was admittedly "unusual," even by King & Spalding standards. (Opinion and Order at 12). Even Mr. Tetrick, the King & Spalding partner that personally fired Mr. Joffe, "could not recall ever firing an associate without any period of notice." (Opinion and Order at 12.) Moreover, Mr. Perry, the King & Spalding partner who previously served as the managing partner of the firm's New York office, "testified that it was customary to provide associates with three months' notice so they could find a new job." (Opinion and Order at 12).

That Mr. Joffe was terminated on December 7, right before the holidays, was another red flag that would hamper Mr. Joffe's candidacy. Any prospective employer would assume that Mr. Joffe did not leave King & Spalding voluntarily because lawyers at large law firms tend not to forfeit their annual bonuses by leaving their jobs before the end of the year, and the holidays are a particularly slow time for hiring.

> 2. <u>Mr. Joffe's Prospects for Prospective Law Firm Employment Were Diminished Further by the Circumstances of His Termination</u>.

In addition to being unemployed, Mr. Joffe was burdened by the ruinous allegations surrounding his demotion and forced exit from King & Spalding. Once a prospective employer becomes aware that Mr. Joffe was demoted from Senior Associate to Associate, taken off partnership track, and had his pay frozen prior to termination without notice in December 2016, that employer would be hard pressed to find a reason to interview Mr. Joffe, let alone hire him.

> 3. <u>Mr. Joffe's Lack of Success in Finding Legal Employment Is Reflective of the Damage King & Spalding's Termination Has Done to His Job and Career Prospects</u>

That Mr. Joffe has been unable to get a job at another New York City law firm after he was terminated from King & Spalding is an entirely expected outcome and confirms how difficult his search has been and will continue to be. In his attempt to find a new job, Mr. Joffe approached New York legal headhunter Jeffrey Schneider the month after he was terminated by King & Spalding, January 2017. Mr. Schneider was a proven past resource for Mr. Joffe because he had actually placed Mr. Joffe at King & Spalding, his most recent position. Mr. Schneider was particularly well suited for marketing and placing Mr. Joffe in a litigation position at another law firm in New York City because Schneider had already placed Mr. Joffe in a similar position about 5 years earlier. Had Mr. Joffe been as employable as he was 5 years earlier, or had the

employability of a currently-employed senior associate at an AmLaw 100 firm, Mr. Schneider should have had success placing him, or at least gotten close to placing him. But Mr. Schneider has been unable to get Mr. Joffe even a single interview, despite the fact that Mr. Joffe has continuously stayed in touch with Mr. Schneider from January 2017 until the present. Mr. Joffe's and Mr. Schneider's most recent email correspondence is dated June 18, 2018, and indicates that they were in the process of scheduling an upcoming phone call. Mr. Schneider has also indicated that he will continue to keep Mr. Joffe "posted with any new appropriate openings." (August 29, 2017 email from Jeffrey Schneider to David Joffe.) Mr. Schneider was interested in presenting Mr. Joffe's resume for only one position, but even that position was discontinued after the law firm in question "put their litigation search on hold." (March 28, 2017 email from Jeffrey Schneider to David Joffe.)

Mr. Joffe has also contacted New York legal headhunters Jordan Rosenberg of Whistler Partners, Dimitry Zuborev of Whistler Partners, and Andrew Gurman of Lord Gurman & Lewis LLC. None of these legal search consultants appears to have submitted his resume for any position.

4. <u>It Is Extremely Unlikely That Any Legal Employer Will Hire Mr. Joffe Unless and Until He Prevails in This Lawsuit Due to the Uncertainty of the Outcome, the Risk of Future Negative Allegations, and the Publicity Surrounding This Case.</u>

Even in the unlikely event that a legal employer is willing to consider Mr. Joffe for an attorney position, that employer would surely hold off on hiring Mr. Joffe unless and until this case is resolved in Mr. Joffe's favor, for the simple reason that it carries too much risk for the new employer. Any prospective employer would realize that this case, and every new development and allegation coming out of this case, will continue to be covered in the press. In the event negative allegations are made against Mr. Joffe during trial, those allegations could reflect poorly on the new firm that hired him. Moreover, the prospective employer's decision to hire Mr. Joffe would itself come under scrutiny in the media and otherwise, and would likely be met with resistance from other lawyers in the firm, as well as clients.

Based on my experience as a legal recruiter, most prospective employers, including law firms, are risk averse and tend to avoid controversy. They are highly protective of their reputations and loathe to do anything that would call their own judgment into question or alienate clients. In fact, they often hire "risk analyst" consultants for this very purpose: to avoid risk. The risk of hiring Mr. Joffe before all the allegations are aired and resolved would carry too much risk for any law firm concerned about its reputation.

5. <u>Even if Mr. Joffe Receives a Favorable Jury Verdict, he will not be able to undo all of the damage that has been done to his professional reputation from King & Spalding's alleged retaliation and the negative allegations that have been made in public statements and claims.</u>

Unfortunately for Mr. Joffe, King & Spalding's allegations against him have been widely published in legal and business publications, including Bloomberg, Law360, Law.com, ABA Journal, Reuters, and Yahoo Finance, among others. Those negative allegations will haunt him for the remainder of his career, and continue to damage his career prospects, regardless of whether he prevails in this suit.

King & Spalding released a public statement directly to the media in May 2017 that Mr. Joffe "was terminated because he repeatedly refused to comply with directives and expectations that apply to all firm associates." (C. Sullivan, 2017). As this case has moved forward, other negative statements and allegations by King & Spalding have come to light and are now a matter of public record. For example, publicly available pleadings detail the disparaging review that King & Spalding partner Meredith Moss gave to Mr. Joffe, in which she claimed that Mr. Joffe turned in drafts of an assignment that were late and that on one occasion turned in work product that included "factual errors" and was otherwise subpar in her view. (Opinion and Order at 8-9). Worse, Ms. Moss continued that Mr. Joffe had done a "truly appalling job" and under the "strengths" section of Mr. Joffe's review form she responded, "none that are apparent to me." She added that she would "never staff him on another matter." (Opinion and Order at 9). Also in the public record are Mr. Tetrick's statement that King & Spalding did "not foresee any realistic possibility" of Joffe "being staffed on new matters and returning to full utilization" at the firm, and his characterization of Mr. Joffe's job performance as "go[ing] off the cliff so quickly." (Opinion and Order at 9-10).

King & Spalding's allegations against Mr. Joffe will remain online and accessible to prospective employers for the rest of his career, making it extraordinarily difficult for him to rehabilitate his reputation and seek comparable employment. As noted in a New York Times article about the perils of personal online information, "The fact that the Internet never seems to forget is threatening, at an almost existential level, our ability to control our identities; to preserve the option of reinventing ourselves and starting anew; to overcome our checkered pasts." (Rosen, 2010).

In Mr. Joffe's situation, the public filings and online articles about this dispute create a permanent record of King & Spalding's alleged grounds for his termination and is open and available to recruiters and prospective employers, who as a matter of course check online sources to learn about potential candidates (Cross-Tab, 2010, p. 3). In fact, in a 2010 study of the role of online reputation in employment decisions, nearly all of the surveyed recruiters and HR professionals in the US said they check online resources to learn about candidates, and 70% said they have rejected candidates based on information they found online (Cross-Tab, 2010, p. 5). Any prospective employer (or legal recruiter or executive recruiter) considering Mr. Joffe for a position who does even a cursory Internet search of Mr. Joffe's background would quickly uncover documents and articles detailing King & Spalding's damaging allegations against Mr. Joffe.

Mr. Joffe has attempted to challenge King & Spalding's decision to terminate him by filing this lawsuit alleging improper retaliation, in an effort to salvage and rehabilitate his reputation, but without a positive reference from his most recent employer, such as a King & Spalding supervising partner, his future employment prospects remain dim. Since his relationship with the

firm was destroyed by the alleged retaliation and subsequent termination, Mr. Joffe will be unable to get a reference from any King & Spalding supervising attorneys, which will make it nearly impossible for him to completely rehabilitate his reputation as a high performing attorney.

Moreover, the mere existence of these allegations is enough to cause rejection of his candidacy, even if their truth or merit is in doubt. Prospective employers are highly unlikely to assume the risk and responsibility of a candidate who comes with negative reputational baggage that, at least, raises serious concerns about how he will perform his duties, such as representing the prospective law firm's clients on future matters. Such was the case with certain employees of Wells Fargo during the recent, well-publicized fake accounts scandal. When some employees reported the unethical practices to their superiors at Wells Fargo, Wells Fargo retaliated by filing accusations of unethical conduct on the employees' U5 documents. Maintained by FINRA, the U5 database is designed to hold bankers, brokers, and financial advisors accountable for wrongdoing. According to employment lawyers, "a negative mark on your U5 is like getting the mark of Cain in the world of bankers and brokers." (Arnold, 2016). Those employees with retaliatory U5 entries on their records found it impossible to obtain comparable employment in the banking industry, even if they were in fact innocent of any wrongdoing. (Arnold, 2016).

Even if Mr. Joffe prevails at trial and the jury determines that King & Spalding retaliated against Mr. Joffe, that decision will not undue all the damage caused by King & Spalding's negative allegations. Those allegations of poor performance remain a stain on his reputation that can only diminish his future employment prospects.

6.  <u>Mr. Joffe's Job Prospects are Further Hampered by Having to File Suit Against His Former Employer to Seek Redress</u>.

Mr. Joffe filed this suit to seek redress for what he alleges is retaliatory termination. That decision to seek relief, however, comes at a cost to his employability and serves as another hurdle to obtaining other legal employment. Prospective employers tend to see great risk in hiring employees who have sued their previous employer. Even King & Spalding Partner Richard Marooney, Jr. has conceded this point. In his October 31, 2017 deposition, Mr. Marooney stated:

> "I think I thought that David Joffe suing the law firm would not be good for David Joffe…I also know that a litigation like this, if brought in court, would become very public as has happened, like that Law360 would report on it, and once that happens, it is a very small legal community. I think I used the words 'It's a small legal community.' The legal community will read about it and know about it, and I thought that that would make David's job harder, in terms of moving forward passed King & Spalding to find other employment…" (Pages 51-52, Deposition of King & Spalding LLP, the Defendant herein, by Richard T. Marooney, Jr.)

Later in Mr. Marooney's deposition he admitted that he may have used the phrase that "David did not want a lot of noise." [Marooney Deposition at 57-58] and in response to the question: "Why did you think a lawsuit would impact David's ability to find alternative employment?" he responded:

> "It's a highly-competitive world. It's a highly-competitive job market. There are a lot of lawyers looking for jobs, and the fact that he had brought a lawsuit against his former employer, I think, for prospective employers that would be a complication for him. I just think just being realistic about it."

(Marooney Deposition at 58.)

That Mr. Joffe's claims in this suit stem from his attempt to raise ethical concerns about two partners at his former firm does not make Mr. Joffe more attractive to a future employer. To the contrary, Mr. Joffe's reputation for vigilance is a red flag that further damages his prospects for future law firm employment. In this respect, Mr. Joffe's reporting of potentially unethical behavior is akin to whistleblowing, and whistleblowing is nearly always a career ender. See, e.g. P. Sullivan, 2012 (in which Patrick Burns of Taxpayers Against Fraud states: "There is a 100 percent chance that you will be unemployed — the question is, Will you be forever unemployable?"), and Dayen, 2018 (in which Richard Bowen, who was fired from Citigroup in 2009 for warning about its "shoddy mortgage practices," describes his own experience: "I tell my students, if you do whistleblowing, do so with the knowledge that you're blowing up your career in every industry you're in.").

7. <u>Even if Mr. Joffe Prevails in this Litigation, it will be Virtually Impossible for Him to Obtain an Attorney Position with One of the Elite AmLaw 100 or 200 Law Firms or with Any of the Prestigious Mid-sized or Boutique Firms that Hire from the Same or Substantially Similar Candidate Pools as Those Elite Firms Do.</u>

The largest and most selective firms, such as those in the AmLaw 100 or 200, charge their clients high billable rates and compensate their attorneys highly. For example, a first-year associate starting out at King & Spalding would make a base salary of \$190,000; an 8th year associate would make a base salary of \$340,000. At many AmLaw 100 firms, senior associates also regularly receive cash bonuses that can exceed \$100,000 per year. Some AmLaw 100 firms pay their senior associates an even higher base salary than King & Spalding does. (Zaretsky 2018). Because these firms charge their clients high fees and offer high compensation to associates, they strive to attract the best talent, recruiting and hiring only attorneys with outstanding academic credentials and, in the case of laterals, a record of success at another top law firm. In 2014, David Joffe was precisely the type of attorney that these firms would hire because he had superb credentials, was employed at his second elite law firm, King & Spalding, was recently promoted to Senior Associate, was on partnership track, was a consistently high biller, and had good reviews from the partners in his group.

Unfortunately for Mr. Joffe, he was no longer that same perfect candidate by the end of 2016: he had been terminated without notice, his positive reviews had been overshadowed by allegations of poor performance, he was unemployed, and his reputation as a fine attorney had been irreparably damaged. As a result, Mr. Joffe is no longer a suitable or desirable candidate for any of these elite law firms. For the same reasons, Mr. Joffe is also excluded from serious consideration by any of the elite mid-sized, small, and boutique law firms that may pay slightly less than the "Biglaw" firms, but often draw top talent from those large elite firms.

As an unemployed lawyer fired from his last firm and carrying reputational baggage, Mr. Joffe will find it nearly impossible to obtain future legal employment, as his post-termination job search has shown. If he is able to land any legal job, perhaps after a resolution of this suit in his favor, it will likely be with a firm that compensates its attorneys at a rate far below that of the top-tier firms that generally hire attorneys with Mr. Joffe's academic credentials. An example would be a firm whose clients are primarily small businesses who cannot or will not pay high billable rates for commercial litigation matters, and insurance defense firms who handle routine small value, lower exposure personal injury or property damage claims for their insurer clients. Those lower paying firms generally do not target the elite, highly credentialed attorneys sought after by the AmLaw 100 or 200, and could see an advantage to hiring a well trained and experienced litigator like Mr. Joffe. Even under those circumstances, that type of law firm would likely hire Mr. Joffe only if he prevails in this suit for the reasons outlined above.

8.  Even Smaller, Lower-paying Firms Are Likely to Choose Other Candidates Over Mr. Joffe.

Even if a smaller, lower-paying firm is willing to overlook Mr. Joffe's reputational damage, that firm may still view him as a flawed, risky candidate for a litigation position. Most small firms prefer to hire attorneys who already have experience handling the same types of cases their firm handles so that the new attorneys can "hit the ground running" and assume full responsibility for cases on day one. Some firms are likely to view Mr. Joffe's previous experience -- handling very large, high value, heavily staffed commercial litigation matters in which he is one of many attorneys working on a case -- as less than ideal for their particular needs. Moreover, Mr. Joffe may not have the experience with certain legal matters that these small firms desire. For example, Mr. Joffe may have limited experience with small-claim insurance defense cases involving personal injury and property damage, making him a less than ideal candidate for positions at firms handling those types of cases.

Another potential obstacle for Mr. Joffe is the perception that he is overqualified for firms that do low billable rate work. Given Mr. Joffe's background as a senior associate with a large, elite firm handling complex litigation matters, smaller firms are likely to have concerns about whether Mr. Joffe is a good long-term fit. These firms may view Mr. Joffe as overqualified, and have concerns that he'll eventually become bored or unchallenged in his role, leading him to seek a more challenging, higher-paying position at another firm doing more sophisticated work.

I believe that with reasonable diligence, Mr. Joffe is more likely than not to ultimately secure employment with a lower-paying firm, as described above, but he will still face significant obstacles in his search for one of these positions.

9.  The Longer Mr. Joffe Remains Unemployed, Including During the Pendency of this Suit, the Less Likely It Is That He Will Find Legal Employment.

Mr. Joffe has now been out of law school for 10 years. Mid-level associates, those who are generally 3 to 6 years out, have traditionally been considered in their career "sweet spot" and are at their peak of employability. (Wechsler, 2009). As a general rule, attorneys who are 10 years

11

out of law school are harder to place than attorneys who are 7 or 8 years out, as Mr. Joffe was in 2015 and 2016.

Assuming Mr. Joffe prevails in this suit, putting him in a better position to at least seek employment, he will be at that time 10 to 12 years out of law school and well past his prime of employability. Moreover, since he will have been out of work for about 2 to 4 years, most firms would have concerns about the sharpness of his litigation skills.

Law firms prefer to hire attorneys who are able to function at a high level immediately and have sharp, current litigation skills. To that end, they generally hire attorneys with relevant, current litigation experience who can "hit the ground running." Law firms are reluctant to hire attorneys, especially senior attorneys, who need time and training to "get back up to speed." As one former corporate human resources professional in charge of hiring employees put it, "Companies want people who need the smallest amount of training possible." (Lucas, 2011) (noting that one of the five reasons that employers don't like to hire unemployed candidates is the concern that "[s]kills do deteriorate without use" and explaining how prospective employers perceive the unemployed as "need[ing] some refreshers and extra help before [they're] up to speed again," even in the case of candidates who have been out of work for less than one year).

10. Mr. Joffe Will Have Even Less Success Trying to Secure an In-House Counsel Position with A Corporation Than He Will Trying to Secure A Law Firm Position Because Those Positions Are Scarcer and More Competitive than Law Firm Positions. Moreover, corporations very rarely hire litigation attorneys as permanent attorney employees, preferring instead to hire litigation attorneys as temporary outside counsel for a specific case while that case is pending.

(a) Scarcity in number of in-house openings vs. private practice openings.

Attorneys who practice law in law firms and corporations generally fall into two primary categories: those who are in private practice (either at a law firm with other attorneys or as a solo practitioner) and those who work in-house as attorneys for a corporation. The vast majority of attorneys who practice law do so in a private practice environment. A minority of attorneys are employed by corporations as in-house counsel because far fewer of these positions exist. According to The American Bar Association (ABA)'s 2018 Lawyer Population Survey, there are 1,338,678 licensed lawyers nationwide. (ABA, 2018). The current ABA Lawyer Population Survey does not break down the number of licensed lawyers by practice setting, but previous ABA demographic surveys showed that only 8% of licensed lawyers work in-house at a corporation, while 75% work in a private practice environment, with the remainder working for the government, in the judiciary or education, or in other roles. (ABA, 2013).

This disparity in the number of positions is easy to understand given the differences in need. Corporations vary widely in size and often use outside lawyers, rather than in-house lawyers, to do their legal work. Most corporations have no in-house attorneys, while others hire only one in-house counsel. In my experience, the majority of corporations who have in-house lawyers employ 5 or fewer attorneys. Large public corporations generally have larger legal departments than smaller private companies, but large public corporations represent a small fraction of

corporate entities as a whole. The Small Business & Entrepreneurship Council (SBEC) has confirmed that the vast majority of companies in the United States are relatively small and do not have many employees. Citing the U.S. Census Bureau Data, the SBEC points out that businesses with fewer than 20 workers made up 89% of all employers. (SBEC).

According to the Association of Corporate Counsel (ACC), the median number of in-house attorneys at corporations with fewer than 100 employees is 1, and the median number of attorneys at corporations with annual revenue of $49 million or less is also 1. This same survey indicates that the median number of in-house attorneys at corporations with between 500 and 1,000 employees is 5, and that the median number of in-house attorneys at companies with annual revenue of $1 billion to $1.9 billion is also only 5. This ACC survey also finds that the median number of in-house attorneys at publicly-traded corporations is only 5, while the median number of in-house attorneys at private companies is 2, and the median number of in-house attorneys at non-profit companies is 3. (ACC, 2012, p. 61).

Law firms employ attorneys to do legal work for various clients, and the number of attorney-employees in a law firm ranges from one for solo practices to several hundred, even thousands, for international law firms with multiple offices in major cities. The relative imbalance in available in-house attorney positions, compared to law firm positions, explains why there is an oversupply of private practice attorneys chasing an undersupply of in-house positions with corporations.

    (b)    <u>The preference of attorney-candidates for in-house positions creates strong demand and competition for the few in-house positions available.</u>

In my practice, the vast majority (80 percent or more) of all attorneys with whom I correspond about new employment opportunities strongly prefer in-house positions or state outright that they would consider only in-house positions. Other legal search consultants have reported similar experiences. General Counsel Consulting, an in-house attorney search and placement firm dedicated exclusively to the placement of attorneys at corporations, poses the following question in an article posted on its website: "What is it about going in-house that seems to increasingly draw attorneys from law firms to in-house legal departments?" This article goes on to conclude that "approximately 80 percent of attorneys actively seeking positions were interested in in-house opportunities," citing a survey conducted by BCG Attorney Search, one of the nation's largest legal search firms. (General Counsel Consulting). Similarly, Linda Kline, the President and Managing Partner of New England Legal Search, the oldest legal search firm in New England, has reported that 80 percent of the lawyers who approach her are interested in going in house. (BCG).

The reasons vary but most cite one or more of the following factors: they do not have to bill and track hours; they do not have to meet demanding annual billable and non-billable hours requirements or targets set by nearly all law firms for all attorneys, even senior level attorneys; they do not have to develop and cultivate clients; and they do not have the pressure to maintain those client relationships as they compete with other outside counsel for that work.

These are just some of the many factors that keep the demand for in-house positions very strong and the pool of interested candidates large. Given that in-house positions are far scarcer than law firm positions, the competition is fierce for any limited in-house openings that become available. Overall, these factors put corporations seeking to hire in-house attorneys in a "buyer's market." They usually have "their pick" of candidates, and a high threshold for credentials, experience level, previous career experience, and quality of references. It is impossible to imagine that a corporation would hire Mr. Joffe, an unemployed litigator, fired from his law firm nearly two years ago, to be its in-house counsel.

Moreover, companies rarely hire litigation attorneys as in-house counsel, choosing instead to engage litigators as outside counsel on particular matters, rather than as permanent employees. For all of these reasons, Mr. Joffe would be even less likely to secure an in-house position with a corporation than to secure a position with a lower paying law firm.

II.     But for the Alleged Retaliation, Mr. Joffe's Career Prospects Were Strong.

As a Senior Associate on partnership track at King & Spalding, Mr. Joffe had several prospective career paths with King and Spalding or another top-tier firm:

Partner: Under the pyramidal business model used by AmLaw 100 firms, a Senior Associate "on partnership track," by definition has a chance of making partner. That chance is a positive percentage greater than 0% based on the definition of the phrase. King & Spalding has confirmed that attorneys in a Senior Associate position at the firm who are on partner track "have a reasonable possibility" of making Partner in the next three years. (Defendant's Statement of Undisputed Material Facts, p. 12, ¶ 93). A 2015 study of the largest law firms in the nation indicates a range of probability for making partner among big law firms, with the highest probability at 16%. Even among large firms with the lowest chances of promotion to partnership, every firm but two had at least a 1% chance of making partner. Only two firms in the survey indicated that the chances were less than 1%, but none was at zero percent. (Dalston, 2015).

Though the chances of making partner at any AmLaw 100 firm are small, King & Spalding consistently promotes senior associates to partner and counsel positions. For 2018, King & Spalding elected 17 new partners and promoted 12 Counsel across seven offices. (K&S Press Release, November 30, 2017). For 2017, King & Spalding elected 14 new partners across seven offices, including 5 litigation attorneys. (Press Release, November 3, 2016). For 2016, King & Spalding elected 24 new partners including a commercial litigation attorney in the firm's New York office, and 4 commercial litigation attorneys in other offices. (Press release, November 5, 2015). The firm also promoted 16 Counsel attorneys in 6 offices that year, including 4 in its New York office, and 5 litigation attorneys in other offices. (K&S Press release, 2015). (See also Weiss, 2008) ("King & Spalding led the list of law firms with the largest percentage increases in

partner promotions, with a 66.7 percent increase. The firm promoted 20 lawyers to partner at the same time its lawyer numbers declined.") Since Mr. Joffe was on partnership track, had been promoted to the "penultimate position" of Senior Associate, had positive reviews, and was in demand for large, complex matters, he had as good a chance as any other Senior Associate to make partner.

Mr. Joffe was also a consistently high biller, making him profitable for the firm. As a general rule, attorneys who bill a lot of hours have a better chance of promotion because they generate revenue for the firm. At the time of his termination on December 7, Mr. Joffe had actually already billed 2,071 hours for 2016, a figure above King & Spalding's minimum 2,000 billable-hours threshold for on-track associates to receive a market rate bonus. In 2015, Mr. Joffe billed 1,922 hours, just shy of King & Spalding's 2,000-hour threshold for a market rate bonus. (Opinion and Order at 10). In the first three months of 2016, Mr. Joffe billed 700 hours, a rate that would have put him on pace to bill over 2,800 billable hours in a year-- well over the King & Spalding 2,000 billable-hours target for a market rate bonus. (Joffe Complaint at 9). All things being equal, this kind of economic productivity would have increased Mr. Joffe's chances of being promoted to Partner or Counsel. In the alternative, King & Spalding likely would have chosen to retain Mr. Joffe in a Senior Associate position for as long as possible because it would be in King & Spalding's economic interest to do so.

    Counsel: If Mr. Joffe was not promoted to partner, he still could have been promoted to Counsel (or a permanent senior associate position) at King & Spalding or at another AmLaw100 firm, and could have continued as counsel for a substantial period of time (i.e., ~20+ years)]. Moreover, in this capacity, he would still retain a chance of making partner at a later date.

    A.   Mr. Joffe Would Have Had Career Opportunities at AmLaw 200 Firms.

If Mr. Joffe did not make partner or counsel at King & Spalding, or an AmLaw100 firm, he would very likely have landed a partner position, or a position expected to lead to partnership, at another AmLaw 200 firm or another firm that compensates attorneys in a manner roughly similar to that of an AmLaw 200 firm, such as a top mid-sized firm or a boutique law firm that hires attorneys from the same candidate pool as the AmLaw 100-200 firms. Examples of mid-sized or boutique firms in New York that might have hired Mr. Joffe if they had a position for a senior litigation associate are Dontzin Nagy & Fleissig LLP and Kagen & Caspersen, two litigation boutiques comprised of former big firm attorneys, and mid-sized law firm Pryor Cashman. In fact, New York legal recruiter Jeffrey Schneider sent Mr. Joffe's resume to Pryor Cashman in 2017 for a Counsel position, but that position was subsequently withdrawn. Presently, Mr. Joffe has virtually no chance of getting a position at any of these firms, but absent the alleged retaliation, Mr. Joffe would have retained his status as an elite candidate and would have been an appropriate candidate for opportunities at firms like these, as well as firms in the AmLaw100-200. Mr. Joffe would never have been in a position to settle for a lower-paying position with a firm with lower billable rates, such as the insurance defense firms described earlier.

B. <u>The Average Total Compensation for Counsel is Lower than the Average Total Compensation for Non-equity Partners and Equity Partners</u>

As a general rule, Equity Partners have higher compensation rates than Non-equity Partners or Counsel, and Non-Equity Partners have higher compensation rates than Counsel. According to the 2018 Legal Salary Guide, published by Special Counsel, for all firms (small, medium, and large combined) the average total compensation for Non-equity partners is about 45% of that of Equity partners, and the average total compensation for Counsel is about 37% of the average total compensation of Equity partners. (Special Counsel, p. 4). The average total compensation for Counsel at large firms, defined as firms with over 250 lawyers, is about 80% of the average total compensation for Non-equity partners at those firms (Special Counsel, 2018, p. 4).

Upon promotion from senior associate to a partner position at a large law firm, in some cases salaries are raised sharply right away, while in other cases they are raised gradually over time. Newly minted equity partners are likely to see an increase in compensation, but they often experience an initial two to three year ramp up period in which the attorney's compensation is reduced to fund his or her "buy-in" to the partnership. (Jeffries, 2017). A senior associate promoted to a non-equity position is also likely to see an increase in compensation but one far below that of an equity partner because of the wide gap in compensation between equity and non-equity partners.

Like newly promoted Partners, newly promoted Counsel are also likely to see an increase in their compensation, but not to the same degree as either equity or non-equity partners. As noted, the average total compensation for Counsel at firms with over 250 lawyers is about 80% of the average total compensation for non-equity partners at those firms. (Special Counsel, 2018, p. 4). Counsel tend to be compensated on a base salary plus bonus model similar to that used for associates. The base salaries for newly minted Counsel at large firms are almost always higher than those for Senior Associates but the increase in base salary tends to be more modest and incremental, especially when compared to the increases in compensation for newly minted partners. For example, AmLaw200 firm Wilmer Hale set its base salary for 2018 at $305k for 6th year associates, $325k for 1st year Counsel, and $340k for 2nd year Counsel. (Rubino, 2018) Skadden Arps is another example of a firm which historically compensates its Counsel at a higher rate than its senior associates. Skadden announced in 2018 that its base salary for 8th year Associates is $340k, the same as King & Spalding, as noted earlier in this report. Skadden has not yet announced its base salaries for Counsel in 2018, but in the past Skadden's compensation for Counsel has been higher than that for Senior Associates. For example, in 2016, Skadden set its base salary at $315k for 8th year Senior Associates, $335k for 1st year Counsel, $345k for 2nd year Counsel; $355k for 3rd year Counsel, and $360k for 4th year Counsel. (Patrice, 2016).

Firm compensation policies vary, and multiple factors come into play, so it is impossible to pinpoint what Mr. Joffe's compensation would have been upon promotion to a partner or counsel position, or predict how gradually or sharply his compensation would have risen in the few years after his promotion. Nevertheless, had Mr. Joffe been promoted to partner, it is reasonable to expect that he would have received compensation in his immediate post-associate years at the low end of the range for all partners at comparable firms because of his status as a new partner. Had Mr. Joffe been promoted to equity partner, his compensation would also have to be adjusted to reflect his buy in obligations. If Mr. Joffe had been promoted to a counsel position,

rather than a partner position, his compensation would have been lower than if he had been promoted to partner, as counsel are compensated at a rate lower than non-equity or equity partners.

Facts and Data Considered in Reaching Opinions and Outside Sources

In my analysis, I have relied upon my knowledge of, and experience in, attorney recruiting and attorney career counseling. I have also relied upon knowledge gained from various executive recruiting and employment books, articles, publications, materials on the labor market, publications focusing on the legal marketplace, presentations sponsored by and participation in recruiter industry associations such as the National Association of Legal Search Consultants (NALSC) and the National Association of Personnel Services (NAPS). I am engaged daily with other executive recruiters, hiring administrators, human resources directors, human resources managers, human resources professionals, hiring authorities, and other professionals in both candidate and hiring roles, and have developed knowledge from those discussions and experiences as well.

Moreover, I rely upon the knowledge I have gained over the past 27 years providing career counseling services and advice to numerous attorneys and other executives who are seeking new positions. Sometimes I am formally retained and compensated by the attorney or executive for those services, and other times those services are part of the usual and regular guidance I provide in helping a candidate navigate the hiring and interview process and land a suitable position. I will also regularly "market" attorney and executive candidates to prospective employers as I try to find new positions for the candidates. The extensive attorney candidate counseling that I have done has given me a deep understanding of the obstacles and challenges candidates face when interacting with prospective employers in the marketplace as they try to obtain a new job. This experience guiding candidates through the real-world obstacles and challenges of the marketplace gives me a realistic perspective and practical understanding of the marketplace that many purported labor and human resources experts, relying solely on academic literature and timeworn assumptions, do not possess.

In addition, I have reviewed the following materials for purposes of forming my opinions.

SOURCES REVIEWED AND CITED

CASE DOCUMENTS

Complaint filed May 8, 2017, Document 1.

Opinion and Order of Judge Caproni, dated July 8, 2018, Document 74.

Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, filed January

4, 2018, Document 36.

Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Facts and

Statement of Additional Facts Pursuant to Local Civil Rule 56.1, filed February 15, 2018,

Document 64.

Deposition of Richard T. Marooney, Jr. on October 31, 2017.

Correspondence between legal recruiters and David Joffe.

Correspondence between David Joffe and Prospective employers, including Oved Law firm.

Resume of David Joffe.


OTHER SOURCES**

American Bar Association. *ABA's 2018 Lawyer Population Survey.*
https://www.americanbar.org/content/dam/aba/administrative/market_research/Total_National_L
awyer_Population_1878-2018.pdf

American Bar Association. *Lawyer Demographics* (2013).
https://www.americanbar.org/content/dam/aba/migrated/marketresearch/PublicDocuments/lawye
r_demographics_2013.authcheckdam.pdf

Chris Arnold, *Workers Say Wells Fargo Unfairly Scarred Their Careers*. NPR. October 21,
2016. http://www.wbur.org/npr/498804659/former-wells-fargo-employees-join-class-action-
lawsuit

Association of Corporate Counsel (ACC), *Establishing the In-House Law Department: A Guide
for an Organization's First General Counsel* (2012).
http://www.acc.com/_cs_upload/vl/membersonly/InfoPAK/1313060_1.pdf

BCG Attorney Search, *A Critical Assessment of In-House Legal,* retrieved October 2018.
https://www.bcgsearch.com/article/60339/A-critical-assessment-of-in-house-legal/

Harrison Barnes, *Legal Career Suicide: Quitting a Job without Having another Lined Up*, BCG
Attorney Search. https://www.bcgsearch.com/article/900045905/Legal-Career-Suicide-Quitting-
a-Job-without-Having-Another-One-Lined-Up/

Cross-Tab, *Online Reputation in a Connected World*, Cross-Tab Market Research, January 2010.
https://www.job-hunt.org/guides/DPD_Online-Reputation-Research_overview.pdf

Brian Dalston, *Which Biglaw Firms Promote the Most (And Least) to Partnership*, Above the
Law. August 4, 2015. https://abovethelaw.com/2015/08/which-biglaw-firms-promote-the-most-
and-least-to-partnership/

David Dayen, *Inhuman Resources*, Huffington Post, July 12, 2018.
https://highline.huffingtonpost.com/articles/en/hsbc-sexual-harassment-hr/

Arthur Delaney, *Unemployed Face Discrimination Just One Month After Losing Their Jobs, Report Says,* Huffington Post. June 30, 2012.
https://www.huffingtonpost.com/2012/07/30/unemployment-discrimination_n_1719337.html

General Counsel Consulting, *Attorneys Seeking Greener Pastures In-House*, retrieved July 2018.
http://www.gcconsulting.com/articles/120088/60/Attorneys-Seeking-Greener-Pastures-In-House/

Chris Isadore, *Looking for Work? Unemployed need not apply*, CNNMoney.com. June 16, 2010.
https://money.cnn.com/2010/06/16/news/economy/unemployed_need_not_apply/index.htm

Brenda Sapino Jeffries, *The Cost of Making Partner and How Senior Associates Should Prepare*.
Law.com (September 5, 2017).  https://www.law.com/sites/almstaff/2017/09/05/the-cost-of-making-partner-and-how-senior-associates-should-prepare/].

King & Spalding, Press Release: *King & Spalding Elects 17 New Partners and Promotes 12 Counsel Across Seven Offices*. November 30, 2017. https://www.kslaw.com/news-and-insights/king-spalding-elects-17-new-partners-and-promotes-12-counsel-across-seven-offices

King & Spalding, Press Release: *King & Spalding Elects 14 New Partners Across Seven Offices*.
November 3, 2016. https://www.kslaw.com/news-and-insights/king-spalding-elects-14-new-partners-across-seven-offices

King & Spalding. Press Release: *King & Spalding Elects 24 New Partners*. November 5, 2015.
https://www.kslaw.com/news-and-insights/king-spalding-elects-24-new-partners

Suzanne Lucas, *Unemployed? 5 Reasons Companies Won't Hire You*, CBS News, July 27, 2011.
https://www.cbsnews.com/news/unemployed-5-reasons-companies-wont-hire-you/

Joe Patrice, *What's Up with Counsel Salaries?,* Above the Law, June 23, 2016.
https://abovethelaw.com/2016/06/whats-up-with-counsel-salaries/

Catherine Rampell, *Help Wanted Sign Comes with Frustrating Asterisk*, New York Times, July 26, 2011. https://www.nytimes.com/2011/07/26/business/help-wanted-ads-exclude-the-long-term-jobless.html

Jeffrey Rosen. *The Web Means the End of Forgetting*, New York Times, July 21, 2010.
https://www.nytimes.com/2010/07/25/magazine/25privacy-t2.html

Kathryn Rubino, *At Long Last Biglaw Giant Makes Its Compensation Move*. Above the Law.
July 2, 2018. https://abovethelaw.com/2018/07/at-long-last-biglaw-giant-makes-its-compensation-move/]

Small Business & Entrepreneurship Council (SBEC). Facts and Data on Small Business and Entrepreneurship, 2017. https://sbecouncil.org/about-us/facts-and-data/

Special Counsel, 2018 Salary Guide for Legal Professionals, retrieved October 2018. http://www.specialcounsel.com/includes/downloads/2018-special-counsel-salary-guide.pdf

Casey Sullivan, *Ex-Big Law Associate Claims His Ethical Concerns About Partners Got Him Fired*, Bloomberg Law. May 10, 2017.  https://biglawbusiness.com/ex-big-law-associate-claims-his-ethical-concerns-about-partners-got-him-fired/

Paul Sullivan, *The Price Whistle-Blowers Pay for Secrets*, New York Times, September 21, 2012. https://www.nytimes.com/2012/09/22/your-money/for-whistle-blowers-consider-the-risks-wealth-matters.html

Stephanie Wechsler, *Why it's best to move as a Mid-Level*, Vault Blog, March 10, 2009. http://www.vault.com/blog/job-search/why-its-best-to-move-as-a-mid-level

Debra Cassens Weiss, *King & Spalding Tops List of Partner Promotion Percentages*, ABA Journal, February 12, 2008. http://www.abajournal.com/news/article/king_spalding_tops_list_of_partner_promotion_percentages

John Ydstie, *Job Seekers Find Bias Against the Unemployed*, NPR, November 17, 2010. https://www.npr.org/2010/11/16/131367533/some-will-only-hire-if-you-already-have-a-job

Staci Zaretsky, *Salary Wars Scorecard: Which Firms Have Announced Raises and Bonuses? (2018)* Above the Law, June 5, 2018. https://abovethelaw.com/2018/06/salary-wars-scorecard-which-firms-have-announced-raises-2018/

** These sources are those reviewed and cited in the report. In the course of researching and preparing this report, I reviewed other materials pertinent to the facts of the case and to my expert opinions, including legal publications and surveys, and media reports about the Joffe case in Bloomberg, Law360, Law.com, ABA Journal, Reuters, and Yahoo Finance, among others.

Cases Testified in as an Expert at Trial or by Deposition

In Wadler v. Bio-Rad Laboratories, Inc., N.D. Cal. Case No. 15-cv-02356-JCS, in the United States District Court in San Francisco, tried in January 2017, I was qualified as an expert on attorney recruiting and executive recruiting matters including, among other things, the precise issue in this case: whether an employer's well-publicized dismissal of and negative allegations about an employee, and the related reputational damage, would have an adverse effect on the dismissed employee's future employment prospects and career. I offered expert testimony, in the form of deposition testimony and two expert reports, in support of the plaintiff, the dismissed Executive Vice President and General Counsel attorney. The jury found that the plaintiff's firing

was in retaliation for protected whistleblowing activity and awarded him approximately $11 million in damages, plus attorney's fees.

In 2017, I was retained by the plaintiff, a dismissed hedge fund portfolio executive, in Joshua Terry v. Highland Capital Management, LP, and ACIS Capital Management, LP, a Dallas, Texas arbitration. The hedge fund portfolio manager alleged wrongful dismissal, among other issues.  I testified in a deposition on the issue of the future employability of the dismissed executive. Similar to the Wadler case and the case before us now, the primary issue my testimony addressed was the effect the public dismissal of the employee would have on the executive's future career and job opportunities. In August of 2017, the arbitration panel awarded the dismissed executive $8 million.

In Chism vs. Tri-State Construction, Inc., Case No. 12-2-32541-3 SEA (2014), I testified both in deposition and trial for the employer defendant corporation in a dispute with its former General Counsel attorney on the issues of attorney compensation, accepted hiring practices, and attorney employability.  In that case the judge issued an opinion in which the Court found me to be a "credible and knowledgeable" "expert in the field of placing attorneys." The court was the Superior Court of the State of Washington in King County.

<u>Compensation</u>

My fee schedule is $400 per hour.


Dated: October 10, 2018

Gordon A. Kamisar

**GORDON A. KAMISAR**
26604 SE 16th Ct.
Sammamish, Washington 98075
gkamisar@seattlesearch.com
(425) 392-1969
Cell: (206) 947-1970

## EDUCATION

**Duke University School of Law**                                    Durham, NC
J.D, 1985
Member, Dean's Advisory Council

**University of Michigan**                                          Ann Arbor, MI
B.A., *with Distinction*, Psychology, 1982

## CURRENT CAREER EXPERIENCE

**Kamisar Legal Search, Inc.**                                      Seattle, WA
President, 1990-Present

Founded Kamisar Legal Search, Inc. (KLS), a Seattle-based attorney recruitment firm that places attorneys locally, nationally and internationally. Was the first attorney to enter the Pacific Northwest legal search profession. Have placed over 300 attorneys in law firms of all sizes and over 100 attorneys in in-house positions at corporations and non-profit organizations. Client base includes law firms of all sizes throughout the nation as well as corporations ranging in size from start-ups to the Fortune 100. Representative placements include those at Microsoft, Starbucks, Amazon, Nike, Nintendo of America, Real Networks, Corbis, Digeo, The Bill and Melinda Gates Foundation, AT&T Bell Labs, AT&T Wireless Services, and Texas Instruments.

Additionally, have provided career counseling to individual attorneys on a range of issues such as how to improve their future employment opportunities, how to improve their resumes, and whether or not to pursue certain job opportunities.

KLS's business has expanded over the years to include non-attorney executives, including Human Resources Managers, Safety Managers, and CEO and CFO executives for private equity firms.

## EXPERT WITNESS EXPERIENCE

Have served as an expert witness on the subjects of attorney compensation, attorney marketability, attorney employability, attorney earning capacity, and attorney job search analysis.

In Chism vs. Tri-State Construction, Inc., Case No. 12-2-32541-3 SEA (2014), I testified both in deposition and trial for the employer defendant corporation in a dispute with its former General Counsel attorney on the issues of attorney compensation, accepted hiring practices, and attorney employability. In that case the judge issued an opinion in which the Court found me to be a "credible and knowledgeable" "expert in the field of placing attorneys." The court was the Superior Court of the State of Washington in King County.

In Wadler v. Bio-Rad Laboratories, Inc., N.D. Cal. Case No. 15-cv-02356-JCS, in the United States District Court in San Francisco, testified as an expert in attorney recruiting and executive recruiting matters including, among things, whether the negative allegations by an employer, and related reputational damage, would have an adverse effect on the dismissed employee's future employment prospects and career. Testified in support of dismissed plaintiff, an Executive Vice President and General Counsel attorney of a Fortune 500 company. In January 2017, plaintiff was awarded approximately $11 million in damages, plus attorneys' fees, when the jury found the employer violated whistleblower protections in its retaliatory firing of the plaintiff.

In 2017, retained by a dismissed hedge fund portfolio executive in Joshua Terry v. Highland Capital Management, LP, and ACIS Capital Management, LP, a Dallas, Texas arbitration involving a hedge fund portfolio manager who alleged wrongful dismissal, among other claims. Testified in a deposition on the issue of the future employability of the dismissed executive. Similar to the Wadler case, the primary issue I addressed in my testimony was the effect the public dismissal of the employee would have on the executive's future career and job opportunities. In August 2017, the arbitration panel awarded the dismissed executive $8 million.

## PREVIOUS CAREER EXPERIENCE AS PRACTICING ATTORNEY

Practiced litigation, copyright and computer law. Began career as an Associate at McCutchen, Doyle, Brown & Enersen, one of the largest law firms in San Francisco at the time. (Firm later became Bingham McCutchen, which was then absorbed by Morgan Lewis, one of the world's largest law firms.) Moved to Washington, DC, and practiced for at Wickens, Koches & Brooks, a litigation boutique, where I also served on the Hiring Committee. Finished legal career in litigation department of Seattle-based LeSourd & Patten, P.S.

As attorney, gained substantial expertise in intellectual property and computer law. Obtained copyright registrations for computer software and worked on copyright infringement action on behalf of a Fortune 500 manufacturer of computer hardware and software. Involved in litigating then cutting-edge issue of whether computer languages are protectable under the copyright laws.

Was a Summer Associate at New York law firm, Donovan Leisure Newton & Irvine, from which I received a permanent offer of employment upon graduation.

## PUBLICATIONS

Co-Author, "Who Really Owns 'Your' Software Programs?" The Software Practitioner (June, 1994).

Author, "Dispelling Common Misconceptions and Confusion About Copyright Protection," Barrister Magazine (American Bar Association) (1988).

Past Member of the Copyright Subcommittee of the American Bar Association (ABA)'s Committee on Computer Programs, the ABA's Committee on Computer Litigation, and the Committee on Electronic & Computer Law of the American Intellectual Property Association (AIPLA).

**SPEAKING ENGAGEMENTS**

Made presentations to law firms on attorney compensation, attorney marketability, and recruitment techniques based upon candidate demographics and practice areas.

Presented at the annual meeting of the National Association of Legal Search Consultants (NALSC) on the subjects of attorney recruitment and marketability with emphasis on the specialized market for intellectual property attorneys.

**CURRENT AFFILIATIONS**

Active Member, Washington State Bar Association

Active Member, National Association of Legal Search Consultants (NALSC)

Active Member, National Association of Personnel Services (NAPS)

Certified Personnel Consultant (CPC) (2017) by the National Association of Personnel Services (NAPS), believed to be the largest and oldest organization of executive recruiters, including legal recruiters, in the United States. Certification is based on meeting peer established criteria, including passing a certification examination.

**RECOGNITION**

Biography included in 6th Edition of Who's Who in American Law