**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**DAVID A. JOFFE,**

**Plaintiff,**

**v.**

**KING & SPALDING LLP,**

**Defendant.**

**Case No. 17-cv-3392 (VEC) (SDA)**

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF DEFENDANT'S REBUTTAL VOCATIONAL EXPERT CARLYNN MAGLIANO SWEENEY

David A. Joffe, Esq. (pro se)
155 Christopher Columbus Drive
Jersey City, NJ 07302
516-695-7086
davidajoffe@gmail.com

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT……………………………………………..………………1**

**ARGUMENT…………….………………………………………………………………….....2**

**I. Defendant Misstates the Scope of the Undersigned's Objections……………………..2**

**II. Ms. Sweeney's Opinion (iii) Recites, *Ad Verbum*, a Conclusion the Jury Must Make..2**

**III. K&S's Discovery Requests Did Not Anticipate Its Expert's Later Criteria...........….3**

**IV. Mr. Kamisar Is Qualified to Opine on Pending-Lawsuit Effects; Ms. Sweeney Is Not.5**

**V. Addendum A Is Not Empirical Evidence and Does Not Rebut Mr. Kamisar………..8**

**VI. Testimony About Mr. Moskowitz Is Prejudicial and, at Best, Minimally Probative..9**

**CONCLUSION……………………………………………………………...…………10**

# TABLE OF AUTHORITIES

## Cases

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ........................................ 5

Davis v. Carroll,
937 F. Supp. 2d 390 (S.D.N.Y. 2013) ........................................ 7

Roniger v. McCall,
No. 97 Civ. 8009 (RWS), 2000 U.S. Dist. LEXIS 11999 (S.D.N.Y. Aug. 22, 2000)................. 3

Scott v. Chipotle Mexican Grill, Inc.,
315 F.R.D. 33, 44 (S.D.N.Y. 2016)........................................ 5, 8

## Statutes & Rules

Federal Rule of Evidence 403........................................ 9, 10

Federal Rule of Evidence 702........................................ 5, 7, 8, 10

## Other Authorities

Learned Hand, Historical and Practical Considerations Regarding Expert Testimony,
15 Harv. L. Rev. 40, 54 (1901)........................................ 7

## PRELIMINARY STATEMENT

Defendant King & Spalding LLP's ("K&S" or "the Firm") opposition to the undersigned's motion to exclude certain opinions of the Firm's vocational expert Carlynn Magliano Sweeney fails to establish the admissibility of those opinions.

*First*, Defendant's concession that Ms. Sweeney will not testify "as to whether Joffe's job search efforts were in fact reasonable" effectively withdraws Ms. Sweeney's Opinion (iii), which expresses precisely that conclusion. And this opinion could not in any case have been reliable—because the methodology on which it is based requires data that Ms. Sweeney did not have and, as the discovery record confirms, K&S did not seek.

*Second*, Defendant does not identify any basis that would qualify its proffered expert to issue her Opinion (iv), Ms. Sweeney's baroque, conceptually destitute analysis of ongoing publicity surrounding terminated counsel Andrew M. Moskowitz, and, in particular, Magistrate Judge Aaron's October 2, 2018 Opinion and Order in this case. K&S acknowledges Ms. Sweeney's lack of professional experience upon which to opine, while the "empirical" evidence she gathers in its stead concerns a different issue than the conclusion she purports to rebut.

*Finally*, Defendant claims not to recognize the blatantly inflammatory nature of Ms. Sweeney's proffered testimony about the undersigned's "notoriety," "sense of entitlement," and "egregious temperament." It's nothing personal, the Firm assures—Ms. Sweeney will merely tell the jury how the undersigned may be "perceived" by "others" from "reports" that "speak to" these qualities. K&S's clever dodge has been used since antiquity, see Cicero, The Catiline Orations ("I will not even mention the fact that you betrayed us in the Roman people by aiding Catiline."), and the point would not be lost on the jury here. Passive-aggressive circumlocutions notwithstanding, Ms. Sweeney's prejudicial ad hominem attacks should be excluded.

## ARGUMENT

### I. Defendant Misstates the Scope of the Undersigned's Objections

As a threshold matter, Defendant mischaracterizes the undersigned's motion to exclude. Contrary to K&S's statement in its brief, see Def.'s Opp'n (Doc. No. 159) at 1, the undersigned's objection to Ms. Sweeney's Opinion (iii), see Ex. D (Sweeney Report) at 3, would not exclude Ms. Sweeney's testimony about the "actual world" in toto. Rather, excluding Opinion (iii) would sever only Ms. Sweeney's unreliable testimony on the ultimate jury question whether the undersigned's job-search efforts were reasonable.

K&S's mischaracterizations continue into its discussion of Ms. Sweeney's comparison-of-hurdles analysis in Opinion (iv). Again contrary to Defendant's assertion, this opinion is not proffered to rebut a sweeping conclusion—because Mr. Kamisar does not reach such a conclusion—that the undersigned will "never land another legal job" as a result of the K&S Publicity. See Def.'s Opp'n at 8. Rather, Mr. Kamisar concludes that, as a result of ***ongoing publicity***, employers are highly unlikely to hire the undersigned ***while this suit is pending***. See Ex. F (Kamisar Report) at 7. Accordingly, Ms. Sweeney's unreliable criticism that Mr. Kamisar failed to consider the Moskowitz Publicity, see Def.'s Opp'n at 10, concerns only the discrete period between October 2, 2018—the date of the Law360 report on Magistrate Judge Aaron's Opinion and Order, on which Ms. Sweeney relies—and the date of the jury's verdict. As further set forth infra, this highly-limited temporal scope further confirms that the danger of undue prejudice from Mr. Sweeney's testimony about Mr. Moskowitz far outweighs its probative value.

### II. Ms. Sweeney's Opinion (iii) Recites, *Ad Verbum*, a Conclusion the Jury Must Make

Defendant's opposition states: "For the avoidance of doubt, *K&S will not offer Sweeney's opinions at trial as to whether Joffe's job search efforts were in fact reasonable*." See Def.'s

Opp'n at 4 (underline in original). This can only be understood as a withdrawal of Opinion (iii)—that "*Mr. Joffe has not undertaken a reasonable job search*," Sweeney Report at 2—as well as the corresponding addendum expounding that opinion, see id. at 19-23 (Addendum B). As K&S appears to acknowledge, Opinion (iii) improperly goes to an ultimate question for the jury and is indistinguishable from testimony that courts in other cases have rejected on that basis. See, e.g., Roniger v. McCall, No. 97 Civ. 8009 (RWS), 2000 U.S. Dist. LEXIS 11999, at *14 (S.D.N.Y. Aug. 22, 2000) ("It would not be proper for [expert] to testify as to whether [plaintiff's] efforts to find comparable employment were 'reasonable.'"). While the undersigned does not challenge Ms. Sweeney's testimony on industry practice—such as "the elements of a reasonable job search"[1]—as proffered, Ms. Sweeney's Opinion (iii) must be excluded.

## III. K&S's Discovery Requests Did Not Anticipate Its Expert's Later Criteria

Under Ms. Sweeney's three-category test for evaluating job-search efforts, only one category—informal networking—meaningfully affects the conclusion, afforded an overwhelming 80% of the total weight. Defendant argues that the Bates-stamped materials Ms. Sweeney relied upon provided sufficient data to conclude that the undersigned did not engage in a single act of networking, since any such "written evidence" would have been produced in discovery. See Def.'s Opp'n at 6-7. In fact it would not have been. As the fact-discovery record demonstrates, Defendant did not anticipate, and its document requests did not cover, its own expert's later methodology.

[1] K&S's opposition notes that courts frequently permit testimony concerning the kind and amount of effort that characterize a "typical" or "successful" job search, knowledge which is beyond the ken of a layperson. See, e.g., Roniger, 2000 U.S. Dist. LEXIS 11999, at *14. But Ms. Sweeney's testimony set forth in Addendum B does not describe any "typical" or "successful" job-search efforts that Ms. Sweeney has actually observed other lawyers undertake or attempt to make comparisons of the undersigned's efforts against such guideposts. Rather, the only comparison point for Ms. Sweeney's assertion that the undersigned's job-search efforts were "woefully inadequate" appears to be a hypothetical job search that meets the definition of "meaningful" set forth in bullet points on the first

Thus, Defendant's document requests served in discovery called for materials relating to "employment agencies, ***headhunters*** or ***potential employers***;" "***applications*** … submitted to an employment agency or to a ***potential employer***;" and "correspondence between Plaintiff and ***potential employers"*** (see Goldberg Decl. (Doc. No. 160), Ex. A at 7)—i.e., materials going precisely to what Ms. Sweeney calls "the online posting thing" and "working with recruiters," the two categories which together account for 20% of the inputs in her analysis.[2] By contrast, as confirmed at deposition, the category of informal networking that is given 80% of the weight in Ms. Sweeney's analysis would consist of documents "***one or even two steps removed***" from "***a potential employer***," see Pl.'s Mot. (Doc. No. 143) at 3—i.e., materials precisely outside the scope of K&S's requests.[3] Accordingly, because by Ms. Sweeney's own definition there is no overlap between the materials K&S requested in discovery and materials concerning networking that carry conclusive weight in Ms. Sweeney's evaluation, Defendant's expert's conclusion about the undersigned's job-search efforts cannot have been based on sufficient data.

---

page of Addendum B (e.g., "Staying calm and getting past the feeling of being in a crisis;" "Utilizing a wide variety of resources…."). See Sweeney Report at 19.

[2] K&S's description of the undersigned's job applications produced in discovery as "duplicative" and "misleading," see Def.'s Opp'n at 5 n.4, is misleading in its own right. While the undersigned certainly attached "the identical resume" to various applications, the undersigned by no means bulk-mailed identical writing samples to generate a longer paper trail. The undersigned attached such writing samples only in discrete instances where the job application specifically called for it—a minority of the applications submitted—and the writing samples are not identical; rather, reflecting the care and effort put into the job search, each was deliberately selected with a view to the particular job in question.

[3] As Defendant notes, the undersigned did not assert specific objections to the Firm's document requests concerning mitigation efforts, but "agreed to produce" and did produce "responsive documents" as requested. See Def.'s Opp'n at 5 n.5. Under no reasonable reading, however, did K&S's requests for materials relating to "potential employers" call for the disclosure of, e.g., contacts with anyone "who might be in a position to help," see Def.'s Opp'n at 5 (emphasis added), or calendar entries reflecting "coffee meetings," id. at 5 n.5. If K&S had actually intended to seek such materials, the words and phrases it uses now to describe them in its brief would have appeared on the face of its discovery requests—but they do not. Even if the undersigned had a crystal ball and could have foreseen that Defendant would later reinterpret "potential employer" in its requests to mean anyone "who might be in a position to help with [a] job search," and "Plaintiff's attempts to obtain employment" to embrace the undersigned's coffee breaks with former classmates, all in an effort to match its expert's later-proffered methodology, this would be covered by the undersigned's general objection to all of Defendant's document requests to the extent they are overly broad, unduly burdensome, ambiguous, or vague.

Defendant also argues that, even if there was a data gap between the discovery materials and its expert's conclusions, Ms. Sweeney had "no obligation to consider [it]" because she is a rebuttal witness. See Def.'s Opp'n at 6. But that is beside the point with respect to Opinion (iii), which is based on Ms. Sweeney's separate review of the undersigned's job-search efforts and applies her own independently-developed methodology. While "[a] rebuttal expert is permitted to use new methodologies," as Ms. Sweeney does here, the use of such new methodologies must, "[a]t a minimum, meet Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)]'s threshold standards." See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016). Because Opinion (iii) of the Sweeney Report relies on data that is insufficient to apply Ms. Sweeney's own stated methodology, like any unreliable expert opinion, Opinion (iii) must be excluded.

Finally, Defendant attempts to fill the gap between Ms. Sweeney's data and her conclusions by exploiting the undersigned's status as pro se litigant, arguing that the absence of networking can be inferred from the fact that the undersigned did not "actually say outright"—in his January 16, 2019 motion to exclude—"[whether] he engaged in direct networking efforts." See Def.'s Opp'n at 5. But, having failed to request this information in document discovery, and having failed to ask a single question on the issue at the undersigned's deposition, K&S cannot seriously now expect to have the adverse party unilaterally supplement the fact record through motion practice.

## IV. Mr. Kamisar Is Qualified to Opine on Pending-Lawsuit Effects; Ms. Sweeney Is Not

Defendant correctly notes that the undersigned's positions on Mr. Kamisar's and Ms. Sweeney's respective qualifications to opine on pending-lawsuit publicity are taken "without any sense of irony." See Def.'s Opp'n at 9. The undersigned is indeed sincere: under the same

Federal Rule of Evidence 702 admissibility criteria, Mr. Kamisar is qualified, and Ms. Sweeney is not.

Applying the agreed standard for experience-based expert conclusions, Mr. Kamisar was able to explain, including detailed discussion of three specific instances in which he had personal involvement from his recruiting practice, why his experience is sufficient to reach and was reliably applied to reach the general conclusion that legal employers are generally risk-averse and would be circumspect in hiring an attorney facing ongoing litigation with a former employer. While the publicity faced by the attorney in each of Mr. Kamisar's examples is not identical to the case at hand, Mr. Kamisar nevertheless identifies the common denominator of pending, workplace-related allegations to conclude that employers would be highly skittish about hiring the undersigned while his highly-publicized employment suit is pending, due to "the uncertainty of the outcome" and "***the risk of future negative allegations***." See Kamisar Report at 7.[4] This is

[4] Mr. Kamisar's first example concerned his refusal to work with an attorney who in a state of intoxication threatened to commit arson under circumstances suggesting a hate crime, as became publicly known. See Joffe Decl. (Doc. No. 165), Ex. 5 (Kamisar Dep.) at 238:5-13. This example supports Mr. Kamisar's conclusion because, as Mr. Kamisar learned, this individual "was immediately terminated and taken off the website at his firm," id. at 238:8-9, and, after the allegations were further aired, lost his law license, see id. at 269:6-8. In turn, Mr. Kamisar's second example—a public figure who lost his prior employment "for sexually assaulting women over a vast amount of time," id. at 240:19-21—supports Mr. Kamisar's conclusion because, upon attempting to place this individual, Mr. Kamisar learned from a law firm hiring partner that "there's no way in H E L L that that's going to work … don't bother," id. at 242:1-3. And Mr. Kamisar's third example—concerning an attorney who had a public role in a small municipality where he got caught looking at pornography at work, which the attorney at first denied citing religious piety, see id. at 242:5-243:17—supports Mr. Kamisar's conclusion because Mr. Kamisar learned that this attorney was not hired by another legal employer but became a solo practitioner~~ and, subsequently, left the law to work for a financial company~~, see id. at 244:8-~~25~~15.

precisely the experiential methodology contemplated by Rule 702, see, e.g., Davis v. Carroll, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (citing Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)) ("[experts] tie observations to conclusions through the use of … 'general truths derived from specialized experience'"), and, as such, is sufficient to discharge the proponent's burden of establishing admissibility.

K&S, by contrast, fails to discharge its burden to establish the adequacy of Ms. Sweeney's experiential qualifications for her comparison-of-hurdles analysis in Opinion (iv). Defendant falls short at the very threshold, as it does not point to ***any relevant experience whatsoever***—not experience interacting with lawyers pursuing employment litigation;[5] nor experience interacting with lawyers facing other adverse workplace-related publicity; nor even experience interacting with potential employers concerning these subjects—that would qualify Ms. Sweeney to draw nuanced distinctions about employers' relative weighting of the K&S Publicity versus the Moskowitz Publicity on the basis of open-ended criteria that cannot be given

Notably, the conclusion Mr. Kamisar draws from his experience—that the K&S Publicity standing alone would cause employers to be wary of "future negative allegations"—encompasses the Moskowitz Publicity as part of the same cause of the undersigned's diminished employability while this suit is pending, rather than an "intervening cause" as Defendant suggests. In other words, the very fact that the undersigned's name became generally publicized in the legal press in connection with his suit against K&S would by itself have made employers hold off on hiring the undersigned while that suit is ongoing, precisely because ***any*** allegations during this time period—whether relating to K&S, Mr. Moskowitz, or something else—would be publicized too, far beyond the level to which such other matters would be publicized in the absence of the instant case. For this reason, Defendant's claim that the Moskowitz Publicity "has nothing to do with K&S," Def.'s Opp'n at 9, misses the mark. While K&S is not the proximate cause of the underlying dispute with former counsel, the Firm is very much the reason why this dispute is the subject of publicity, as evidenced by the fact that every single one of the "more than ten" items of Moskowitz Publicity to which Ms. Sweeney cites in her Report has the words "King & Spalding" in the headline. See Sweeney Report at 7 & nn.6-7.

[5] The undersigned does not argue, as K&S would have it, see Def.'s Opp'n at 6, that experience interacting with individuals facing "publicity from employment litigation," narrowly defined, is an absolute prerequisite to proffer Ms. Sweeney's Opinion (iv)—though such experience would certainly suffice. But, in any case, it is K&S's burden, not the undersigned's, to identify Ms. Sweeney's relevant experience, and K&S fails to do so.

objective meaning.[6] Defendant's conclusory statement that, "As a highly qualified career coach … Sweeney is clearly qualified," see Def.'s Opp'n at 7, does not suffice.

Finally, here too Defendant cannot exempt itself from Rule 702 by claiming a "different and lower burden" for rebuttal witnesses. See Def.'s Opp'n at 7. Rebuttal witnesses must meet the same qualification standards as affirmative experts. See Scott, 315 F.R.D. at 44.[7]

## V. Addendum A Is Not Empirical Evidence and Does Not Rebut Mr. Kamisar

Ms. Sweeney's lack of experiential qualifications to substantiate her Opinion (iv) is not compensated by the handpicked list in Addendum A of attorneys who sued their former law firms. See Sweeney Report at 14-18. Even setting aside the internal contradictions and unreliable methodology underlying Ms. Sweeney's list that are set forth in the undersigned's moving papers, see Pl.'s Mot. at 7-8,[8] Addendum A does not reliably serve the purpose that

---

[6] K&S finds "condescending" the undersigned's statement that Ms. Sweeney's comparison-of-hurdles analysis amounts, in substance, to "gibberish." See Def.'s Opp'n at 7 (citing Pl.'s Mot. at 1). The undersigned does not suggest, of course, that Ms. Sweeney's analysis is completely unintelligible—as her deposition transcript attests, Ms. Sweeney is a highly articulate witness. Rather, Ms. Sweeney's Opinion (iv) amounts to gibberish because the underlying criteria—e.g., whether a certain article speaks to "temperament," which would influence employers, or alternatively to "behavior," which would not—cannot be applied by anyone other than Ms. Sweeney. Accordingly, whatever value Ms. Sweeney's criteria may have as "common-sense observation," see Def.'s Opp'n at 9 n.9, as expert analysis these criteria consist of quite literally meaningless language.

[7] K&S suggests that a rebuttal expert is exempt from Rule 702 to the extent they "simply point out flaws" in the affirmative expert's testimony. See Def.'s Opp'n at 8 n.8. But pointing out flaws does not "help the trier of fact," as Rule 702 requires, unless the rebuttal exert is actually qualified to identify whether or not something is a flaw. Here, for example, one of the purported "flaws" identified by Ms. Sweeney is Mr. Kamisar's failure to consider that the undersigned's "notoriety" from the K&S Publicity would be an "asset if he would have applied to higher paying whistleblower firms." See Sweeney Report at 5. But, because Ms. Sweeney does not have relevant experience or qualifications to know whether the asset-value of personal "notoriety" is actually relevant to whistleblower firms (rather than the product of Ms. Sweeney's own uninformed surmise), the jury would not be aided by her observation that Mr. Kamisar failed to consider it.

[8] K&S's counsel, having conducted extensive further research on two attorney-plaintiffs identified in the undersigned's moving papers, sets forth in a footnote detailed argumentation for why these individuals' examples "refute Kamisar's opinion." See Def.'s Opp'n at 7 (emphasis in original). To the extent counsel's argumentation is persuasive, this only further undermines the reliability of Ms. Sweeney's analysis in light of Ms. Sweeney's failure to incorporate or even consider these examples when forming her opinion, and, conversely, also strongly suggests that Ms. Sweeney's "common sense" publicity analysis can be performed as well or better by counsel and does not require involving Ms. Sweeney to confer on this analysis the patina of "expertise."

Defendant describes—i.e., "identify[ing] counterexamples" to Mr. Kamisar's conclusion, see Def.'s Opp'n at 7. Ms. Sweeney's list of individuals who, in K&S's words, "received media attention and then found another legal job," id. (emphasis added), would rebut only the straw-man "thesis"—which Mr. Kamisar does not proffer—"that attorneys who sue their firms never land another legal job," see id. at 8 (emphasis added). But this list does not rebut, and in fact appears only to confirm, Mr. Kamisar's actual thesis—that employers would be circumspect about hiring the undersigned now, while media attention is ongoing. And Ms. Sweeney's list separately fails to identify counterexamples-in-rebuttal because a substantial fraction of the individuals therein became solo practitioners, which is equally consistent the notion of a "last-resort" move by an attorney who was unable find subsequent legal employment (such as, e.g., Mr. Kamisar's example of the municipal attorney caught looking at pornography at work, see Kamisar Tr. at 242:5-243:17).

**VI. Testimony About Mr. Moskowitz Is Prejudicial and, at Best, Minimally Probative**

King & Spalding's opposition addresses the danger of undue prejudice from testimony about the Moskowitz Publicity by repeating that Ms. Sweeney merely identifies deficiencies in Mr. Kamisar's analysis. See Def.'s Opp'n at 9-10. But this employs a classic dodge of paralipsis. As K&S would have it, Ms. Sweeney will tell the jury not that the undersigned's temperament is egregious, but, instead, that "highly unflattering" "reports" can be "perceived" by unnamed "others" as "speaking to" the undersigned's egregious temperament. Common sense, however—and the orators of classical antiquity—both strongly suggest that the jury will understand this as a passive-aggressive way of communicating the very things Ms. Sweeney purports not to say directly.

Defendant also fails to consider, as part of the Rule 403 analysis, the highly limited

probative value Ms. Sweeney's opinions concerning the Moskowitz Publicity would have even if they were reliable (which they are not). As set forth in the undersigned's prior opposition brief, Ms. Sweeney's and Mr. Kamisar's conclusions regarding the undersigned's compensation prospects in the actual world post-trial boil down to the question whether the undersigned should expect a salary somewhat higher than or somewhat lower than $200,000 per year. See Pl.'s Opp'n (Doc. No. 152) at 23-24. The only relevance to this disagreement of Ms. Sweeney's opinion on the Moskowitz Publicity concerns the undersigned's ability to obtain this salary in the discrete period—presumably less than a year—between Magistrate Judge Aaron's October 2, 2018 Opinion and Order and the date of the jury's verdict. Considered against the highly fraught subjects that Ms. Sweeney's Opinion (iv) on the Moskowitz Publicity would raise—including her running commentary on whatever judicial developments on the Opinion and Order take place in this Court between now and the date of Ms. Sweeney's testimony—the highly circumscribed probative value of that opinion further militates in favor of its exclusion under the balancing test of Rule 403.

## CONCLUSION

For the reasons set forth herein and in the undersigned's moving brief, the undersigned respectfully requests that this Court exclude, pursuant to Federal Rules of Evidence 403 and 702, Opinions (iii) and (iv) of the Sweeney Report and Ms. Sweeney's testimony with respect to those opinions, and grant such other relief as the Court deems proper.

Dated: February 27, 2019

By: *[/s/ David A. Joffe]*

David A. Joffe, Esq. (pro se)
155 Christopher Columbus Drive
Jersey City, NJ 07302
516-695-7086
davidajoffe@gmail.com