UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__09/24/2019__
```

-------------------------------------------------------------X
DAVID A. JOFFE,                             :
                                            :
                    Plaintiff,              :
                                            :          17-CV-3392 (VEC)
          -against-                         :
                                            :          OPINION AND ORDER
KING & SPALDING LLP,                        :
                                            :
                    Defendant.              :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        This action stems from Plaintiff David Joffe's unceremonious termination from

Defendant King & Spalding LLP ("K&S").  Defendant moves to preclude Plaintiff's vocational

and damages experts; Plaintiff moves to preclude Defendant's vocational, damages, and ethics

experts.  The vast majority of the parties' arguments go to the weight of the experts' opinions,

not their admissibility.  For the reasons discussed below, Plaintiff's motion to exclude

Defendant's damages expert is denied; Plaintiff's motion to exclude Defendant's ethics expert is

granted; all other motions are granted in part and denied in part.

## BACKGROUND[1]

        On December 7, 2016, Plaintiff, then an eighth-year litigation associate at K&S, was

informed that he was being terminated, without prior notice; he was then escorted from the

building.  *Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2018 WL 2768645, at *7 (S.D.N.Y.

June 8, 2018).  Prior to terminating Plaintiff's employment, K&S had demoted Plaintiff from

senior associate to associate, removed Plaintiff from the firm's partnership track, frozen his pay,

and denied him a bonus for 2015.  *Id.* at *4.

---

[1]        The Court limits the factual background to the facts necessary to contextualize the motions at issue.  A
more detailed recitation of the history of the case can be found in this Court's summary-judgment order.  *See Joffe v.
King & Spalding LLP*, No. 17-CV-3392, 2018 WL 2768645, at *1 (S.D.N.Y. June 8, 2018).

Plaintiff alleges that the pre-termination adverse actions were due to his expression of ethical concerns about the conduct of two K&S partners, which arose during their representation of ZTE, a Chinese telecommunications company.  *Id.* at *1, 3–4.  Purportedly worried that he was being penalized for having raised such concerns, on July 25, 2016, Plaintiff emailed David Tetrick, who was the partner in charge of the K&S's Business Litigation Associates Committee, stating:

> To be clear, I do not believe that Bob [Straus] or Paul [Perry] intentionally misled the Court, nor that they engaged in any other culpable conduct. However, I do believe the Sanctions Order was an entirely understandable, and entirely foreseeable, result of several instances of poor judgment by the partners, in the face of ever more glaring red flags, that occurred over the prior year in which the matter had been pending.  While I had raised my concerns with the partners throughout that period (which, I believe, helped prevent several other near-misses), as the associate on the matter, the ultimate decision-making was, largely, outside my personal control.

*Id.* at *4 (citation omitted).  Plaintiff asserts that the July 25 email was a separate instance of him attempting to report potentially unethical conduct to a senior attorney at K&S; Defendant disagrees.  *Id.*  This Court, in denying Defendant's motion for summary judgment, determined that the issue is a factual dispute for the jury.  *Id.* at *10 ("A reasonable jury might [] view the July 25, 2016 Email as an attempt to report ethical concerns to more senior attorneys at King & Spalding.").  In September 2016, Tetrick decided to fire Plaintiff; Tetrick formally terminated Plaintiff on December 7.  *Id.* at *5.  Because the firing occurred before the new year, K&S rescinded a $20,000 contribution to Joffe's 401k account, three days before the contribution would have vested.  *Id.* at *7.

Plaintiff claims that his firing (and the manner of his firing), as well as the pre-termination adverse actions, were retaliation for Plaintiff's efforts to comply with the Rules of Professional Conduct for New York attorneys.  *Id.*  According to Plaintiff's theory of his injury, but for the unlawful termination, he would have been promoted to partner or counsel at K&S or a

comparable law firm.  To support that theory, Plaintiff wishes to offer the testimony of Gordon Kamisar, whose report concludes that Plaintiff likely would have become either a partner or counsel but for the firing, and that the manner in which K&S terminated Plaintiff rendered him essentially unemployable at comparable firms.  *See generally* Kamisar Report (Dkt. 163-2). Plaintiff also wishes to offer the testimony of Kristin Kucsma, an economist, whose report provides a year-by-year estimate of Joffe's lost earnings as a result of not being promoted to partner or counsel.  *See generally* Kucsma Report (Dkt. 155-6).

K&S argues that Plaintiff was fired for poor performance and, even if he was not, Plaintiff was not retaliatorily discharged because he was not in fact reporting an ethics violation. Furthermore, K&S argues, Plaintiff did not conduct a reasonable job search and thereby failed to mitigate damages.  Defendant wishes to offer the testimony of Professor Bruce Green, an ethics professor, who would opine that K&S did not commit an ethics violation and that, as a result, Plaintiff had no reporting obligation under the Rules of Professional Conduct and was unreasonable in believing that he had such an obligation.  *See generally* Green Report (Dkt. 138-1).  Defendant also wishes to call Carolyn Sweeney, a career counselor, to rebut Kamisar's testimony and to opine that Plaintiff did not conduct a reasonable job search and that, regardless of his firing, he would have had difficulty finding a comparable job as an eighth-year litigation associate.  *See generally* Sweeney Report (Dkt. 144-4).  And finally, Defendant wishes to call Thomas Hubbard, a business school professor, to opine that Kucsma's damages models are systematically biased in favor of Plaintiff.  *See generally* Hubbard Report (Dkt. 141-1).

The parties have moved to preclude the testimony of each of their opposing experts, filing a total of five motions pursuant to Rule 702 of the Federal Rules of Evidence.

**DISCUSSION**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ."  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993) (describing "liberal thrust" of the Federal Rules and "general approach of relaxing the traditional barriers to 'opinion' testimony" (citation omitted)); *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016) ("The Second Circuit has instructed that there is a 'presumption of admissibility of [expert] evidence' after *Daubert*." (quoting *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995))).  Nevertheless, the district court must act as a gatekeeper against unreliable expert testimony.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  The proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact.  *See, e.g., Nimely*, 414 F.3d at 397; *Williams*, 506 F.3d at 160.

To determine whether an expert is qualified, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  A "lack of

4

formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004); *see McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (holding that Appellant's "quibble with [expert's] academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility"). "The words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule . . . ." *See United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (quoting Fed. R. Evid. 702).

To ascertain reliability, "the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265–66 (2d Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case." *Id.* at 266. "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* Expert methods and opinions that are "debatable" or "shaky" that can be adequately tested during trial should not be excluded under *Daubert*'s liberal standard, unless the flaws are so large that the expert "lacks good grounds for his or her conclusions." *Id.* at 267 (citations omitted); *see Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence."). That is, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267.

To determine whether expert opinion will assist the trier of fact, courts must consider whether the purported expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[2]  Fed. R. Evid. 702. Proffered testimony is not helpful to the jury if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (citation omitted). An expert's opinion must be precluded if it "undertakes to tell the jury what result to reach" and "attempts to substitute the expert's judgment for the jury's." *Id.* (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

Finally, "[i]n addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 403). Courts have recognized "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Id.*

## A.  Plaintiff's Vocational Expert, Gordon Kamisar

Kamisar is a legal recruiter who has placed attorneys at law firms and corporations for nearly 30 years. Kamisar Report at 1. He primarily places attorneys in the Seattle area, but he

---

[2]      At a minimum, the specialized knowledge being proffered must be relevant to the factual disputes in the case. *Amorgianos*, 303 F.3d at 265 ("[T]he trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) and Fed. R. Evid. 401)).

has some experience with attorneys in other markets, including New York, where Plaintiff was based while at K&S.  *Id.* at. 2.

After reviewing Plaintiff's resume, the Complaint, the undersigned's summary judgment opinion and related filings, and correspondence between Plaintiff and legal recruiters and prospective employers, Kamisar rendered three opinions.  *Id.* at 17–18.  First, "[a]s a result of Mr. Joffe's termination from King & Spalding, it will be nearly impossible for Mr. Joffe to obtain another legal position comparable to either the associate or senior associate position he held at King & Spalding."  *Id.* at 3.  Second, "[b]ut for King & Spalding's termination of Mr. Joffe under [the alleged] circumstances . . . , Mr. Joffe would likely have at least maintained his Senior Associate position at King & Spalding, and quite possibly have been offered a Counsel or Partner position with the firm."  *Id.*  Third, alternatively, but for the circumstances of his termination, Plaintiff "would have been well positioned to land a comparable position at another" firm offering roughly equivalent compensation.  *Id.*

K&S challenges Kamisar's admission as an expert on the basis of his qualifications, the relevance of his testimony, and the reliability of his conclusions.

### 1.  Qualifications

K&S contends that Kamisar is not qualified to opine on Plaintiff's employability in the New York market because he is a Seattle-based recruiter.  Def. Kamisar Br. (Dkt. 147) at 6.  At his deposition, Kamisar admitted that he had not placed any attorneys in New York in the past five years, and that over the course of his career, only approximately 15 of his 300-plus placements were in New York.  Kamisar Dep. (Dkt. 163-5) at 26–27.  Kamisar also testified that he had never successfully placed a senior litigation associate in New York.  *Id.* at 28.  For those reasons, K&S contends that there is a mismatch between Kamisar's experience and his testimony about Plaintiff's employability in New York.

K&S's objections to Kamisar's experience go to the weight of his testimony, not its admissibility.  K&S has provided no authority for the requirement that a vocational expert must be familiar with local employment conditions in order to testify about an individual's employability.  *See In re Benjumen*, 408 B.R. 9, 20 (Bankr. E.D.N.Y. 2009) ("Defendants fail . . . to provide any authority that requires the exclusion of [expert] testimony based on" failure to "examine local employment conditions.").  Rather, Kamisar's experience and Plaintiff's career are sufficiently aligned because both are focused on national law firms—whatever differences there may be in competitiveness between the Seattle and New York markets, those differences are unlikely to be so fundamental as to render Kamisar's experience wholly inapposite.  Moreover, as Kamisar indicated in his report, a recruiter typically conducts many more searches than successful placements—which means that using successful placements as the critical metric likely underestimates Kamisar's experience and expertise.  Kamisar Report at 2.  For instance, although he has not successfully placed a senior litigation associate in New York, Kamisar is familiar with job openings in New York, including at least one posting for a senior litigation associate.  Kamisar Dep. at 24.  K&S also does not contest that Kamisar has at least some experience placing attorneys, including litigators, in New York.  *See* Def. Kamisar Br. at 6.  The fact that those placements may be dated and relatively infrequent is classic grist for cross-examination.

The Court sees no other reason to question Gordon Kamisar's qualifications and concludes that he is qualified to testify as to Plaintiff's employability at national law firms, including in the New York market.

### 2.  Relevance

K&S contends next that the subject matter of Kamisar's proffered testimony, Plaintiff's employability, is irrelevant to this case.  Def. Kamisar Br. at 7.  Specifically, K&S argues that

Plaintiff, as a matter of law, is not entitled to consequential damages in this breach-of-contract case—and therefore, any evidence of lost earnings is immaterial and should be excluded. *Id.* at 7–8. K&S's argument as to the relevance of consequential damages is too little, too late.

Contrary to K&S's argument, consequential damages may sometimes be recoverable in a breach-of-contract case. Specifically, such damages are available if "they are reasonably foreseeable or 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'" *Judd Burstein, P.C. v. Long*, No. 15-CV-5295, 2017 WL 3535004, at *4 (S.D.N.Y. Aug. 16, 2017) (quoting *Kenford Co., Inc. v. Cty. of Erie*, 73 N.Y.2d 312, 319, 321 (1989)). The foreseeability of Plaintiff's difficulty in finding a comparable job following his unceremonious termination from K&S is a question for the jury. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-8317, 2017 WL 2664199, at *3 (S.D.N.Y. June 20, 2017) (declining to exclude expert because Defendant's argument as to admissibility turns on "the core factual dispute in this case"); *Int'l Connectors Indus., Ltd. v. Litton Sys., Inc., Winchester Elecs. Div.*, No. 88-CV-505, 1995 WL 253089, at *11 (D. Conn. Apr. 25, 1995) (denying summary judgment on availability of consequential damages because of factual disputes).

The cases on which K&S relies are distinguishable both factually and procedurally. In *Marchuk v. Faruqi & Faruqi, LLP*, the Court ruled on a motion for judgment as a matter of law in a sexual harassment case, concluding that insufficient evidence had been presented to render front-pay damages sufficiently certain; the Court did not come close to ruling on the availability of consequential damages in a breach-of-contract action as a general matter. 100 F. Supp. 3d 302, 306, 310 (S.D.N.Y. 2015) ("[W]ithout tangible evidence in the record, there is significant risk that any front pay award will be largely speculative."). In *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, the Court ruled on a summary judgment motion in a case involving several law-

firm partners' breach of a promise to support an associate's partnership application; the case therefore did not involve the foreseeable consequences of an unusually harsh termination, and the Court was not limiting damages through a *Daubert* ruling. 872 N.Y.S.2d 691 (Sup. Ct. 2008). Procedurally, K&S could have sought to limit Plaintiff's claim for consequential damages through a dispositive motion—the Court will not now conduct a mini-redo of summary judgment on an evidentiary motion. *See Ramirez v. Avery Berkel, Inc.*, No. 02-CV-6887, 2004 WL 3741743, at *9 (S.D.N.Y. Mar. 17, 2004) (explaining differing purposes of *Daubert* motion and summary judgment motion); *e.g.*, *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 375 (S.D.N.Y. 2014) ("The Court, accordingly, holds that the four categories of damages timely sought by PNC are consequential damages expressly barred by the [] damages waiver. The Court, therefore, grants [Defendant's] motion for summary judgment as to such damages."); *Roneker v. Kenworth Truck Co.*, 944 F. Supp. 179, 186 (W.D.N.Y. 1996) ("Accordingly, plaintiff is barred from recovering consequential damages . . . . To the extent that he is [seeking non-consequential damages], plaintiff can proceed to trial . . . ."); *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976) ("Accordingly, defendant's motion for summary judgment precluding plaintiffs from recovering consequential damages is hereby granted.").

The Court therefore concludes that Kamisar's testimony should not be excluded on relevance grounds.

### 3. Reliability

According to K&S, various parts of Kamisar's opinion are unreliable because he fails to explain the basis for his conclusions. First, Kamisar's opinion that Plaintiff may have been promoted to counsel or partner at K&S (or retained as a permanent senior associate) is purportedly unreliable because Kamisar had no knowledge of K&S's promotion practices, nor

did he make any effort to acquire such knowledge.  Def. Kamisar Br. at 11–12.  Second, Kamisar

reached an opinion about Plaintiff's employability without ascertaining his practice specialties or

the types of clients that Plaintiff represented, or consulting any of Kamisar's own records as to

past placements.  *Id.* at 13.  Third, Kamisar concluded that Plaintiff has been rendered

unemployable at comparable firms, without having confirmed his hypothesis by asking law firms

how they would react to a person with Plaintiff's background.  *Id.* at 14–15.  Finally, Kamisar

did not consider an obvious alternative cause of Plaintiff's unemployment, namely media

coverage of Plaintiff's acrimonious relationship with his former attorney in this case.  *Id.* at 16.

      The majority of K&S's arguments go to weight, not admissibility.  While conducting a

granular review of Plaintiff's former clients and cases and conducting an employer survey could

have bolstered the strength of his testimony, Kamisar, as an experienced recruiter, can predict

how employers are likely to react to Plaintiff's resume and credentials without fielding a survey.

Plaintiff's specializations and clientele are additional data points on which Kamisar could have

opined, but their absence alone does not contradict or otherwise negate Plaintiff's other

credentials.  *See In re Benjumen*, 408 B.R. at 20 ("Defendants fail . . . to provide any authority

that requires the exclusion of [expert] testimony based on" failure to "perform a full vocational

evaluation.").  To the extent that Kamisar failed to consider Plaintiff's lack of marketable

specialization or client experience, Defendant can explore that weakness on cross-examination.

*See Daubert*, 509 U.S. at 596.  Similarly, K&S can provide "contrary evidence" to rebut

Kamisar's opinion that Plaintiff could have been retained at K&S as a senior associate and

undermine Kamisar's assumption that K&S's retention policy is similar to other firms with

which he has experience.  *See* Kamisar Dep. at 254–56 ("I know from my experience that

[permanent retention of senior associates] happens all the time.  It's not like the old days where

you don't make partner [or counsel] and you're terminated. . . . I have no reason to believe

there's some special, unusual policy at King & Spalding . . . ."); *Daubert*, 509 U.S. at 596; *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may go to weight, not admissibility." (quotation marks and citation omitted)).

The Court does agree with K&S that Kamisar's conclusion that Plaintiff "quite possibly [would] have been offered a Counsel or Partner position" with K&S, Kamisar Report at 3, is inadmissible.  When a vocational expert relies "solely on experience," he or she "must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinions offered by the expert, and how that experience is reliably applied to the facts." *Gyllenhammer v. Am. Nat'l Red Cross*, No. 15-CV-1143, 2018 WL 1956426, at *6 (N.D.N.Y. Jan. 23, 2018); *see also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132–33 (2d Cir. 2006) (holding that expert qualified on basis of experience "must show how his or her experience . . . led to [the expert's] conclusion or provided a basis for [the expert's] opinion").  Here, Kamisar has no knowledge of K&S's promotion practices, including whether Plaintiff was likely to satisfy firm-specific, partner pre-requisites, nor does Kamisar have any experience working with K&S.  Kamisar Dep. at 140, 202–03, 217, 253.  Kamisar could have relied on his general knowledge of law firm promotional practices, as he did when explaining his opinion on retention of senior associates, and assumed (while explaining the basis for his assumption) that K&S is similar to other firms—but he did not do so.  Instead, Kamisar acknowledged that different firms in fact have different practices for elevating associates and conceded that he does not know K&S's practices.  *See* Kamisar Dep. at 140, 253.  In other words, Kamisar has not explained how his general knowledge of law firms translates into a

conclusion about Plaintiff's promotion prospects at K&S specifically.[3]  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  Because Kamisar's conclusion that Plaintiff could have become a K&S partner is speculative, it is excluded; Kamisar may still testify as to Plaintiff's chances of becoming a partner at a law firm more generally.

The Court also finds that Kamisar failed to consider the impact of media coverage of Plaintiff's toxic relationship with his former counsel when opining that Plaintiff's difficulty of finding employment to-date is attributable to K&S's actions.  For the majority of his report, Kamisar explains his view of the impact of Plaintiff's termination on his employability, noting, for instance, that law firms are generally risk-averse and will regard Plaintiff's unemployment as a red flag that he was terminated without notice.  *See* Kamisar Report at 6–7.  For those parts of the report, because Kamisar's opinion focused specifically on the impact of K&S's actions, he need not consider any effect of negative publicity surrounding Plaintiff's relationship with his former counsel, which occurred later.  In Section I. A. 3 of the report, however, Kamisar opines "[t]hat Mr. Joffe has been unable to get a job at another New York City law firm after he was terminated from King & Spalding . . . confirms how difficult his search has been and will continue to be."  *Id.* at 6.  To attribute Plaintiff's sustained difficulty in finding employment to K&S, Kamisar was required to consider "obvious alternative causes," including Plaintiff's public

---

[3]     In another part of his report, Kamisar characterizes Plaintiff's probability of making partner at K&S as "greater than 0%," as opposed to characterizing that result as "quite possibl[e]."  Kamisar Report at 14.  Kamisar derived the former conclusion from the fact that Plaintiff had been "on partnership track" prior to the alleged retaliation—he states that partnership track, by definition, means some non-zero possibility of making partner; Kamisar also relies on the parties' statement of undisputed facts that Plaintiff had a reasonable possibility of being *nominated* for partner.  *Id.*  That conclusion is not based on any specialized knowledge and is not helpful to the jury, who can draw the same inference from the fact that Plaintiff was on the partnership track.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015) ("[E]xperts who merely recit[e] what is on the face of a document produced during discovery do no more than that which the finder of fact could him or herself do, and such experts' reports may be precluded on this basis alone." (quotation marks and citation omitted)), *aff'd*, 899 F.3d 87 (2d Cir. 2018).

separation from his former counsel, which overlapped at least in part with his job-search.  *See Tardif v. City of New York*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) ("While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes [of injury] and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." (quotation marks and citation omitted)).

While Kamisar testified at his deposition that he has "thought about [Plaintiff's former-counsel controversy] quite a bit," Kamisar Dep. at 265, his report makes no mention of that consideration.  And to the extent that Kamisar attempted to downplay the significance of the controversy, he simply concluded that Magistrate Judge Stewart Aaron's characterization of Plaintiff's conduct—as "unprofessional"—was "pretty vague."  *Id.* at 266–67.  Because Kamisar failed to address an obvious alternative in his report and failed to give a reasoned explanation for that failure, Kamisar may not testify that Plaintiff's difficulty in finding a job, post-dating Plaintiff's conflict with his former counsel becoming the subject of media attention, is solely attributable to K&S's actions.[4]

\*　　\*　　\*

For those reasons, K&S's motion to exclude the testimony of Plaintiff's expert, Gordon Kamisar, is GRANTED to the extent that Kamisar may not testify about Plaintiff's chances of becoming counsel or partner at K&S specifically or that K&S's actions are the sole cause of Plaintiff's prolonged difficulty in finding comparable employment; the motion is otherwise DENIED.

---

[4]     K&S also seeks to exclude Kamisar's testimony pursuant to Rule 403, but that section of its brief does nothing but recite the rule and make a conclusory statement about Kamisar's reliability.  Because the Court has already addressed the reliability arguments and Kamisar's testimony is otherwise probative, nothing further is needed to reject K&S's Rule 403 argument.

**B.  Plaintiff's Damages Expert, Kristin Kucsma**

Kucsma, an economist at the Sobel Tinari Economics Group, produced a report estimating Plaintiff's damages.  Her report compares Plaintiff's current expected earnings against his hypothetical earning capacity under three assumed scenarios.  The first scenario compares Plaintiff's current expected earnings to what he would have earned had he become a partner at K&S or at a comparable top-100 firm, on or about January 1, 2019; the second scenario considers what Plaintiff would have earned had he become counsel at K&S or at a comparable top-100 firm, on or about January 1, 2019; and the third scenario considers what he would have earned had he become counsel or partner at a top-200 firm, rather than a top-100 firm, on or about January 1, 2019.  Kucsma Report at 7–8.

K&S argues that Kucsma's damages models are unreliable and that her testimony should be excluded under Rule 403 for the same reason.  There is no dispute that she is qualified or that her report would be helpful to the trier of fact, and the Court sees no basis for finding Kucsma unqualified or her opinion unhelpful.  *See Coleman v. Dydula*, 139 F. Supp. 2d 388, 395 (W.D.N.Y. 2001) ("[A]n expert economist's testimony as to lost future wages is generally admissible."  (citing *Polaino v. Bayer Corp.*, 122 F. Supp. 2d 63, 66–67 (D. Mass. 2000))).

**1.  Reliability**

According to K&S, Kucsma's damages models are fatally flawed because (1) she relied on Kamisar's unreliable opinion, (2) she unreasonably assumed that Plaintiff would have been promoted on January 1, 2019, (3) she inappropriately used average partner income from the American Lawyer to determine what Plaintiff's income would have been had he become a law firm partner, (4) she inappropriately assumed that Plaintiff would reach average partner compensation in three years after promotion, (5) she inappropriately estimated average counsel compensation at top-100 firms, (6) her estimate of fringe benefits as 4.8% of gross income is

15

inappropriate, and (7) her use of median lawyer income in New York to estimate Plaintiff's actual expected earnings understates Plaintiff's earning potential. *See* Def. Kucsma Br. (Dkt. 149) at 7–23. With the exception of Kucsma's opinion as to fringe benefits, the Court finds that K&S's arguments go to weight, not admissibility.

As part of her damages model, Kucsma applied a 4.8% increase to Plaintiff's predicted gross earnings to account for fringe benefits, *i.e.*, employer contributions to retirement and savings plans. Kucsma Report at 9.[5] The 4.8% figure, however, is an average of all employer contributions across all sectors tracked by the Bureau of Labor Statistics. *Id.* Nowhere in the report does Kucsma explain why this nationwide figure is an appropriate estimate for fringe benefits earned by law-firm partners, or even attorneys generally, in the New York region. *See id.*; *see also Roniger v. McCall*, No. 97-CV-8009, 2000 WL 1191078, at *3 (S.D.N.Y. Aug. 22, 2000) ("In order to be reliable, [expert] opinion as to when [Plaintiff] should have found comparable work should be based on information that is pertinent to [Plaintiff's] field."). For that reason, the Court precludes Kucsma from including in her opinion of Plaintiff's lost earnings the 4.8% adjustment for employer-provided fringe benefits.

Next, while K&S does not raise this argument, the Court, in its gatekeeping capacity, finds Kucsma's opinion as to the range of Plaintiff's loss to be unreliable. Kucsma's report concludes that, "[w]ithin a reasonable degree of economic certainty . . . our professional opinion [is] that the total value of the economic loss[] sustained by Mr. Joffe amounts to between $21,970,899 and $49,274,667." Kucsma Report at 2. While it is true that $21,970,899 is the lowest figure of the three hypothetical scenarios and $49,274,667 the highest, there is no evidence to support the existence of a continuous range bounded by those two scenarios. Rather,

---

[5]     Kucsma expressly excluded the value of employer-provided health insurance from her fringe benefit calculation. Kucsma Report at 9.

Kucsma's report provides three estimates for three discrete scenarios that do not consist of the entire universe of possibilities. For instance, Plaintiff's worst-case scenario, of the three analyzed by Kucsma, was that Plaintiff would have become an average-paid counsel or partner at a top-200 firm. Certainly there are other worse possibilities—Plaintiff might not have found a job at a top-200 firm at all, or he might have found himself earning below-average pay at a top-200 firm. To construct a range is misleading to the jury, as it suggests that $21,970,899 is the absolute floor of Plaintiff's potential earnings had he not been fired from K&S, and there is simply no basis for that conclusion. The Court therefore precludes Kucsma from testifying as to the range of potential damages; she may, however, testify as to the damages estimates for each of the three scenarios she analyzed.

While K&S points to other flaws in Kucsma's models, any defects are not so large as to render her opinion inadmissible. First, the argument that Kucsma's opinion should be excluded because she relies on Kamisar's report is meritless because the relevant portions of Kamisar's report, as explained above, are admissible. Second, K&S's argument that Kucsma picked an arbitrary date of January 1, 2019, as the date on which Plaintiff would have been promoted is a minor quibble. Identifying a particular date is necessarily somewhat arbitrary, but Plaintiff was already a senior associate by 2015, which, as this Court's summary-judgment order pointed out, was the "penultimate stop" to becoming a partner. *See Joffe*, 2018 WL 2768645, at *1. In that context, the assumption that Plaintiff, if he were to be promoted at all, would have been promoted by in or about early 2019 is not entirely baseless. Moreover, to the extent that 2019 is not the most accurate estimate of when Plaintiff would have been promoted, K&S can present contrary evidence showing the need for an adjustment, and the jury can adjust the starting point for damages as it finds appropriate. *See Cedar Petrochemicals*, 769 F. Supp. 2d at 285. In other words, the thrust of Kucsma's report is her damages models—a dispute over when the model(s)

17

should come into effect is a factual question that does not undermine the methodology that she employed.  *See Amorgianos*, 303 F.3d at 267; *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 432 (E.D.N.Y. 2011) ("[M]ere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000))).  The same is true with K&S's criticism of Kucsma's assumption that Plaintiff would reach average partner compensation within three years.  While the Court tends to agree with K&S that at the end of three-years, a newly minted partner is unlikely to be earning average partner compensation, the parties can present their competing evidence as to the typical length of time it takes for a newly minted partner to reach mean partner compensation, and the model can be adjusted as the trier of fact finds appropriate.

K&S also faults Kucsma for using average partner pay as a proxy for Plaintiff's expected earnings as a partner.  According to K&S, Kucsma should have used the median pay, rather than the mean, because using the median reduces the impact of outliers, *i.e.*, ultra-high-earners whose incomes distort the representativeness of the mean. Def. Kamisar Br. at 14.  In this case, because the median is significantly lower than the mean in Kucsma's dataset, according to K&S, she has overestimated Plaintiff's expected earnings by about 30%.  *Id.*  Similarly, K&S's expert, Hubbard, faults Kucsma for not weighing the average partner earnings in her calculation based on Plaintiff's relative likelihood of becoming a partner at the given firm.  In other words, Hubbard suggests that firms that are ranked below K&S in the top-100 ranking should be given greater weight, to derive a weighted average that is more accurate than a simple average. Hubbard Report at 11, 13.  Assuming that Hubbard is correct, Kucsma's approach, depending on the scenario, overstates Plaintiff's potential lost earnings by 20% or 50%.  *Id.*  Nevertheless, the fact that the median or a weighted average may be a better metric does not render the simple

average inherently unreliable.  K&S can criticize Kucsma's methodology on cross-examination, and if the jury credits Hubbard's testimony, it can appropriately reject or adjust Kucsma's estimates.  *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 51 (S.D.N.Y. 2016) ("Disputes regarding the proper variables to employ in statistical studies are more properly left for juries to consider and to decide." (quotation marks and citation omitted)).

K&S further contends that Kucsma's estimate of average counsel earnings for top-100 firms is unreliable.  Kucsma concluded that, for such firms, counsel on average earn 48% of what partners earn.  Kucsma Report at 7 & n.2.  To derive the 48% figure, a metric that is not available for top-100 firms, Kucsma compared counsel earnings to partner earnings in a sample of "large firms" whose data were available in a separate salary guide.  *Id.*; Special Counsel Salary Guide ("SCSG") (Dkt. 155-11) at 3; Kucsma Dep. (Dkt. 155-7) at 111.  K&S argues that it is unreliable to derive a ratio from one sample (the SCSG sub-sample) and apply it to another population (the top-100 firms as defined by the American Lawyer).  Although this is a closer issue than K&S's other objections, two circumstances weigh in favor of finding her methodology acceptable.  First, there is no available dataset for counsel salary at top-100 firms.  Second, there is no reason to believe that the ratio of counsel-to-partner compensation in top-100 firms by revenue is likely to be significantly different from the ratio in "large firms," defined in the salary guide as firms with more than 251 attorneys.[6]  SCSG at 3.  In this context, the Court concludes that Kucsma has used a methodology containing the "same level of intellectual rigor that characterizes the practice of an expert" in her field.[7]  *Amorgianos*, 303 F.3d at 265–66.

---

[6]      To the extent there is contrary evidence, K&S can question the factual basis for Kucsma's assumption during cross-examination.

[7]      K&S also argues that Kucsma, when applying the 48% ratio to partner compensation at the top-100 firms, should have weighted the compensation figures based on the number of equity and non-equity partners.  Def. Kucsma Reply at 7.  Plaintiff contends that the data available for top-100 firms could not be weighted.  Pl. Kucsma

And finally, K&S takes issue with Kucsma's estimate of Plaintiff's future earning capacity.  Kucsma assumes that Plaintiff's future income will be the median attorney income in the New York-New Jersey metropolitan area, which, according to 2017 Bureau of Labor Statistics, is $160,370.  Kucsma Report at 8.  K&S argues that the use of metropolitan area data understates Plaintiff's income because he would be employed in Manhattan, which may be more lucrative than elsewhere in the metropolitan area.  Def. Kucsma Reply Br. (Dkt. 170) at 9.  Because K&S does not point to a source of more granular data and Kucsma's reliance on New York-New Jersey data does not lack "good grounds", the Court declines to exclude Kucsma's testimony on this basis.[8]

## 2.  Rule 403

K&S merely recites its reliability arguments for its Rule 403 argument.  Because those arguments have already been addressed above and Kucsma's opinion is otherwise probative, there is no need to discuss them further.

*     *     *

For the foregoing reasons, Kucsma's report must be revised to remove the value of fringe benefits from her calculation before she testifies.  Additionally, Kucsma's opinion that Plaintiff's damages are between $21,970,899 and $49,274,667 is excluded.  Finally, if Plaintiff agrees with K&S that the calculation of average counsel pay for top-100 law firms can and should be calculated using weighted equity and non-equity data, Plaintiff may amend the Kucsma Report to

---

Br. (Dkt. 154) at 7 n.6.  To the extent that there is a dispute over weighting methodology, the parties can examine the competing methods and any resulting overestimation of counsel compensation during trial.

[8]      K&S also criticizes Kucsma for using the median pay for the metropolitan area, as opposed to the average pay, which is higher.  Def. Kucsma Reply at 9–10.  Again, to the extent that K&S believes that the average is, in this instance, a more appropriate metric, it can make the case to the jury for what is a slight adjustment.  *See Scott*, 315 F.R.D. at 51.  To the extent that K&S criticizes Kucsma for inconsistent usage of the median and the mean, that is additional material for cross-examination.

reflect that change.  K&S's motion to preclude Kucsma's report and testimony is otherwise DENIED.

## C.  K&S's Vocational Expert, Carolyn Sweeney

Sweeney, a career counselor for attorneys, issued a report rebutting the conclusions reached by Kamisar, Plaintiff's vocational expert.  Sweeney Report at 1.  Specifically, Sweeney concludes that (1) Plaintiff, as an eighth year litigation associate, would have had difficulty finding a similar job even if he had not been fired from K&S, (2) Kamisar had no basis for opining that Plaintiff would have landed a partner-track position, (3) Plaintiff has not undertaken a reasonable job search, and (4) Kamisar ignored the negative impact of Plaintiff's public dispute with his former attorney on his employment prospects.  *Id.* at 3.

Plaintiff seeks to exclude Sweeney's opinion on the basis of reliability and Rule 403. Plaintiff also argues that Sweeney's proffered testimony that Plaintiff failed to conduct a reasonable job search is not helpful to the jury because it invades the province of the jury to decide the "ultimate question" of mitigation and recites a legal conclusion.

### 1.      Helpfulness to Trier of Fact

Because K&S has agreed not to "offer Sweeney's opinion at trial as to whether Joffe's job search efforts were <u>in fact</u> reasonable," Plaintiff's motion to preclude is moot as to this issue. *See* Def. Sweeney Resp. Br. (Dkt. 159) at 4 (emphasis original).  Consistent with the cases cited by Plaintiff, Sweeney may, in any event, testify as to what a reasonable job search, in her experience, typically consists of, and how Plaintiff's job-search efforts compare.  *See, e.g.*, *Castelluccio v. Int'l Bus. Machines Corp.*, No. 09-CV-1145, 2012 WL 5408420, at *3 (D. Conn. Nov. 6, 2012); *Roniger*, 2000 WL 1191078, at *5; *see also Duncan*, 42 F.3d at 101 ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.").

Sweeney's effort to rebut Kamisar's testimony by testifying about the incomplete results of a Google search would not be helpful to the jury.  Kamisar's report concluded that "it will be nearly impossible for Mr. Joffe to obtain another legal position comparable to either the associate or senior associate position he held at King & Spalding."  Kamisar Report at 3–4.  Although Sweeney found examples of attorneys who obtained legal employment despite having engaged in litigation against their former employer, the identified examples of post-litigation employment are not comparable to a partnership in a firm like K&S; she also conceded during her deposition that she did not know the likely compensation paid to any of the attorneys in the examples she found.  *See* Sweeney Report, Add. A; Sweeney Dep. (Dkt. 144-3) at 128–29.  Because Kamisar's opinion is limited to "position[s] comparable" to a senior associate position at K&S, Sweeney's rebuttal simply misses the point.  *See* Kamisar Report at 3.  For that reason, the Court finds Sweeney's survey of anecdotal cases to be lacking the context necessary to make it a relevant rebuttal.  *See Amorgianos*, 303 F.3d at 265.  Sweeney is therefore precluded from offering those anecdotal examples, contained in Addendum A of her report, as evidence to rebut Kamisar's opinion that K&S's actions rendered Plaintiff nearly unemployable in his previous niche.[9]

## 2.    Reliability

As to Sweeney's opinion of Plaintiff's job search efforts, Plaintiff argues that Sweeney failed to consider whether Plaintiff looked for jobs through informal networking channels.  As to Sweeney's opinion of the relative impact of the publicized circumstances in this case, Plaintiff argues that she used an unreliable methodology.  Much like K&S's efforts to exclude Kamisar, Plaintiff's arguments as to Sweeney's reliability go to weight, not admissibility.

---

[9]        Because Sweeney's anecdotal results are excluded on this basis, the Court declines to rule on Plaintiff's argument as to the reliability of Sweeney's informal survey.

First, Plaintiff cites no case law supporting his argument that Sweeney's opinion should be excluded for failure to consider information not made available to her.  *See* Pl. Sweeney Br. (Dkt. 143) at 18–19.  Sweeney assumed, based on her inability to find Plaintiff's LinkedIn page and an absence of any documentation of or reference to Plaintiff's networking efforts, whether in case filings or in Plaintiff's expert's own report, that Plaintiff did not devote nearly the amount of time she would have recommended towards networking.  Sweeney Report, Add. B at 4; Sweeney Dep. at 108, 114, 117.  In Plaintiff's view, the complete absence of any information about networking in the materials that Sweeney reviewed suggests a possible gap in the record, not a glaring inadequacy in his overall job search.  While Sweeney arguably should have considered the possibility that Plaintiff did at least *some* networking that is not reflected in the record, the Court cannot conclude that it was "obvious" that networking could have constituted close to 80% of Plaintiff's job-search efforts—and yet not have been even obliquely referenced anywhere in the record.  *See Tardif*, 344 F. Supp. 3d at 601.  Even at this point, Plaintiff has not pointed to any information that Sweeney overlooked.  To the extent that Plaintiff has evidence to the contrary, that is a simple factual dispute going to the validity of Sweeney's assumptions, which the jury can resolve.  *See Deutsch*, 768 F. Supp. 2d at 432.

Next, the Court finds meritless Plaintiff's argument that Sweeney used an unreliable methodology to assess his employability.  Just like Plaintiff's expert, Kamisar, who did not utilize a strictly scientific method to assess Plaintiff's employability, Sweeney relies primarily on her experience.  As explained above, a vocational expert need only "explain how [her] experience leads to the conclusions reached, why that experience is a sufficient basis for the opinions offered by the expert, and how that experience is reliably applied to the facts." *Gyllenhammer*, 2018 WL 1956426, at *6; *see also World Trade Ctr. Properties*, 467 F.3d at 132–33.  In this case, Sweeney concluded that the negative publicity surrounding Plaintiff's

separation from his former attorney raises a different type of concern for employers than his firing from K&S. Sweeney Report at 7. She opined that law firms, in her experience, are likely to view the incident with Plaintiff's former counsel as more serious and likely to be indicative of an inability to work collegially with other lawyers—particularly when Plaintiff's conduct was characterized by a magistrate judge as hostile and unprofessional. *Id.* On that record, the Court cannot conclude that Sweeney's opinion suffers from a fatal "analytical gap between the data and the opinion proffered."[10] *See Joiner*, 522 U.S. at 146.

In short, Sweeney's testimony is not excludable as unreliable.

**3. Rule 403**

Rule 403 allows for the exclusion of evidence if its "probative value is substantially outweighed by a danger of . . . unfair prejudice . . . [or] misleading the jury." Fed. R. Evid. 403. According to Plaintiff, Sweeney's testimony as to his "temperament," *i.e.*, hostile relationship with his former counsel, should be excluded as unduly prejudicial under Rule 403 because her testimony would generate even more negative publicity and further harm his employability. Pl. Sweeney Br. at 20 ("Ms. Sweeney's testimony would be prejudicial because it would create exactly the publicity that Ms. Sweeney believes to be uniquely harmful."). He cites no authority, however, for the proposition that "prejudice" under Rule 403 encompasses collateral

---

[10]     Plaintiff also argues that Sweeney's opinion as to the impact of such publicity should be excluded because she lacks specific experience working with attorneys dealing with negative publicity. Pl. Sweeney Br. at 16. Sweeney, however, has approximately fifteen years of experience ascertaining what law firms look for in applicants so that she can help present applicants in the best light possible. *See* Sweeney Report at 1–2. That she may not be familiar with the specific scenario of litigation publicity does not render her unqualified to predict how law firms are likely to react to an applicant who had a public falling out with his own attorney and who was faulted by a federal magistrate judge for his role in creating that toxic relationship. *See In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 470 (S.D.N.Y. 2016) ("[I]f an 'expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" (quoting *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007))). As with K&S's quibbles with Kamisar, Plaintiff can adequately explore any gaps in Sweeney's experience on cross-examination. *See McCullock*, 61 F.3d at 1043.

consequences outside the courtroom.[11]  Indeed, as the context of Rule 403 and its Advisory Committee Notes show, "unfair prejudice" "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 advisor committee's note; *see United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) ("[T]he prejudice must be unfair in the sense that it could unduly inflame the passion of the jury, confuse the issues before the jury, or inappropriately lead the jury to convict on the basis of conduct not at issue in the trial.").  In other words, the purpose of Rule 403 is to ensure a fair and efficient jury verdict, not to protect plaintiffs from the extrajudicial consequences of their own litigation.[12]

Plaintiff also, misguidedly, contends that admitting testimony about Magistrate Judge Aaron's criticism of Plaintiff would confuse or mislead the jury as to "who exactly—Ms. Sweeney, Magistrate Judge Aaron, this Court, and/or the jury itself—is the proper arbiter of [Plaintiff's] 'temperament' and 'behavior.'"  *See* Pl. Sweeney Br. at 22.  Sweeney's testimony as to the impact of negative publicity does not hinge on whether Plaintiff has a winning personality or an obnoxious one.  Rather, her testimony is about the perception of Plaintiff that law firms would have upon seeing Judge Aaron's sharp criticism and related media coverage—and how

---

[11]    Plaintiff badly misconstrues (or misrepresents) the one case he does cite, *United States v. Geisen*, which mentions, under completely different circumstances, the impact of the acceptance of a deferred prosecution agreement (DPA) on one's employability.  612 F.3d 471, 496 (6th Cir. 2010).  Contrary to what Plaintiff would have the Court believe, *Geisen* did not hold that evidence should be excluded under Rule 403 because it could affect the subject's employment prospects.  Rather, *Geisen* only discussed the employment consequences of a DPA to determine whether a rejection of a DPA is probative of a defendant's mental state.  *See id.* ("Refusing to accept the DPA, therefore, is not [] probative of a 'consciousness of innocence.'").  The Court in *Geisen* ultimately concluded that the probative value of such evidence was outweighed by prejudice to the Government during the trial—not prejudice to the defendant outside the courtroom.  *Id.* at 497.

[12]    To the extent that Plaintiff argues that Judge Aaron's criticism might unfairly prejudice him before the jury, that risk is minimal, as Judge Aaron did not use inflammatory language in his decision, and the jury will not hear the specific details of Plaintiff's relationship with his former counsel.

that perception would likely affect his employment prospects.  The idea that public criticism by a judge makes an attorney less employable is not likely to confuse the jury.

In sum, the Court finds Plaintiff's Rule 403 arguments meritless.

*        *        *

For the foregoing reasons, Plaintiff's motion to exclude Carolyn Sweeney is DENIED, except as to Addendum A of Sweeney's report and any related use of anecdotal proof to rebut Kamisar's opinion that Plaintiff's termination from K&S made him essentially unemployable at comparable firms in comparable positions.

### D.  K&S's Damages Expert, Thomas Hubbard

Hubbard, who holds a Ph.D. in economics and is a professor specializing in law-firm organization, opines that Plaintiff's expert, Kucsma, used flawed damages models, premised on inaccurate assumptions about law firms, to significantly overestimate Plaintiff's lost earnings. Hubbard Report at 1–2.  Plaintiff seeks to exclude Hubbard's testimony on the basis of his qualifications and the reliability and helpfulness of his testimony; Plaintiff also recites the same arguments under the banner of Rule 403.

#### 1.  Qualifications

Plaintiff's effort to disqualify Hubbard is somewhat puzzling.  *See* Pl. Hubbard Br. (Dkt. 140) at 12 & n.8.  Plaintiff cites two cases in which a proffered expert was found to be unqualified because the expert did not have specialized knowledge of modeling techniques.  *See id.* (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004) and *Lamoureaux v. Anazaohealth Corp.*, No. 03-CV-1382, 2009 WL 1162875 (D. Conn. Apr. 30, 2009)).  In both of those cases, the relevant experts were not economists and were not otherwise familiar with modeling techniques.  *See LifeWise Master Funding*, 374 F.3d at 928 ("Mr. Livingston was not an expert in damages analysis or in any of the techniques used to create the . . . model.");

*Lamoureaux*, 2009 WL 1162875, at *6 ("[A]s his testimony reflects, he is not an economist and is not an expert on damages models.").

Unlike the expert in *Lifewise Master Funding*, for instance, who was unfamiliar with basic modeling concepts, such as regression analyses, 374 F.3d at 928, Hubbard is an economist, Hubbard Report at 2, and is familiar with regressions and other quantitative analyses. *See* Hubbard Report at 23–26; Hubbard Dep. at 110. Plaintiff instead appears to hinge his argument on a distinction between the academic study of economics and forensic economics, which is used in litigation. He cites no authority for that categorical distinction, and the Court sees no reason to draw one. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) ("[W]here, as here, well-trained people with somewhat more general qualifications are available, it is error to exclude them."); *see also El Ansari v. Graham*, No. 17-CV-3963, 2019 WL 3526714, at *4 (S.D.N.Y. Aug. 2, 2019) (declining distinction between clinical and forensic psychology).

The Court therefore finds Hubbard to be qualified to render an opinion on Kucsma's modeling methods and assumptions about law firms.

### 2. Helpfulness to Trier of Fact and Reliability

Although two separate prongs, the Court addresses helpfulness and reliability together because Plaintiff makes the identical argument as to each. Specifically, Plaintiff argues that Hubbard's criticism of Kucsma's models and assumptions is neither reliable nor helpful to the trier of fact because, when deposed, Hubbard was, at times, unable to conclude that more accurate methods could feasibly have been implemented in this case. *See* Pl. Hubbard Br. (Dkt. 140) at 13–16. In some instances, Hubbard's report does posit alternative models and shows how much lower Plaintiff's damages would be under those approaches. *See, e.g.*, Hubbard Report at 13, 16.

The Court rejects Plaintiff's arguments because the feasibility of alternative methods is fundamentally a different question than the inaccuracy or bias of Kucsma's models, which is the actual subject of Hubbard's testimony.  In the same way that the best available car in a lot could still be a lemon, a damages estimate can be the best available—yet inaccurate or biased nevertheless.  For example, one of Hubbard's critiques of Plaintiff's model is that it assumes that it was equally likely that Plaintiff would have been hired at any one of the top-100 law firms, even though, in real life, Plaintiff's chances of getting hired would be lower at the more competitive and better compensated firms.  *See* Hubbard Dep. at 71–73.  Assigning an accurate probability to Plaintiff's chances of being hired at each firm may not be achievable, but Plaintiff's model may nevertheless be biased in Plaintiff's favor because it completely ignores the difficulty of getting hired at the most desirable firms.  In that scenario, the reliability of Hubbard's opinion that Plaintiff's estimate is upwardly biased bears no relation to the feasibility *vel non* of alternative methods.  *See Henkel v. Wagner*, No. 12-CV-4098, 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) ("Dr. Abboud does not need a 'model or theory' to identify purported flaws in [affirmative expert's] testimony.  Rather, she needs only her expertise and the 'method' identified at the beginning of her report—namely, reviewing the documents in this case, along with [the affirmative] report, and arriving at an opinion as to [the affirmative expert's] analysis of the alleged economic damages.").  Similarly, the best data available may nevertheless be inflated or so inaccurate as to be inappropriate to use in a model.  Even if no better approach is possible, the trier of fact would nonetheless be aided by knowledge of the weaknesses and biases in the model presented by Plaintiff, so as to calibrate the model's results or temper the weight assigned to it.

Furthermore, as K&S has argued, a rebuttal expert need not identify alternative or better methodologies.  *See, e.g.*, *Scott*, 315 F.R.D. at 51 ("As a rebuttal witness, [the expert] was under

no obligation to create models or methods of his own . . . ."); *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681, 2015 WL 5459662, at \*12 (S.D.N.Y. Sept. 16, 2015) ("There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." (citing *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007))). Accordingly, the fact that Hubbard posits critiques and alternatives on rebuttal without recommending one or the other does not compel exclusion.

In sum, the Court rejects Plaintiff's arguments as to reliability and helpfulness to the trier of fact.[13]

\*   \*   \*

For the foregoing reasons, Plaintiff's motion to exclude the report and testimony of Thomas Hubbard is DENIED.

## E.  K&S's Ethics Expert, Bruce Green

Green is a Professor of Law at Fordham Law School, where he teaches legal ethics. Green Report at 1.  K&S retained him to opine on (1) whether K&S partners, Straus and Perry, actually violated the New York Rules of Professional Conduct ("RPC") in connection with their representation of ZTE; (2) whether Plaintiff had an obligation under the RPC to report Straus and Perry's conduct; and (3) whether Plaintiff could have reasonably believed that he had a reporting obligation under the RPC.  *Id.* at 3.  Green answers all three questions in the negative.  *Id.* at 4, 9, 12.

---

[13]     For the same reasons, the Court denies Plaintiff's barely repackaged Rule 403 argument that Hubbard's testimony would be unduly confusing because he cannot suggest better alternatives.

Plaintiff does not challenge Green's qualifications, and the Court likewise sees no reason to exclude him on that basis. Plaintiff does, however, seek to exclude Green's opinion on the basis of helpfulness to the jury, relevance, reliability, and Rule 403.

### 1. Relevance

Plaintiff contends that none of Green's three opinions is relevant within the legal framework set forth in this Court's order denying K&S's motion for summary judgment. As to Plaintiff's common-law claim for breach of contract, which was found to be analogous to employment retaliation claims under federal law, the Court set forth a burden-shifting framework:

> [A] plaintiff establishes a *prima facie* case under [*Wieder v. Skala*, 80 N.Y.2d 628 (1992)] by demonstrating that he reported, attempted to report, or threatened to report suspected unethical behavior and that he suffered an adverse employment action under circumstances giving rise to an inference of retaliation. It is then the defendant-employer's burden to come forward with evidence that shows either that the plaintiff's attempted, threatened or actual report was not in good faith or that, regardless of the employee's good faith, any adverse action taken against the employee was not connected to the attempted, threatened, or actual report. If a defendant-employer can identify a bona fide, non-retaliatory reason for the adverse action, it is the plaintiff's burden to demonstrate that the purported non-retaliatory reasons are pretextual.

*See Joffe*, 2018 WL 2768645, at *8. Under that approach, the mere fact that the attorney's suspicion later turned out to be a false alarm is not fatal to Plaintiff's claim—he need only have had a good-faith and reasonable belief that the reported conduct may have been unethical.[14] *Id.*

---

[14]    Put differently, the scope of a *Wieder* claim is not coterminous with the reach of the RPC. As articulated in this Court's summary-judgment order, a law firm breaches its implied obligation under *Wieder* if it terminates a lawyer's employment in retaliation for the latter's good-faith and reasonable efforts to comply with disciplinary rules, even if the latter's compliance efforts were not in fact required under the rules. In other words, *Wieder* creates room for error for the reporting attorney, protecting all attorneys who raise an ethical concern in good faith and with a reasonable basis, even if they are later found to be mistaken. *See Joffe*, 2018 WL 2768645, at *8. Indeed, as explained in this Court's summary-judgment order, the level of certainty required to trigger *Wieder*'s protection—good-faith, reasonable belief—is different from the level of certainty that triggers a mandatory reporting obligation under Rule 8.3 of the RPC—either actual knowledge or "clear belief." *Id.* (citing N.Y.S. Bar Assoc. Ethics Op. 854 (2011)).

While not dispositive, however, whether an ethics violation actually occurred is certainly relevant to Plaintiff's belief.

Evidence is relevant under Rule 401 if it "has any tendency to make a fact more or less probable than it would be without the evidence," and that fact "is of consequence in determining the action."  Fed. R. Evid. 401.  Here, the consequential fact is Plaintiff's good-faith, reasonable belief that Strauss or Perry committed an ethics violation and that he had a reporting obligation. Whether Plaintiff subjectively and reasonably believed that a violation may have occurred is undoubtedly tied to the obviousness of the misconduct, which may be correlated with whether the perceived conduct was in fact unethical.  The more obvious it was that Strauss or Perry's conduct was unethical, the more reasonable it would have been for Plaintiff to have perceived the conduct to be unethical and reportable; inversely, the more obvious it was that Strauss or Perry's conduct was entirely appropriate, the less reasonable it would have been for Plaintiff to have perceived the conduct to be unethical and reportable.  If Plaintiff were obviously required to report Strauss and Perry's conduct under the RPC, then the act of reporting was reasonable and more likely to have been done in good faith; similarly, if Strauss and Perry's conduct was obviously unimpeachable, then Plaintiff's act of reporting tends to be less reasonable and less likely to have been done in good faith.  In short, although the existence *vel non* of an ethics violation and a reporting obligation will not be dispositive, it may nevertheless be considered with other evidence when determining whether Plaintiff had a reasonable, good-faith belief that the attorneys committed an ethics violation and that Plaintiff had a reporting obligation.

Plaintiff also disputes the relevance of Green's conclusion that Plaintiff behaved unreasonably by not seeking ethics advice from a supervisor, as contemplated by the RPC.  *See* Joffe Green Br. (Dkt. 137) at 15 (citing Green Report at 12).  Plaintiff contends that because K&S does not have a rigorous ethics-reporting program, Green's testimony is irrelevant.  The

Court does not construe Green's opinion as being premised on the existence of such a program—and even if it were, that would go to the weight of his opinion, not its admissibility.

The Court does find irrelevant paragraph 26 of Green's report, which concludes that Plaintiff, to the extent he had a reporting obligation, was required to report his concerns only to the presiding judge on the ZTE matter, not to any other disciplinary authority.  Green Report at 11.  The manner of Plaintiff's reporting obligation has no bearing on whether Plaintiff had such an obligation or whether Plaintiff acted in good faith by making internal complaints.

As part of his relevance argument, Plaintiff also contends that Green's testimony is excludable to the extent that it contradicts this Court's summary-judgment order.  That argument, in the Court's view, is better addressed in terms of helpfulness to the jury and under Rule 403.

Thus, the subject matter of Green's report, with the exception of paragraph 26, passes the Rule 401 relevance threshold.

### 2.  Reliability

Plaintiff's reliability arguments either go to weight or are properly assessed under a different prong of the Rule 702 analysis.  First, Plaintiff claims that Green's interpretation of RPC 8.4 is internally inconsistent, and that Green appears to have backtracked on his interpretation of the word "knowledge" as used in Rule 8.3 of the RPC when challenged at his deposition.  Pl. Green Br. (Dkt. 137) at 21–22.  Those objections could be adequately addressed during cross-examination.  Next, Plaintiff contends that Green's assessment of Plaintiff's reporting conduct consists of a factual narrative.  Whether expert testimony should be excluded for engaging in factual narrative is properly decided in terms of whether the testimony is likely to be helpful to the trier of fact.

Paragraph 25 of Green's report in particular is pure *ipse dixit*.  There, Green summarily concludes, without any explanation, that behaving with reckless disregard towards the truth has

no bearing on an attorney's trustworthiness or fitness as a lawyer.  Green Report at 10–11; *see Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

The Court finds Green's opinion reliable, except as to paragraph 25 of his report.

### 3. Helpfulness to Trier of Fact

Plaintiff contends that Green's opinion should be excluded as unhelpful to the trier of fact.  According to Plaintiff, the proper interpretation of the Rules of Professional Conduct is not a subject appropriate for expert testimony—and should instead be regarded as a legal question on which the jury should and would be instructed by the Court.  Pl. Green Br. at 15–16.  Plaintiff also contends that Green's opinion as to what Plaintiff actually meant in his communications to K&S partners is not helpful to the jury, who can draw their own factual conclusions by reading the same emails.  The Court agrees with Plaintiff that portions of Green's report should be excluded as factual narrative and spin because they do not rely on any specialized knowledge or expertise.  The Court also agrees with Plaintiff that Green's opinion would not be helpful to the jury.

In part (iii) of his report, Green concludes that Plaintiff could not have reasonably believed that he had a reporting obligation.  Green Report at 12.  Green premises that conclusion on three intermediate determinations:(1) Plaintiff's July 25 email did not express concern about potential misconduct, (2) Plaintiff did not seek ethics advice, and (3) Rule 8.3's reporting obligation requires "knowledge," not mere impression, of misconduct.  Green Report at 13–16.  Green's opinion as to the meaning of Plaintiff's July 25 email (paragraphs 31–32) is plainly improper because jurors can read the email for themselves.  *See id.* at 14–15; *Anderson News*, 2015 WL 5003528, at *2.  Similarly, members of the jury can determine for themselves whether

Plaintiff in fact sought ethics advice and do not benefit from Green's conclusion that Plaintiff failed to do so (paragraph 30). *See* Green Report at 13. Whether Green's interpretation of the RPC is helpful to the jury is an issue that also implicates parts (i) and (ii) of Green's report.

Green's interpretation of the RPC is not helpful to the jury because it is not based on his assessment of ordinary legal custom or practice. Instead, he seeks to testify as to the contents of the RPC, a topic on which the Court can capably instruct the jury. In *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 144 (2d Cir. 2016), the Second Circuit held that courts should not consider an ethics expert's opinion on whether information in a complaint is "confidential" under the RPC and is thereby protected from the public's right of access. *See id.* ("As a threshold matter, we note that defendants rely in large part on the conclusions of their legal-ethics expert made in a declaration filed in the district court. We do not consider arguments based on this declaration because of our longstanding rule that expert testimony on issues of domestic law is not to be considered."); *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, No. 14-CV-6867, 2016 WL 1071107, at *10 (S.D.N.Y. Mar. 18, 2016), *aff'd*, 814 F.3d 132 (2d Cir. 2016). Although *Bernstein* did not involve admissibility of expert testimony at trial, courts have applied the same principle to jury trials. *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) ("[S]uch testimony is inadmissible whether offered at trial for the benefit of the jury or submitted with motions for the benefit of the judge."). Here, because Green's opinion rests entirely on his interpretation of the text of the RPC, it is not admissible.

While it is true that the disciplinary rules themselves do not have the force of law, their interpretation is nevertheless governed by judicial precedent. *See Niesig v. Team I*, 76 N.Y.2d 363, 369 (1990) ("[T]he code does not have the force of law . . . . [W]e are not constrained to read the rules literally or effectuate the intent of the drafters, but look to the rules as guidelines to

be applied with due regard for the broad range of interests at stake. . . . When we find an area of

uncertainty, however, we must use our judicial process to make our own decision in the interests

of justice to all concerned." (quotation marks and citations omitted)).  As a result, an expert

opinion as to the meaning of the RPC must be consistent with controlling caselaw for it to be

valid—and yet, if the testimony were to be premised on the expert's interpretation of judicial

precedent, the testimony would impinge on the Court's obligation to instruct the jury on the law.

For that reason, courts in legal malpractice cases have generally allowed testimony from legal

experts only "as to the ordinary practices of those engaged in the business of law, legal studies,

or law-related fields, or as to trade customs and usages of those so employed."  *See Morris*, 73 F.

Supp. 2d at 381 (citing *Marx & Co. v. The Diners' Club, Inc.,* 550 F.2d 505, 509 (2d Cir. 1977));

*see, e.g.*, *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-CV-931, 2014 WL

12788845, at *11 (E.D.N.Y. Mar. 31, 2014) (concluding that expert should be allowed "to give

expert opinion testimony about the applicable standard of care, provided such testimony does not

include opinions on . . . the ultimate issue of whether the defendants committed legal

malpractice).  While Green could have been an admissible expert, had he rested his opinion on

whether K&S's and Plaintiff's actions were consistent with ordinary and custom legal practice,

he did not do so.[15]

Thus, Green's opinion is excluded as unhelpful to the jury because it invades the

province of the Court to charge the jury on the scope of New York's Rules of Professional

Conduct.

---

[15]     Sporadically, the report does conclude that Plaintiff's conduct and perception were "unreasonable."  *See* Green Report at 13.  Green's reasonableness determination, however, rests entirely on his textual interpretation of the RPC, not on ordinary and customary legal practice.  *See id.* at 12–13.

### 4. **Rule 403**

Green's opinion is also inadmissible under Rule 403 because "its probative value is substantially outweighed" by the risk of "confusing the issues, misleading the jury, [and causing] undue delay." Fed. R. Evid. 403.  As explained above, the existence *vel non* of an ethics violation by K&S and a reporting obligation on Plaintiff's part is relevant only to show the obviousness of Plaintiff's reporting obligation, which, in turn, is probative of his good-faith and reasonable belief.  Under the facts of this case, because Plaintiff's duty to report is not clear-cut when assessed against the RPC, Green's testimony is only marginally probative.  Meanwhile, Green's testimony risks creating a mini-trial on the minutia of bar association ethics opinions and Green's theories of legal ethics, none of which is controlling on the Court's eventual instructions as to the correct interpretation and usage of the RPC.  The ethics minitrial is also likely to create a sideshow that distracts the jury from the main question—whether Plaintiff had a good faith and reasonable belief that he was obligated to raise an ethics concern, whether he actually communicated that concern to K&S before the adverse employment actions took place, and whether the adverse employment actions were taken in retaliation for his doing so.

In sum, because Green's opinion in this case is only minimally probative and likely to be highly distracting and confusing to the jury, it is excluded pursuant to Rule 403.

\*     \*     \*

For the foregoing reasons, Plaintiff's motion to exclude the report and testimony of Bruce Green is GRANTED.

## CONCLUSION

K&S's motion to exclude the report and testimony of Plaintiff's expert, Gordon Kamisar, is GRANTED as to his opinion on Plaintiff's chances of becoming counsel or partner at K&S

and his opinion that K&S's actions are the sole cause of Plaintiff's prolonged inability to find comparable employment; the motion is otherwise DENIED.

K&S's motion to exclude the report and testimony of Plaintiff's expert, Kristin Kucsma, is GRANTED to the extent that Kucsma may not include in her opinion the value of fringe benefits, or the existence of a continuous range of damages as set forth in her report; the motion is otherwise DENIED.  Plaintiff must serve a revised Kucsma report on K&S not later than **November 1, 2019**.

Plaintiff's motion to exclude the report and testimony of K&S's expert, Carolyn Sweeney, is GRANTED as to Addendum A of Sweeney's report and any related use of anecdotal proof to rebut Kamisar's opinion that Plaintiff's termination from K&S made him essentially unemployable at comparable firms in comparable positions; the motion is otherwise DENIED.

Plaintiff's motion to exclude the report and testimony of K&S's expert, Thomas Hubbard is DENIED.

Plaintiff's motion to exclude the report and testimony of K&S's expert, Bruce Green, is GRANTED.

The parties are directed to appear for a status conference on **October 25, 2019, at 10:00 A.M.** to set a trial schedule.  No later than **October 18, 2019**, the parties must submit a joint letter setting forth their joint or respective positions on any outstanding issues and providing three potential trial dates before May 1, 2020, that are mutually satisfactory.

The Clerk of Court is respectfully directed to terminate the open motions at docket entries 136, 139, 142, 146, 148, and 174.[16]


**SO ORDERED.**

**Date:  September 24, 2019**
**New York, New York**                                    **VALERIE CAPRONI**
                                                          **United States District Judge**

---

[16]      Plaintiff's motion for leave to file a sur-reply is denied as moot because the contested exhibits are immaterial to the Court's disposition of the motions to exclude.