UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
DAVID A. JOFFE,                                            :
                                                           :  Civil Action No.: 17-cv-03392
                    Plaintiff,                             :  (VEC)(SDA)
                                                           :
        -- against --                                      :
                                                           :
KING & SPALDING LLP,                                       :
                                                           :
                    Defendant.                             :
---------------------------------------------------------- X

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
<u>REGARDING PLAINTIFF'S ERISA CLAIM</u>**

David A. Joffe, Esq. (<u>pro se</u>)
155 Christopher Columbus Drive
Jersey City, NJ 07302
516-695-7086
davidajoffe@gmail.com

Pursuant to Section 8(C)(ii) of this Court's Individual Practices in Civil Cases, Plaintiff David A. Joffe respectfully submits the following Proposed Findings of Fact and Conclusions of Law regarding his claim under Section 510 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.

## PROPOSED FINDINGS OF FACT

1. From January 2012 until his termination on December 7, 2016, Plaintiff was employed by Defendant as a litigation associate in the Firm's New York office. Def.'s Reply to Pl.'s Resp. to Def.'s Statement Of Material Facts (Doc. No. 64) ("56.1 Statement") ¶ 225.

2. During the course of his employment, Plaintiff was eligible to make and had made contributions to the Firm's Profit Sharing—401(k) Plan ("K&S Plan" or "Plan"), a defined-contribution plan covering all employees of K&S. See 56.1 Statement ¶ 319.

3. On April 12, 2016, Plaintiff received a memorandum from K&S entitled "2016 Salary and Profit Sharing." The memorandum stated: "[Y]ou will receive profit-sharing contributions to your retirement account totaling approximately $20,000. These amounts will vest on January 1, 2017, subject to the normal vesting rules. If you have questions regarding your salary, please contact [K&S partner] David Tetrick." Ex. J-12; 56.1 Statement ¶ 323.

4. On April 15, 2016, Plaintiff sent Tetrick an email asking to clarify the "normal vesting rules" for the pension-account contribution. Ex. J-14; 56.1 Statement ¶ 324.

5. Tetrick testified that, in response to Plaintiff's inquiry, he obtained and reviewed the K&S Plan's summary plan description—"the plain-English version of a retirement plan document." JPTO Ex. F (Tetrick Tr.) 66:7-11. Tetrick further testified that, from his review of this document sometime in May 2016, he learned that the scheduled vesting of the Firm's 401k contribution on January 1, 2017 was conditioned on Plaintiff maintaining continuous

employment at King & Spalding through that date.  See id. at 66:12-20; see also Ex. P-192.

6. On May 4, 2016, Tetrick responded to Plaintiff by attaching the summary plan description and explaining that this document "describes the plan's vesting rules."  Ex. J-14.

7. Also in his May 4, 2016 email, Tetrick informed Plaintiff that the latter was awarded no bonus for 2015.  See Ex. J-14.  Together with the Firm's removal of Plaintiff from K&S's partnership track and temporary freezing of his pay several months prior, this caused Plaintiff to become concerned that he was being penalized for his expression of ethical reservations concerning King & Spalding's representation of the Chinese telecommunications firm ZTE Corporation ("ZTE"), on which he worked with K&S partners Robert Perry and Paul Straus throughout the prior year.  See Joffe v. King & Spalding LLP, No. 17-cv-3392 (VEC), 2018 U.S. Dist. LEXIS 96919, at *8-9 (S.D.N.Y. June 8, 2018) (citing 56.1 Statement at ¶¶ 90, 313, 325, 331).  Plaintiff testified that he accordingly sought to "re-raise the ethical issues which I realized seemed not to have been adequately, or at all, addressed in the first instance."  JPTO Ex. S (Joffe Tr.) 251:1-5.

8. On July 25, 2016, Plaintiff sent Tetrick an email (the "July 25, 2016 Email") that referenced "several instances of poor judgment by the partners [on the ZTE Matter], in the face of ever more glaring red flags, that occurred over the prior year in which the matter had been pending."  Joffe, 2018 U.S. Dist. LEXIS 96919, at *9-10 (citing 56.1 Statement ¶ 331).

9. Tetrick testified that, upon receiving the July 25, 2016 Email, he forwarded this email to K&S's head of HR Chris Jackson.  Tetrick explained that, in the July 25, 2016 Email, "Mr. Joffe made allegations about two of our partners, and he accused them of exercising poor judgment, amongst other things.  And I thought it was important that Mr. Jackson have notice of that."  Tetrick further explained it was important for Jackson to have notice of Plaintiff's July 25,

2016 Email "[b]ecause it's an associate who is making serious allegations about two of our partners ... I count on Mr. Jackson to handle personnel issues like that." Tetrick Tr. 94:10-15; Joffe, 2018 U.S. Dist. LEXIS 96919, at *10; 56.1 Statement ¶¶ 340-41. In "[l]ate July or early August of [20]16," Jackson spoke with Tetrick regarding Plaintiff's employment. This was the first occasion that Jackson had had discussions with anyone at the firm about Plaintiff. JPTO Ex. H (Jackson Tr.) 15:13-16; 56.1 Statement ¶ 342.

10.    Tetrick also testified that, when he received the July 25, 2016 Email, he "forwarded th[e] e-mail to [K&S partner] [Michael] Johnston in [the latter's] capacity as the firm's employment lawyer." Tetrick also had several "conversations with [K&S General Counsel] [Robert] Thornton about the ZTE matter," each of which was "at the direction of Mr. Johnston, as the firm's employment lawyer." Tetrick Tr. 91:4-92:18; 56.1 Statement ¶¶ 345-47; Joffe, 2018 U.S. Dist. LEXIS 96919, at *11.

11.    At some point in or before September 2016, K&S made the decision to terminate Plaintiff's employment. 56.1 Statement ¶¶ 349, 392.

12.    On September 21, 2016, Tetrick stated in an email that the "[w]orking plan [was] a meeting next week in NYC [with Plaintiff], with immediate outplacement." Two weeks later, on October 5, 2016, Tetrick stated that, "I'm trying to schedule a meeting with [Plaintiff] next Thursday or Friday morning and we expect to immediately out place him." Ex. J-17; 56.1 Statement ¶¶ 349, 356.

13.    The following day, however, on October 6, 2016, Tetrick decided to delay Plaintiff's termination. See Supplemental Declaration of David Tetrick ("Tetrick Decl.") (Doc. No. 66) ¶ 6. Tetrick explained that, "Mr. Joffe was employed on a client matter, at the time. ... And there was an important event coming up in that matter where the partner in charge said that

3

Mr. Joffe was important to that matter, and that he wanted, if at all possible, for Mr. Joffe's employment to continue until after that event occurred." Tetrick Tr. 124:11-20; see also Jackson Tr. at 22:4-16 ("there was an assignment that Joffe was working on that was a critical piece of work for a client … [so] the decision was made to delay the termination until that particular assignment was completed").

14. In a declaration submitted to this Court, Tetrick also averred that, in light of the request from the K&S partner, he decided to delay Mr. Joffe's termination meeting until after November 15, 2016. Tetrick Decl. ¶ 8.

15. Before Plaintiff was fired but after K&S had made the decision that he would be fired, Plaintiff received his annual performance review from Tetrick and another partner. Plaintiff was not informed at this performance review that the decision had been made to terminate his employment. Tetrick Tr. 136:22-137:12; Joffe, 2018 U.S. Dist. LEXIS 96919, at *11; 56.1 Statement ¶¶ 358, 370.

16. On December 7, 2016, K&S terminated Plaintiff's employment. Plaintiff was not provided with any notice of his termination. He was told that he would "be escorted to the elevator after this meeting." Joffe Tr. at 272:22-24; 56.1 Statement ¶¶ 377-78; Joffe, 2018 U.S. Dist. LEXIS 96919, at *12.

17. Tetrick averred that, "The termination meeting was set for December 7, 2016, because that was the earliest date after November 15 on which I would otherwise be in New York for a partners meeting, and I wanted to have the termination conversation with Mr. Joffe in person." Tetrick Decl. ¶ 10.

18. K&S's personnel records show that the formal date chosen for Plaintiff's termination was not December 7, 2016, when Plaintiff was escorted from the building, but rather

4

eight days later, or December 15, 2016.  Ex. P-194 (Employee File) at 125 (K&S_0000564); Joffe, 2018 U.S. Dist. LEXIS 96919, at *19; Joffe Tr. at 131:11-15 ("I was told even the day I was terminated, December 7th, [that] the day I was asked to leave the building[] was not the formal end of my employment, as I understand.  It was a later date.").

19. Plaintiff testified that, at the termination meeting on December 7, 2016, Tetrick informed Plaintiff that the latter would not qualify for the $20,000 contribution to his 401k account because Plaintiff would not be currently employed on the January 1, 2017 vesting date.  See 56.1 Statement ¶ 401; Joffe Tr. 138:11-139:5 ("Q. What did you ask [Tetrick] and what did he say?  A. He said … [o]ne of [the requirements is] being currently employed, and you won't be, and, therefore, you won't [qualify].  Q. Were you surprised that he was familiar with the terms of the firm's pension plan?  A.  I was surprised that he said it in what seemed like [almost a] mocking way—but, no, I wasn't surprised.").

20. Also at the termination meeting, Tetrick informed Plaintiff that Plaintiff would be given a written offer of six months severance ($132,500) in exchange for a broad waiver of claims.  The offer provided for an acceptance period of ten days.  See Ex. J-24; Joffe, 2018 U.S. Dist. LEXIS 96919, at *13; 56.1 Statement ¶ 400.

21. On December 29, 2016, seventy-two hours before the scheduled vesting date, K&S clawed back its $20,000 contribution to Plaintiff's pension account in its entirety.  56.1 Statement ¶ 403; Joffe, 2018 U.S. Dist. LEXIS 96919, at *19.

## PROPOSED CONCLUSIONS OF LAW

22. Plaintiff brings a claim under Section 510 of ERISA, which prohibits the discharge of employees "for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan]."  29 U.S.C. § 1140.

5

23. "[S]ection 510's essential purpose is to prevent employers from intentionally interfering with impending pension eligibility whether motivated by malice toward the particular employee(s) or by a general concern for the economic stability of the company." Hayden v. Freightcar Am., Inc., CIVIL ACTION NO. 3:2007-201, 2008 U.S. Dist. LEXIS 9913, at *155 (W.D. Pa. Feb. 11, 2008) (quoting Gavalik v. Continental Can Co., 812 F.2d 834, 857 n.39 (3d Cir. 1987)).  See also Hogan v. Jacobson, 823 F.3d 872, 885 (6th Cir. 2016) (quoting Tolle v. Carroll Touch, Inc., 977 F.2d 1129, 1134 (7th Cir. 1992)) ("[T]he emphasis of a [Section 510] action is to prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits or which punish a participant for exercising his or her rights under an employee benefit plan.").

24. "In order to prevail on [a Section 510] claim, [a] plaintiff must show that interfering with her rights under ERISA was a motivating factor behind her termination." See, e.g., Allen v. Verizon Wireless, CIVIL ACTION NO. 3:12-CV-00482 (JCH), 2015 U.S. Dist. LEXIS 81047, at *41 (D. Conn. June 23, 2015); see also Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) ("[A] prima facie case [under Section 510] requires ... evidence suggesting that pension interference might have been a motivating factor."); Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1111 (2d Cir. 1988) ("An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to

engage in activity prohibited by § 510.").¹

25.    The familiar McDonnell-Douglas three-step framework for indirect proof of intent applies to claims under Section 510. See Dister, 859 F.2d at 1111.  First, Plaintiff must establish a prima facie case by showing that he was qualified for his position, that he was protected by ERISA, and that he was terminated under circumstances giving rise to an inference of discrimination.  Joffe, 2018 U.S. Dist. LEXIS 96919, at *35 (citing Quinby v. WestLB AG, No. 04-CV-7406 (WHP), 2007 U.S. Dist. LEXIS 28657, at *13 (S.D.N.Y. April 19, 2007) (citing Dister, 859 F.2d at 1114-15)).  Second, if Plaintiff can establish a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for his termination.  Id. (citing Dister, 859 F.2d at 1111).  Third, if Defendant is able to put forth a legitimate, non-discriminatory reason, it is then Plaintiff's burden to show that Defendant's proffered reason is pretextual.  Id. (citing Dister, 859 F.2d at 1111).  At the third and final stage of this framework, "[t]he plaintiff's ultimate burden of persuading the trier of fact … merges with the plaintiff's burden of proving that the employer's reason is pretextual.  This may be accomplished 'either directly by persuading the court that a discriminatory reason more likely

---

¹ K&S submits that the applicable standard is "but-for" causation, as that test was set forth by the Supreme Court in Nassar for retaliation claims under Title VII and in Gross for claims under the ADEA.  See Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Proposed Findings") ¶ 11 (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176-77 (2009); Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)), rather than the "motivating factor" standard set forth by the Second Circuit in Dister specifically for claims under Section 510, see Dister, 859 F.2d at 1111.  But while defendant cites to out-of-circuit authority for this proposition, see Def.'s Proposed Findings ¶ 11, district courts in this circuit, even post-Nassar/Gross, continue to regard Dister's "motivating factor" causation standard as governing law with respect to Section 510 claims such as the one here. See Wilkins v. Time Warner Cable, Inc., 10 F. Supp. 3d 299, 317 n.14 (S.D.N.Y. 2014) (citing Gross, 557 U.S. at 176-78; Dister, 859 F.2d at 1111) ("To succeed on his ADEA claim, Plaintiff must prove that age was the but-for cause. ... To succeed on his ERISA claim, Plaintiff need only show that his constructive discharge was in part motivated by a specific intent to interfere with his benefit rights."); see also Von Maack v. Wyckoff Heights Med. Ctr., 15 Civ. 3951 (ER), 2016 U.S. Dist. LEXIS 80879, at *36 (S.D.N.Y. June 21, 2016) (quoting Dister, 859 F.2d at 1111) ("An essential element of plaintiff's proof under the statute is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510."); Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., No. 17-CV-4730 (KMK); No. 17-CV-5547 (KMK), 2019 U.S. Dist. LEXIS 43297 (S.D.N.Y. Mar. 15, 2019) (applying "motivating factor" standard to Section 510 claim); Ghorpade v. Metlife, Inc., No. 14-CV-4379 (JPO), 2016 U.S. Dist. LEXIS 94510, at *23-25 (S.D.N.Y. July 20, 2016) (same).

motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Dister, 859 F.2d at 1112 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

26. The McDonnell-Douglas framework is premised on "the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it." Dister, 859 F.2d at 1112. "[T]o compensate for this lack of evidence … when an employer's explanation for firing an employee is unconvincing, it risks an adverse verdict under ERISA." Id. at 1112-14.

27. Applying the McDonnell-Douglas framework to the instant facts, Plaintiff has established a prima facie case; Defendant has articulated a purported legitimate explanation; and Plaintiff has rebutted Defendant's purported legitimate explanation.

28. At the **first stage**, there is no dispute that Plaintiff was qualified for his position and that he was protected by ERISA. And the circumstance that Plaintiff was terminated two weeks before a contribution to his 401k account was due to vest is sufficient on its face to support an inference of discrimination. Joffe, 2018 U.S. Dist. LEXIS 96919, at *35 (citing Quinby, 2007 U.S. Dist. LEXIS 28657, at *45 (finding two-week temporal proximity between termination and vesting states prima facie case and collecting cases)).[2]

---

[2] Defendant maintains that the two-week gap between Plaintiff's termination and the vesting date of his ERISA benefits is insufficient to infer discriminatory motive because the initial decision to terminate Plaintiff's employment was made several months prior. See Def.'s Proposed Findings ¶ 20 (emphasis added). But in drawing an inference of motive from temporal proximity, courts look to the "passage of [time] between the protected activity and the adverse employment action," Fraser v. Fiduciary Tr. Co. Int'l, No. 04 Civ. 6958 (PAC), 2009 U.S. Dist. LEXIS 75565, at *18 (S.D.N.Y. Aug. 25, 2009) (quoting Garrett v. Garden City Hotel, Inc., No. 05 Civ. 0962, 2007 U.S. Dist. LEXIS 31106, at *69-70 (E.D.N.Y. Apr. 19, 2007) (collecting cases)) (emphasis added)—not the time from when such action is first contemplated and remains subject to change. Indeed, here K&S's plan to terminate Plaintiff in September 2016 in fact did change, after Tetrick learned that Plaintiff was "the only associate on an important client matter" that was then ongoing. See Joffe, 2018 U.S. Dist. LEXIS 96919, at *35 (citing 56.1 Statement ¶ 205). Thus, the decision to set Plaintiff's discharge date two weeks before his pension benefits were to vest was made separately at some later point and remained subject to change until K&S pulled the trigger on December 7, 2016. It is the proximity of this latter action to the vesting date that supports an inference of discriminatory motive here.

29. When viewed together with the highly close temporal proximity between Plaintiff's discharge and the vesting date of his benefits, several additional circumstances surrounding Plaintiff's termination lend further support to the inference that K&S "was at least in part motivated by the specific intent to engage in activity prohibited by § 510." Dister, 859 F.2d at 1111.

30. First, the record shows that Tetrick, at the time he selected mid-December for Plaintiff's termination, was fully aware that the January 1, 2017 vesting date for K&S's $20,000 contribution was quickly approaching, and that this contribution could be clawed back if (and only if) Plaintiff's termination took effect before that date. Indeed, Tetrick testified that, only several months earlier, he had reviewed the K&S Plan's summary plan description specifically to ascertain this very fact. Tetrick Tr. 66:2-20 ("I didn't know the specifics of either the—the service period, or the employment period. … I would have learned it in reviewing the summary plan description in May of 2016."). Tetrick's knowledge that choosing a termination date in mid-December rather than, e.g., mere weeks later in early January, would mean the difference between vesting and forfeiture of Plaintiff's ERISA benefits, contributes to an inference of improper intent. See Johnson v. Wyndham Vacation Ownership, Inc., No. C15-0766RSL, 2015 U.S. Dist. LEXIS 157431, at *5 (W.D. Wash. Nov. 20, 2015) ("An inference of improper motive may arise where an employer is aware that an employee will begin utilizing benefits in the near future and terminates those benefits in the months beforehand.") (citing Dister, 859 F.2d at 1115); Flanagan v. Hunter Automated Machinery Corp., No. 92 C 5412, 1994 U.S. Dist. LEXIS 17852, at *31 (N.D. Ill. Dec. 14, 1994) (fact that plaintiff's "ERISA benefits were considered by those within the company who were responsible for the adverse actions taken against him" supports inference of "specific intent essential to his claim under ERISA § 510").

9

31. Second, the inference that K&S chose the December 7, 2016 termination date at least in part to interfere with the vesting of its pension contribution days later is further supported by the unusually harsh manner in which Defendant handled other aspects of Plaintiff's termination. Thus, Tetrick could not recall ever firing an associate without any period of notice, Joffe, 2018 U.S. Dist. LEXIS 96919, at *18-19 (citing Tetrick Tr. 19:4-21:25); while Rich Marooney, a partner who has worked at K&S for more than twenty years, could not recall any other attorney who had been escorted out of the premises, see 56.1 Statement ¶ 384; JPTO Ex. N (Marooney Tr.) 46:14-22. The seeming spitefulness with which Plaintiff appears to have been singled out for termination with zero notice and immediate expulsion from the building raises the inference that, in selecting the date of that termination, K&S acted in the same spirit by purposefully also ensuring Plaintiff would lose not only his job right before the new year, but a large chunk of his 401k to boot. See, e.g., Gavalik, 812 F.2d at 846 (prima facie case established by showing that plaintiffs "were singled out for adverse treatment on the basis of their unvested pension eligibility").

32. Finally, the circumstances of Defendant's severance offer given at Plaintiff's termination meeting also give rise to an inference that interference with ERISA benefits played a role in the timing of Plaintiff's discharge. At that meeting on December 7, 2016, K&S informed Plaintiff that he would not receive any severance unless he accepted Defendant's offer and released K&S from liability within then next ten days, or by December 17, 2016—a conspicuously short window (particularly during the holiday season) that, as K&S must have been aware, would increase the pressure on Plaintiff to take the offered pay and sign the release. This raises the inference that clawing back its contribution to Plaintiff's 401k was a motivating factor in Defendant's choice of termination date because such a clawback would serve to

increase that same pressure further—since, if Plaintiff declined to sign the offered release before December 17, he would now both receive zero severance pay going forward <u>and</u> <u>also</u>, immediately thereafter, would face the guaranteed loss of $20,000 that had already been deposited into his pension account in the past.[3]

33. At the **second stage** of the <u>McDonnell-Douglas</u> framework, Defendant proffers, as its legitimate, non-discriminatory reason(s), that Plaintiff failed to submit a practice plan—a business case for an associate's future at the Firm—for three separate years; that for one of those years Plaintiff was late in submitting his self-evaluation; and that the Firm did not believe Plaintiff would be fully utilized going forward because the partners in New York were unwilling to work with him. See <u>Joffe</u>, 2018 U.S. Dist. LEXIS 96919, at *12-13, 32-33; Def.'s Proposed Findings ¶ 6. And specifically with respect to the date chosen for Plaintiff's termination, Tetrick avers that he initially planned to terminate Plaintiff shortly after receiving the July 25, 2016 Email (in September or October 2016), but that he delayed this plan after another partner requested that Plaintiff remain employed at the Firm "if at all possible" because Plaintiff was essential to an "important client matter being handled" by that partner. See <u>Joffe</u>, 2018 U.S. Dist. LEXIS 96919, at *17-18; 32-33; 56.1 Statement ¶ 205; Tetrick Decl. ¶¶ 6-10. These explanations satisfy Defendant's burden of articulating a legitimate, nondiscriminatory basis for its adverse employment action. See <u>Dister</u>, 859 F.2d at 1116 (citing <u>Burdine</u>, 450 U.S. at 254-56 (defendant "is required to articulate—but not prove—a legitimate, non-discriminatory reason for

---

[3] Defendant submits that its offer of $132,500 in severance pay "negates any inference" that its choice of termination date "was intended to save $20,000." See Def.'s Proposed Findings ¶ 19. But reaping "substantial cost savings," <u>see id.</u>, is not the only motive prohibited by Section 510. See <u>Gavalik</u>, 812 F.2d at 857 n.39 ("§ 510's essential purpose is to prevent employers from intentionally interfering with impending pension eligibility whether motivated by malice toward the particular employee(s) or by a general concern for the economic stability of the company"); <u>Dister</u>, 859 F.2d at 1111 (describing "expansive remedial aim of § 510"). Here, Defendant was well aware that a clawback of $20,000 would be financially substantial <u>for</u> <u>Plaintiff</u>, and would therefore make it more likely that Plaintiff would agree to release the Firm from any claims.

11

the discharge")).

34. At the **third stage** of McDonnell-Douglas, and for the reasons previously set forth in this Court's opinion denying King & Spalding's motion for summary judgment, Plaintiff has discharged his burden of proving by a preponderance of the evidence that the purported legitimate reasons advanced by Defendant are pretextual and unworthy of credence.

35. Defendant's claim that Plaintiff was terminated for the failure to submit self-evaluations and/or practice plans is belied by the facts that (i) Plaintiff appears to be the only K&S attorney who had ever been disciplined in any way (let alone fired) for failing to submit these documents; (ii) K&S did not even keep track whether other associates had or hadn't submitted these documents in prior years; and (iii) two years earlier Plaintiff received a positive review and was promoted to senior associate despite having failed to submit a practice plan for that year. See Joffe, 2018 U.S. Dist. LEXIS 96919, at *17-18.

36. Defendant's claim that Plaintiff was terminated because K&S did not believe he could be fully utilized going forward is also contradicted by the record. Plaintiff's performance reviews, which had previously been overwhelmingly positive throughout his tenure at King & Spalding, remained largely positive at the time of his termination as well, with qualitative feedback that suggested Plaintiff was perceived by K&S's New York partners as smart but was seen by some as lacking in self-confidence. Critically, despite K&S's assertion that Plaintiff was essentially unstaffable, all five partners who had reviewed Plaintiff in the year preceding his termination said that they would work with Plaintiff again. Defendant's stated rationale that Plaintiff was terminated for lack of workflow is also contradicted by Plaintiff's 2,017 billable hours accrued at the time of his termination, which was above King & Spalding's minimum to receive a market rate bonus for that year. And while Defendant told Plaintiff that he was being

let go immediately because his active matters were coming to an end, at the time K&S initially decided to terminate Plaintiff's employment several months prior, none of those matters was actually near completion, which means that Defendant's articulated basis was an ex post rationale rather than an actual reason for its decision.  See Joffe, 2018 U.S. Dist. LEXIS 96919, at *30-32.

37.     Finally, Defendant's explanation specifically with respect to the date chosen for Plaintiff's termination only further undermines the credibility of K&S's purported legitimate reasons.  K&S claims that it discharged Plaintiff due to a lack of internal demand for Plaintiff's work and the purported unwillingness of partners in his practice group to staff him on important matters, yet, on the other hand, avers that Plaintiff's termination was delayed because a partner in his practice group deemed Plaintiff essential to defending a deposition in an important matter that was scheduled to take place over a month away.  See Def.'s Proposed Findings ¶ 6; Tetrick Decl. ¶ 6-7.  Despite this seemingly obvious evidence of internal demand for Plaintiff's work by partners in Plaintiff's practice group, however, K&S nevertheless continued to seek Plaintiff's discharge on the "earliest date" possible after this deposition in an important matter concluded.

38.     Viewing the evidence as a whole, Plaintiff has successfully demonstrated that it is more likely than not that the intent to interfere with his ERISA benefits was at least a motivating factor in Defendant's decision to terminate Plaintiff's employment on December 7, 2016, and that Defendant's stated reasons for that decision are pretextual.  Accordingly, judgment should be entered in favor of Plaintiff on his claim under Section 510 of ERISA.

Dated: March 5, 2021            By:     */s/ David A. Joffe*

                        David A. Joffe, Esq. (pro se)
                        155 Christopher Columbus Drive
                        Jersey City, NJ 07302
                        516-695-7086
                        davidajoffe@gmail.com