UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

DAVID A. JOFFE,                              :
                                             :          17-CV-3392 (VEC)
                              Plaintiff,      :
                                             :
              -against-                       :
                                             :
KING & SPALDING LLP,                         :
                                             :
                              Defendant.      :
------------------------------------------------------------ X

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO PRECLUDE THE TESTIMONY OF KRISTIN KUCSMA

Defendant, King & Spalding ("K&S"), submits this memorandum in support of its

motion to preclude the anticipated testimony of plaintiff's expert economic witness, Kristin

Kucsma. Ms. Kucsma is expected to offer testimony as to the alleged economic damages

suffered by plaintiff ("Joffe") by virtue of the supposed loss of an opportunity that he would have

had (but for his termination) to work at another AmLaw 100 law firm as a partner or "counsel"

or to work at an AmLaw 200 law firm as a partner.

As discussed below, Ms. Kucsma's methodology relied on assumptions supposedly taken

from a draft report by Joffe's "employability" expert, Gordon Kamisar, concerning Joffe's

prospects in the "but for" world. This is why plaintiff needed to recall Kamisar to supplement

his initial testimony (which was limited to the alleged reason for Joffe's alleged inability to find

a job after his termination) when defendant indicated that Kucsma's testimony should be

excluded. (Tr. 951-952). However, even after being recalled to the witness stand, Kamisar

failed to provide the predicate for Kucsma's assumptions. In fact, he failed entirely to address in

any respect one of the most critical assumptions in her calculations, i.e., that Joffe would earn

average partner (or counsel) compensation three years after attaining that position. His testimony established that he <u>cannot</u> provide that predicate. Kucsma's testimony must therefore be excluded.

## I.   <u>EXPERT TESTIMONY MUST HAVE AN ADEQUATE FOUNDATION</u>

FRE 703 requires that expert testimony, including expert testimony concerning damages requires a proper factual foundation. "Put another way, an 'expert's testimony [regarding future earnings loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury." *Elcock v. Kmart Corp.*, 233 F.3d 734, 755-756 (3d Cir. 2000); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996). While the district court has discretion to admit or exclude expert evidence, it is an abuse of discretion to admit expert testimony that is speculative or conjectural "or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an 'apples to oranges' comparison." *Boucher*, Id. at 21 (citations omitted).

*In Boucher*, the plaintiff was a young man with a spotty work record when he was injured at work. *Id.* at 20. His expert economist was permitted to testify at trial about Boucher's "lost earnings" on the assumption that he would have worked a full-time job "for the rest of his career." *Id.* at 22. The jury awarded Boucher a substantial amount in lost future earnings and the defendant appealed, arguing that the expert's assumptions lacked a factual basis. On appeal, the Second Circuit cautioned against the temptation to answer such an argument with "the shorthand remark that the jury will give it the weight it deserves." *Id.* at 22 (citing *In re Air Crash Disaster at New Orleans, Louisiana,* 795 F.2d 1230, 1233 (5th Cir. 1986). Noting that the "Federal Rules of Evidence require a greater degree of discrimination than that," the court held

2

"[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiffs future employment prospects. . . ." Id. at 21-22. The court concluded that the expert's projections were not "accompanied by a sufficient factual foundation . . . " Id. (emphasis added).[1]

## II.   KAMISAR'S TESTIMONY FAILS TO LAY AN ADEQUATE FOUNDATION FOR KUCSMA'S TESTIMONY

### A. Kucsma's Calculations Rely On Kamisar's Assumptions.

The economic calculations that Joffe intends to present to the jury through Kucsma's testimony rely on assumptions that she makes based on Kamisar's opinion about what Joffe's employment prospects would have been in a "but for" world (i.e., where he had not been terminated by K&S). Kucsma herself does not purport to have any knowledge concerning what Joffe's employability would have been. Rather, she is an economist who was tasked with making economic projections based on Kamisar's supposed opinions. With that as her predicate, Kucsma's calculates damages that assume three scenarios[2]:

1.   In Scenario A, Alternative 1, Joffe would have: (i) become a partner at an AmLaw 100 firm in 2019; (ii) been paid average partner compensation in 2022; and (iii) been paid average annual increases in 2019 (upon promotion) and in 2020-2022 in equal

---

[1]   See also Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992) ("Because [the expert's] analysis was predicated on an assumption not supported by the record - the assumption that [the plaintiff] suffered from a permanent, total disability - the district court did not err in excluding the proffer."); Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983) ("expert's testimony [regarding future earnings loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury.").

[2]   Kucsma's calculations and assumptions are set forth in PX 197.

percentage amounts (48.46 percent increases each year) sufficient to raise his compensation to the projected average partner compensation in 2022.

2. In Scenario A, Alternative 2, Joffe would have: (i) become a "counsel" at an AmLaw 100 firm in 2019; (ii) been paid average counsel compensation in 2022; and (iii) been paid average annual increases in 2019 (upon promotion) and in 2020-2022 in equal percentage amounts (21.82 % each year) sufficient to raise his compensation to the projected average counsel compensation in 2022.

3. In Scenario B, Joffe would have: (i) become a partner at an AmLaw 200 firm in 2019; (ii) been paid average counsel compensation in 2022; and (iii) been paid average annual increases in 2019 (upon promotion) and in 2020-2022 in equal percentage amounts (20.14 % each year) sufficient to raise his compensation to the projected average in 2022.

Kucsma's expert report and deposition testimony made it clear that she had no basis of her own for opining that Joffe would become a partner or counsel or for opining that Joffe would be paid average compensation three years after becoming a partner or counsel. According to her report:

> Further, in both Scenarios, we assume that Mr. Joffe would have received median earnings for the positions of partner and/or counsel by January 1, 2022, three (3) years after obtaining those positions. [SOURCE: Draft Expert Report [of Gordon Kamisar][3]

---

[3] At her deposition, Kucsma acknowledged that her calculations did not in fact use "median" earnings but instead used average earnings.

Kucsma reiterated at her deposition that she relied entirely on Kamisar's "draft" report for this assumption and that she simply built in cumulative annual compensation increases for Joffe from 2019 to 2022 that resulted in 2022 compensation equal to the average that she projected for partners or counsel.[4]  By doing so, she calculated damages figures that build in huge increases in compensation in the early years of a hypothetical Joffe partnership (or counsel position) that her calculations then carry forward for the balance of his work life.

## B. **Kamisar's Testimony Does Not Establish A Predicate For Kucsma's Calculations.**

Kamisar's November 18 testimony was confined entirely to a discussion of Joffe's diminished career prospects as a result of his termination.  He failed entirely to address the "but for" scenario of a supposedly bright future for Joffe as a partner at an AmLaw 100 or AmLaw 200 firm or as a counsel at an AmLaw 100 firm.  K&S therefore asked to preclude Kucsma's testimony on those subjects as lacking foundation.  (Tr. 951-952).  However, the Court permitted Joffe to recall Kamisar as a witness on November 19.  Yet, even when permitted a "do over," Joffe failed to elicit testimony from Kamisar that would provide a predicate for Kucsma's calculations.

First, Kamisar provided no testimony that would support Kucsma's assumption that Joffe would have achieved average (or median) earnings of a partner or counsel within three years of promotion.  In fact, his (second) direct examination elicited no testimony whatsoever on this subject, even though it is a linchpin of Kucsma's calculations.  The only thing that Kamisar

---

[4]    Attached as Appendix A are pp. 75-81 of Kucsma's deposition transcript in which she testified as to the basis for her calculations and assumptions.  The projected earnings figures discussed there are different from those in PX 197 because the numbers in the exhibit reflect updated projections based on the same methodology.

testified to on his (second) direct examination on the subject of expected earnings was that Joffe's earnings (as an equity partner) would be depressed in the initial years as a result of the need to "buy in" to a hypothetical partnership. (Tr. 1214)  He provided no testimony as to when Joffe could expect to earn the average of what an equity partner earns (or, for that matter, on whether or when Joffe would ever become an equity partner).  He also provided no testimony concerning when a non-equity partner or counsel can expect to earn the average (or median) compensation for those positions.

Kamisar's testimony on cross-examination underscored why the subject was unaddressed by his direct examination.  Kamisar acknowledged on cross-examination that his own report stated that "[f]irm compensation policies vary, and multiple factors come into play, so it is impossible to pinpoint what Mr. Joffe's compensation would have been upon promotion to a partner or counsel position, or predict how gradually or sharply his compensation would have risen in the few years after his promotion." (Tr. 1245-1247, emphasis added.)  That testimony could not be more obviously inconsistent with Kucsma's assumption (purportedly based on Kamisar's opinion) that Joffe would have received huge increases in compensation immediately after promotion to bring him to the average partner (or counsel) compensation three years after such promotion.

That flaw alone is sufficient to preclude Kucsma's testimony because the assumption she made (that Joffe would earn average compensation three years after promotion to any of the three positions encompassed by her testimony) is at the heart of her calculations.  It is, however, only one of many flaws resulting from Kamisar's testimony.

Kamisar did not testify that Joffe would have been likely to become a partner (or counsel) at an AmLaw 100 firm. Rather, he testified on direct examination that Joffe would have been "virtually guaranteed" to obtain a job as a partner or counsel at one of an AmLaw 100 or AmLaw 200 firm or at a "smaller" firm that recruits lawyers with similar qualifications. (Tr. 1206, 1232-1233) He testified that it was a "common occurrence" for associates who leave an AmLaw 100 firm in their eighth year to "eventually" make partner at such other firms. (Tr. 1206, 1208, 1230) When forced to disaggregate that opinion as to the different positions for which Joffe might have been hired in the "but for" world, however, Kamisar conceded that he could not identify a single eighth year associate who left one AmLaw 100 firm and ultimately became a partner at another and he eventually acknowledged that it was "not very common" that a seventh or eighth year associate laterals to another AmLaw 100 firm and becomes a partner. (Tr. 12330-1232). He also acknowledged that the chances of making partner at any AmLaw 100 firm are small. (Tr. 1234)[5] This is an additional (and independent) reason why Kucsma should not be permitted to testify, in particular with respect to damages under Scenario A, Alternative 1.

Kucsma's testimony lacks foundation for the additional reason that it fails to account for Kamisar's testimony that promotion to non-equity partner is the first step to partnership at many firms; that it could be many years before a non-equity partner is promoted to equity partner; that it is not possible for an outsider to determine whether a particular partner is equity or non-equity; and that some non-equity partners remain in that position for their entire careers. (Tr. 1241) Kamisar also acknowledged that (as his report stated) "[a] senior associate promoted to a non-

---

[5] The best Kamisar could do was to say that he believed it would not have been "freakish or extremely rare" to "move from eighth year to counsel at another firm and later become a partner." (Tr. 1231, emphasis added). However, he could not provide a single example. In any event, Scenario A, Alternative 1 and Scenario 2 in Kucsma's analysis both assume that Joffe would have moved directly from associate to partner, an assumption not supported in any way by Kamisar's testimony.

equity position is also likely to see an increase in compensation but one far below that of an equity partner because of the wide gap in compensation between equity and non-equity partners." (Tr. 1244)

The above testimony eviscerates Kucsma's assumptions as to Scenarios A, Alternative 1, and Scenario 2, neither of which account for a progression by Joffe from non-equity to equity partner. Rather, both Scenarios: (i) rely on "averages of averages" that include both equity partner and non-equity partner compensation; and (ii) include in those "average of averages" firms that do not even have non-equity partners, many of which are at the upper tier of the AmLaw 100 list (thus skewing the "average of averages" upward)[6].

### III.   Kucsma Cannot Fill In The Gaps Left By Kamisar's Testimony

Kamisar's testimony does not simply leave gaps in the analysis of where Joffe would have landed in the "but for" world; the testimony actually contradicts the assumptions that are the basis for Kucsma's testimony. Even if the flaw involved mere gaps, however, Kucsma (who is not an employability expert) would not be permitted to fill in those gaps by relying on some omitted part of Kamisar's testimony because one expert witness may not give the opinion of another expert who does not testify on his/her opinion. While Rule 703 permits an expert to rely on hearsay evidence that may include another expert's report, it does so only because the expert is subject to cross-examination on the validity of the hearsay sources. *See TK-7 Corp. v. Est. of Barbouti,* 993 F.2d 722, 732 (10th Cir. 1993) (quoting Rule 703 Advisory Comm. Notes) (emphasis added). *See also Accord In re M/V MSC FLAMINIA,* No. 12-CV-8892 (KBF), 2017

---

[6]      According to the American Lawyer article that is PX 131 (at p. 100), ten of the top fourteen firms (ranked by average partner compensation) have zero non-equity partners. The compensation figures for these firms are, not surprisingly, outliers that bring up the average considerably.

WL 3208598, at *5 (S.D.N.Y. July 28, 2017) ("[E]xperts may rely on one another, but they may

only do so if the requisite standards for reliability are met each step of the way.  If one expert's

opinions are built upon a foundation laid by another, reliability of the latter requires reliability of

the former"); *Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, 172 F.3d 44, 1999 WL

12931, at *4 (4th Cir. 1999) (unpublished table decision); *Mooring Cap. Fund, LLC v. Knight*,

388 F. App'x 814, 820 (10th Cir. 2010) ("An expert is not entitled to testify to opinions that rely

on the opinion of another expert, simply because the other is an expert."); *In re Imperial Credit*

*Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1013 (C.D. Cal. 2003).  "'To allow otherwise

would deprive the opposing party of the opportunity to cross examine the expert on the basis for

the nontestifying expert's opinion.'"  *See Quiles v. Bradford-White Corp.,* No. 10-CV-747, 2012

WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012); *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp.

2d 558, 664 (S.D.N.Y. 2007) (holding that if the testifying expert had been allowed to relate the

findings of another's expert's regression analysis at trial, the testimony would violate the hearsay

rule—he would be relating the out-of-court statements of another expert, and those statements

would be offered for the truth of the opinion); *Simon v. Select Comfort Retail Corp.,* No. 4:14-

cv-1136 JAR, 2016 WL 160643, at *4 (E.D. Mo. Jan. 14, 2016).

## CONCLUSION

For the foregoing reasons, the Court should preclude the testimony of Kristin Kucsma.

PROSKAUER ROSE LLP

By:  s/Joseph Baumgarten
Joseph Baumgarten
11 Times Square
New York, New York 10036
Attorneys for Defendant

November 20, 2021

**APPENDIX A**

73

*Kucsma*

1 attorneys as counsel or partners?
2     **A.**   I did not do any research like that,
3 no.
4     **Q.**   Did you do anything to research
5 whether some firms are more likely than others to
6 hire laterals as counsel or partners?
7     **A.**   No.
8     **Q.**   Did you do anything -- do you know
9 what the phrase "two-tier partnership" means?
10     **A.**   Specifically, no.
11     **Q.**   Do you know that some firms have only
12 equity partners and other firms have equity
13 partners and non-equity partners?
14     **A.**   Of course. My parent company has
15 equity partners and non-equity partners.
16     **Q.**   When you assumed in the Scenario A and
17 Scenario B that Mr. Joffe would have become a
18 partner at a firm in the AmLaw 100 or AmLaw 200,
19 were you assuming an equity partner or a
20 non-equity partner?
21     **MR. JOFFE:** Objection to form.
22     **Q.**   Were you assuming that he would have
23 become an equity partner or a non-equity partner?
24     **MR. JOFFE:** Objection to form.

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

74

*Kucsma*

1     **A.**   I based my calculations on the average
2 earnings of all partners at AmLaw 100 firms.
3     **Q.**   So you based your calculation on the
4 average compensation of all partners including
5 equity partner and non-equity partners, correct?
6     **A.**   Yes.
7     **Q.**   Why?
8     **A.**   Again, I relied upon information in
9 Mr. Kamisar's report in which he noted that he,
10 Mr. Joffe, would have been well-positioned to --
11 land a comparable position at another firm, and he
12 specifically noted counsel or partner position.
13     **Q.**   So he didn't distinguish between
14 equity and non-equity?
15     **A.**   Not in that conclusion or that
16 opinion, no.
17     **Q.**   And did you do anything to try to
18 determine whether any of the firms in the AmLaw
19 100 hire or -- withdrawn.
20     Did you do anything to determine
21 whether any of the firms in the AmLaw 100 promote
22 people to non-equity partner as a condition of
23 being promoted further to equity partner?
24     **A.**   I did not specifically conduct that

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

75

*Kucsma*

1 research, no.
2     **Q.**   Do you know whether any firms promote
3 people to non-equity partner before they are
4 eligible for promotion to equity partner?
5     **A.**   Specifically, I don't know.
6     **Q.**   Would you agree with me that when an
7 associate becomes a partner at a large law firm in
8 some cases their salaries are raised sharply right
9 away, while in other cases they are raised
10 gradually over time?
11     **A.**   Will I agree with that statement? I
12 believe that's probably a true statement.
13     **Q.**   And you assume in your scenario that
14 Mr. Joffe's salary would be raised sharply right
15 away, correct?
16     **MR. JOFFE:** Objection to form.
17     **A.**   I assumed that his earnings would ramp
18 up over a three-year period.
19     **Q.**   And in particular, in Scenario A --
20 turn to page 16 -- your Scenario A assumes that
21 Mr. Joffe's compensation in Alternative 1 would
22 have been $545,594 in 2019?
23     **A.**   Yes.
24     **Q.**   And that would have been an increase

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

76

*Kucsma*

1 from what you had projected his last salary as
2 answer an associate to be of $368,894, correct?
3     **A.**   That is correct.
4     **Q.**   And that projection assumes,
5 therefore, that Mr. Joffe would have received a
6 47.9 percent increase in his first year as a
7 partner, correct?
8     **A.**   I did not perform that calculation,
9 but that sounds approximately correct.
10     **Q.**   And you then assumed that his salary
11 between 2019 and 2020 would have gone from
12 $545,594 to $806,934, correct?
13     **A.**   Yes.
14     **Q.**   And that projection would be another
15 47.9 percent increase, correct?
16     **A.**   Again, I didn't perform that
17 calculation, but that sounds approximately
18 correct.
19     **Q.**   How did you come up with that as your
20 projection?
21     **MR. JOFFE:** Objection to form.
22     **A.**   As I mentioned earlier, I took the
23 starting point of $368,894 and I assumed that --
24 as I noted -- on page 8 of my report, that by

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

77

***Kucsma***

1
2 January 1, 2022, Mr. Joffe's earnings would be
3 consistent with the average earnings of, in this
4 particular scenario and alternative, partners for
5 AmLaw 100 firms.
6      So I simply then calculated the
7 compound average growth rate necessary to get him
8 from the associate level earnings up to the
9 partner level earnings by January 2022, and there
10 is an implied compound average annual growth rate
11 that happens in those years, which is probably
12 approximately equal to the rates you've mentioned
13 to me.
14     **Q.**  And why did you assume that he would
15 be earning the average of all AmLaw 100 firm
16 partners by 2022?
17     **A.**  I base that on information provided by
18 Mr. Kamisar in his report.
19     **Q.**  Can you show me where in his report,
20 to where he said that would be a reasonable
21 assumption?
22      **MR. JOFFE:**  Objection to form.
23      **MR. BAUMGARTEN:**  What was wrong with
24 the form?
25      **MR. JOFFE:**  The statement -- the way

***COMPUTER REPORTING NYC INC.***
***(212) 986-1344***

78

***Kucsma***

1
2 that you characterized what Mr. Kamisar said
3 is different than what she said she adopted.
4      **MR. BAUMGARTEN:**  I'm sorry. Could you
5 read the last answer back and then my
6 question.
7      (Record read.)
8      **MR. JOFFE:**  She didn't say that this
9 is a reasonable assumption.
10     **Q.**  Can you show me where -- what in Mr.
11 Kamisar's report you were referring to?
12     **A.**  There is a statement on page 16 of his
13 report where he notes that -- I believe you
14 referenced part of this earlier -- in some cases
15 salaries are raised sharply right away, while in
16 other cases they are raised gradually over time.
17     Then Mr. Kamisar goes on to note:
18 Newly minted equity partners are likely to see an
19 increase in compensation, but they often
20 experience an initial two to three-year ramp-up
21 period, in which the attorney's compensation is
22 reduced to fund -- and so on.
23     So I relied on that two to three-year
24 ramp-up period referenced by Mr. Kamisar, and I
25 chose to use the three-year ramp-up period.

***COMPUTER REPORTING NYC INC.***
***(212) 986-1344***

79

***Kucsma***

1
2     **Q.**  Mr. Kamisar refers to a two to
3 three-year ramp-up period in which the attorney's
4 compensation is reduced to fund his or her buy-in
5 to the partnership.
6     **A.**  Correct.
7     **Q.**  Did you assume that Mr. Joffe's
8 compensation would be reduced in the first two to
9 three years?
10     **A.**  No. Technically what Mr. Kamisar is
11 saying here is that the compensation would be
12 replaced with equity in the firm. That's
13 technically what he's saying here.
14     So overall in this case, a partner
15 would be receiving that compensation. It's just
16 that instead of receiving it in the form of a
17 paycheck he would receive it in the form of equity
18 instead.
19     **Q.**  And you read that comment of Mr.
20 Kamisar stating that Mr. Joffe could have expected
21 to earn the average of what equity partners earn
22 after three years of partnership?
23     **A.**  No. I used that as a basis for
24 assuming that Mr. Joffe's earnings would have
25 ramped up over a three-year period.

***COMPUTER REPORTING NYC INC.***
***(212) 986-1344***

80

***Kucsma***

1
2     **Q.**  Well, why did you assume that he would
3 have earned the average as of -- of equity
4 partners by 2022?
5      **MR. JOFFE:**  Objection to form.
6     **A.**  I provided the quote in my report on
7 page 7 from Mr. Kamisar's report, and I think I
8 read it into the record earlier as well. It's the
9 first paragraph you see on the top of page 7 in my
10 report.
11     **Q.**  What is it that Mr. Kamisar said?
12     **A.**  He noted that: But for King &
13 Spalding's termination of Mr. Joffe under
14 circumstances alleged to be retaliatory, Mr. Joffe
15 would likely have at least maintained his senior
16 associate position at King & Spalding and quite
17 possibly have been offered a counsel or partner
18 position with the firm. Alternatively, he, Mr.
19 Joffe, would have been well positioned to land a
20 comparable position at another 100 or 200 -- AmLaw
21 100 or 200 firm.
22     **Q.**  Where in Mr. Kamisar's report did he
23 indicate or suggest that Mr. Joffe would have
24 earned the average of what equity partners earn at
25 AmLaw 100 firms by 2022?

***COMPUTER REPORTING NYC INC.***
***(212) 986-1344***

81

*Kucsma*

1
2    **MR. JOFFE:**  Objection to form.
3    **A.**    Mr. Kamisar noted that Mr. Joffe quite
4    possibly would have been offered a partner
5    position.  He then made reference to AmLaw 100 or
6    200 firms, and he also made reference to a
7    three-year ramp-up.
8             And those are the pieces that I used
9    in part to develop the framework in my report.
10    **Q.**    Did you rely on anything else other
11    than what you've testified to for -- in making the
12    assumption that Mr. Joffe would have earned the
13    average of partners by 2022?
14    **A.**    No.
15         **(Defendant's Exhibit 59,** Document
16         headed The Payout Picture, marked for
17         identification, as of this date.)
18    **Q.**    Do you know what Exhibit 59 is?
19    **A.**    This is a document that includes
20    information for the average compensation of all
21    partners for the AmLaw 100.
22    **Q.**    And if you look at your report, page
23    7, you refer to, in talking about Scenario A,
24    Alternative 1, annual earnings in that alternative
25    are established at $1,495,020 in 2017 dollars

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

82

*Kucsma*

1
2    based upon the average compensation of all
3    partners at AmLaw 100 firms.
4             And then you cite the source.
5             Is Exhibit 59 the source?
6    **A.**    This -- does have information, as I
7    said, for compensation of all partners in 2017.
8             I don't believe the document I have
9    looked exactly like this, but this seems to be
10    information, again, regarding 2017 compensation
11    for all partners in the AmLaw 100.
12    **Q.**    Is the document you have that you
13    consulted in your packet?
14    **A.**    Yes.
15    **Q.**    Do you have that in front of you?
16    **A.**    Oh, no, I did not bring it with me
17    today, no.
18    **Q.**    But do you believe this is the
19    information that you used?
20    **A.**    This certainly is information for
21    compensation for all partners in 2017.
22    **Q.**    And so you took the -- you added up
23    the average of all of the averages and then
24    computed an overall average?
25    **A.**    Correct.

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

83

*Kucsma*

1
2    **Q.**    And so your average included the
3    average of the 81 equity partners at Wachtell
4    Lipton, the number one firm in this ranking?
5    **A.**    Yes.
6    **Q.**    Did you make any attempt to exclude
7    firms at the high end or the low end?
8    **A.**    No.
9    **Q.**    Was that based on what you understood
10    Mr. Kamisar's opinion to be?
11    **A.**    There was no basis for me to exclude
12    any firms.  The information I had was simply that
13    Mr. Joffe, again quite possibly, would have been
14    offered, could have been offered a position as
15    counsel or partner within the firm.
16             Alternatively, he would have been well
17    positioned to land a comparable position at
18    another AmLaw 100 firm.  There was simply no basis
19    for me to exclude any of the firms on this list.
20    **Q.**    So the compensation at Wachtell, the
21    number one firm, was counted equally in computing
22    the average with the average at Lewis Brisbois,
23    which is the number 100 firm?
24    **A.**    Yes.
25    **Q.**    And did you make any adjustments for

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*

84

*Kucsma*

1
2    the fact that Wachtell has zero non-equity
3    partners and Lewis Brisbois has 565 non-equity
4    partners?
5    **A.**    No.
6    **Q.**    In preparing your report, did you
7    notice that none of the top six firms, Wachtell,
8    Paul Weiss, Sullivan & Cromwell, Cravath, Davis
9    Polk and Simpson Thacher, did you notice that none
10    of them have any non-equity partners?
11    **A.**    I may have noticed that.  I certainly
12    reviewed the list.  It's very obvious they have no
13    equity partners, so I probably did notice it at
14    some point.
15    **Q.**    Did you do anything to take account of
16    that in your calculations?
17    **A.**    No.  I simply took an average of all
18    of the average compensation figures across all
19    partners.
20    **Q.**    In taking the average you just added
21    up the totals and divided by 100, right?
22    **MR. JOFFE:**  Objection to form.
23    **A.**    Yes, I did take an arithmetic average.
24    **Q.**    That doesn't require any expertise,
25    does it?

*COMPUTER REPORTING NYC INC.*
*(212) 986-1344*