PROSKAUER ROSE LLP
Joseph Baumgarten
Pinchos Goldberg
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
jbaumgarten@proskauer.com
pgoldberg@proskauer.com

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- X
DAVID A. JOFFE,                                             :
                                                            :
                Plaintiff,                      :  Civil Action No.: 17-cv-03392 (VEC)
                                                            :
      -- against --                                         :
                                                            :
KING & SPALDING LLP,                                        :
                                                            :
                Defendant.                      :
----------------------------------------------------------- X


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

## **TABLE OF CONTENTS**

                                                                                     **Page**

PRELIMINARY STATEMENT ..................................................................................................... 1

LEGAL ARGUMENT ..................................................................................................................... 1

ARGUMENT .................................................................................................................................... 2

I.       JOFFE HAS FAILED TO PROVE THAT HIS REMOVAL FROM THE
           PARTNERSHIP TRACK IN 2015 WAS RETALIATORY ................................................. 2

           A.      Joffe Has Failed To Prove That His Alleged Protected Activity Was the But
                  For Cause of His Removal from the Partnership Track in 2015 ............................... 2

           B.      Joffe's Purported Belief That He Had a Duty to Report Ethical Concerns
                  in 2015 was Not Reasonable ..................................................................................... 5

           C.      Joffe Did Not Actually Report Any Ethical Concerns in 2015 ................................. 9

II.      JOFFE HAS FAILED TO PROVE THAT HIS TERMINATION IN 2016 WAS
           RETALIATORY ............................................................................................................... 11

           A.      Joffe Has Failed To Prove That His Alleged Protected Activity Was the But For
                  Cause of His Termination in 2016 ............................................................................ 11

           B.      Joffe's Purported Belief That He Had a Duty to Report Ethical Concerns
                  in 2016 was Not Reasonable or in Good Faith ........................................................ 13

           C.      Joffe Did Not Actually Report Any Ethical Concerns in 2016 ............................... 13

CONCLUSION ............................................................................................................................... 16

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................................... 1

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F.3d 276 (2d Cir. 1998) ............................................................................................. 11

*Setelius v. Nat'l Grid Elec. Servs. LLC*,
    No. 11-cv-5528, 2014 WL 4773975 (E.D.N.Y. Sept. 24, 2014) ...................................... 11

*Soliman v. Deutsche Bank AG*,
    No. 03-cv-104, 2004 WL 1124689 (S.D.N.Y. May 20, 2004) ........................................ 11

*Wieder v. Skala*,
    80 N.Y.2d 628 (1992) ....................................................................................... 1, 2, 9, 15

**PRELIMINARY STATEMENT**

No reasonable juror could conclude based on the evidence offered by Plaintiff David Joffe against Defendant King & Spalding LLP ("K&S") that he was a "whistleblower" entitled to relief under the narrow exception to employment at-will articulated by the New York Court of Appeals in *Wieder v. Skala*, 80 N.Y.2d 628 (1992).

After five days of trial featuring endlessly repetitive questioning by Joffe, the record lacks evidence to support any element of his *Wieder* claim: (i) Joffe cannot demonstrate that any alleged report of ethical concerns by Joffe contributed in *any* way to his removal from the partnership track in 2015 or termination in 2016, much less that such a report was the "but for" cause for his removal; (ii) any belief by Joffe that he had an obligation under the New York Rules of Professional Conduct to report his purported ethical concerns was not objectively reasonable; and (iii) Joffe never actually reported any ethical concerns.

K&S therefore respectfully moves pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law with respect to Joffe's *Wieder* claim—the only claim before the jury.

**LEGAL STANDARD**

Judgment as a matter of law is appropriate when "a party has been fully heard . . . during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, where there "can be but one reasonable conclusion as to the verdict," the court should direct a verdict for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

# ARGUMENT

Joffe has failed to meet his burden of proof with respect to his claim that the two alleged adverse employment actions were retaliatory; namely, his removal from the partnership track in 2015 and his termination in 2016. We address each adverse employment action in turn.

## I. JOFFE HAS FAILED TO PROVE THAT HIS REMOVAL FROM THE PARTNERSHIP TRACK IN 2015 WAS RETALIATORY.

### A. Joffe Has Failed To Prove That His Alleged Protected Activity Was the But For Cause of His Removal from the Partnership Track in 2015.

According to the Court's draft Jury Instructions,[1] Joffe must prove that his report of suspected unethical conduct was the "but for" cause of the adverse employment actions he complains of. Joffe has failed to produce any direct or indirect evidence from which a reasonable juror could conclude that any alleged report of ethical concerns by Joffe in 2015 contributed in *any* way to his removal from the partnership track, much less that it was the "but for" cause for the decision.

Joffe testified that he was told by David Tetrick on December 8, 2015 that he was being removed from the partnership track for three reasons: (i) his failure to submit a practice plan for two consecutive years in 2014 and 2015; (ii) his late time entries; and (iii) criticism from Meredith Moss for his work on the Auditor Liability Bulletin ("ALB").[2] Tetrick has testified as to those reasons as well.[3] Joffe has not introduced any evidence establishing that the reasons given by Tetrick for the decision to remove him from the partnership track were a pretext for retaliation based on a report of ethical concerns. To the contrary, Joffe acknowledged that:

---

[1] Defendant notes its continued objection to the framing of the *Wieder* elements adopted by the Court.
[2] Trial Tr. 245:1-13.
[3] Trial Tr.

2

(i) he should have submitted a practice plan in 2014 and 2015[4], yet failed to do so in both years;[5]

(ii) he repeatedly failed to enter his time for the prior week by the firm's deadline on the following Tuesday at 8:00 p.m.[6] and repeatedly received time entry sanctions as a result;[7] and

(iii) Moss removed him from the ALB team after he disappointed her by submitting a draft with factual errors on one occasion and failing to timely manage his submission on another occasion.[8]

Moreover, the evidence conclusively establishes that the ZTE matter had nothing to do with the decision to remove Joffe from the partnership track. Meredith Moss made the initial recommendation to remove Joffe from the partnership track, and Joffe has conceded that Moss had nothing to do with the ZTE case and did not act with retaliatory intent.[9] There is also no evidence that Tetrick—who was initially "surprised to see [Joffe] go off the cliff so quickly" but ultimately

---

[4] The importance that K&S attaches to practice plans as part of the review process is underlined by the email sent by Michael Ciatti to Tetrick and others in which he observed that review meetings should be "forward-looking discussions about the lawyer's trajectory, what they need to do to execute on their business plans, and how the team or firm can help them execute on their plans." D-17.

[5] Trial Tr. 246:12-13, 249:5-16, 420:15-421:24, 432:24-435:18.

[6] Trial Tr. 465:4-479:11; D-3; D-4; D-13; D-20; D-21; D-23; D-24; D-25; D-26; D-29; D-33; D-34; D-35; D-38; D-44.

[7] Trial Tr. 479:12-485:12; D-28; D-52; D-59

[8] Trial Tr. 440:19-458:1; J-7 at K&S_0000388 (Moss review referring to Joffe's work on the ALB as "appalling," stating that "I have no confidence in [Joffe's] work and will never staff him on a matter" and that "[i]f his approach to client work is anything like this, he shouldn't have a job here."); D-31; D-45; D-46; D-57 (November 17, 2015 email from Moss to Joffe informing him that she removed him from the ALB team "because [his] heart didn't seem to be in it").

[9] D-49 (August 16, 2015 email from Moss to Tetrick: "At a minimum, I think he should go off track; in the field of NY senior associates, he has no chance of being promoted in the next two years, and we should tell him that now"); D-134 (November 2, 2021 Joffe admission: "I don't allege that Ms. Moss acted with retaliatory intent"); Trial Tr. 459:12-460:15 (Joffe testimony that Moss never worked on the ZTE case or exchanged a word with him about the case); Moss Deposition Designations at 188:4-8 ("Q. What did you know, if anything, about the Vringo/ZTE matter at the time you wrote this [August 11, 2015] e-mail? A. I don't recall knowing anything other than you had billed 1400 hours to it.").

3

agreed with Moss's recommendation[10]—retaliated against Joffe for raising any concerns about the ZTE matter. Joffe testified that the ZTE matter never came up at the December 8, 2015 meeting during which Tetrick communicated the decision to Joffe, and that he did not believe or suspect when told of the decision that it was connected to the ZTE matter.[11] The evidence also makes clear that Tetrick was not aware of any attempt by Joffe to raise ethical concerns in 2015 when the decision to remove Joffe from the partnership track was made.[12] Finally, and most ironically, there is no dispute that the one person with the most incentive to retaliate against Joffe for anything that happened in the ZTE matter—Paul Straus, the person whom Joffe threatened to report to the bar in February 2015—did not in fact retaliate against him:

> I don't think I was retaliated -- and I've always thought I – I've never claimed I was retaliated against by Paul Straus for saying that to Paul Straus."

D-133 (November 2, 2021 Joffe admission).[13] To the contrary, Joffe received his best performance reviews in 2015 and 2016 from Straus,[14] and Straus recommended Joffe to another partner after K&S's work on the ZTE matter concluded.[15]

---

[10] D-49; Trial Tr. 1031:15-20.

[11] Trial Tr. 245:14-16, 258:16-21, 487:5-12.

[12] Trial Tr. 308:17-23 (Joffe testimony that Tetrick's only knowledge about the ZTE case would have been from Joffe's performance reviews); J-8 at K&S_0000173 (Joffe listed his work on the ZTE matter as his "most significant achievement on behalf of clients" in his 2015 self-evaluation); Trial Tr. 439:21-25 (Joffe testimony: Q. Sir, is there anything that you submitted in connection with the review process in 2015 that would have alerted the reader to the fact that you had raised or were raising concerns about ethical breaches in connection with the ZTE matter? A. As part of the review process in 2015? No.); *see also* Trial Tr. 887:3-19, 1033:10-1034:13, 1036:8-1037:3 (Tetrick testimony that he was unaware of Joffe having raised any concerns about the ZTE matter when he made the decision to remove Joffe from the partnership track).

[13] *See also* Trial Tr. 628:10-23, 631:2-11 (Joffe testimony confirming same).

[14] J-7 (2015 performance review); J-7 (2016 performance review).

[15] D-54 (September 22, 2015 email from Straus to James Berger recommending Joffe for a new matter).

4

In sum, Joffe has failed to carry his burden of proof to establish that his alleged protected activity had anything to do with the decision to remove him from the partnership track in 2015, let alone that it was the "but for" cause, and no reasonable juror could conclude otherwise.

**B.    Joffe's Purported Belief That He Had a Duty to Report Ethical Concerns in 2015 was Not Reasonable.**

Even assuming, *arguendo*, that Joffe had a subjective good-faith belief that he had an obligation to report his purported ethical concerns in 2015, Joffe's belief was not *objectively* reasonable. Joffe testified that he formed his view about his ethical obligations after he downloaded a copy of the New York Rules of Professional Conduct on his iPad in July 2015, and that this led him to believe that Straus and Perry may have violated Rule 8.4(c) (prohibiting conduct involving "misrepresentation") or 8.4(d) (prohibiting conduct involving "that is prejudicial to the administration of justice").[16] Joffe's own testimony, however, makes clear that it was unreasonable for him to conclude that any of the specific "incidents" that occurred in the ZTE matter implicated either of these provisions of the ethics rules. Specifically:

- **TRO Hearing**: Joffe testified that he did not observe any ethics violations at the TRO hearing or that Straus had any reason to believe that his statement to Judge Kaplan was untrue.[17]

- **Wang Declaration**: Joffe testified that he did not believe that anyone at K&S, including himself, was aware that the Wang declaration contained any false statements when it was submitted.[18]

---

[16] Trial Tr. 178:22-179:12, 182:2-14, 241:9-16.

[17] Trial Tr. 85:12-15 (Joffe did not observe "ethics violations" at the July 7, 2014 TRO hearing), 89:7-12 ("Q. What about Mr. Perry and Mr. Straus, as far as you know, did they know or did they have any reason to believe on July 7, 2014, that the statement was false? A. No. What Mr. Straus said in the quote that we're looking at was what I understood he and Mr. Perry believed was true and what I believed was true.").

[18] Trial Tr. 110:10-14 ("Q. Did you believe or do you believe that anyone's conduct in connection with the Wang declaration was intentional? A. I don't believe anyone intentionally lied to Judge Kaplan about what Vringo shared or didn't share with the European court, no."), 122:12-19 ("Q. Did you believe or do you believe now that in connection with the Wang declaration, European counsel, the episode that we just discussed, that there were ethical violations that you were required to report? A. I want to be clear, both then and now the answer is no, I don't think and I didn't

5

- **Hu Declaration / NDRC Communications**: Joffe testified that he did not believe that anyone at K&S, including himself, was aware that the Hu declaration contained any false statements when it was submitted.[19]

- **Disclosure of Confidential Information to Google and Edelman**: Joffe testified that Judge Kapan became aware of the disclosures to Google and Edelman.[20]

- **Opposition to Motion to Compel Guo Deposition**: Joffe testified that he did not believe that anyone at K&S, including himself, was aware of the real reason for Guo's reluctance to travel to U.S. at the time that K&S submitted its opposition to Vringo's motion to compel Guo's deposition.[21]

- **Order to Show Cause**: Joffe testified that he wrote the first draft of the opposition to Judge Kaplan's Order to Show Cause and wanted to help convince the Court that Straus and Perry should not be sanctioned.[22]

No reasonable lawyer would believe that any of the above incidents triggered Joffe's duty to report under Rule 8.3, which only requires reporting when a lawyer "knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer."

---

think that the Wang declaration European counsel episode by itself involved ethic violations that I'm required to report.").

[19] Trial Tr. 153:24-154:2 ("Q. At the time that [the Hu declaration] was signed, did you believe the statement was false or misleading? A. No, I did not believe that at the time, and I don't believe that Mr. Straus or Mr. Perry believed that either at the time."), 155:9-16 ("Q. Do you believe -- did you believe or do you believe now that in connection with what you've described in the Hu declaration/NDRC episode up to now, that there were ethical violations that you were required to report? A. I would say the answer is almost. If Paul Straus had gone through with obtaining and filing that declaration from Deekin would have been personal knowledge and false, I would have felt compelled to report that. Thankfully, he held off.").

[20] Trial Tr. 616:16-19.

[21] Trial Tr. 208:20-25 (Joffe didn't believe the K&S partners were aware of Guo's real reason), 221:4-8 ("Q. To be clear, in relation to the Guo deposition and the Iran embargo episode that we just discussed, you did not believe anyone at King & Spalding acted fraudulently or with intent to deceive, correct? A. No").

[22] Trial Tr. 205:16-20 ("Q. Going back to the order to show cause, did you at the time believe Mr. Perry or Mr. Straus should have been sanctioned? A. It's not my place to make that kind of call. I'm not a judge. I thought that -- I hoped they wouldn't be, and I wanted to try to make sure that they wouldn't be."), 226:24-227:1 ("I recall that I was the one who wrote the first draft of [the opposition to the Order to Show Cause].").

6

To the extent that Joffe claims he believed that he had a duty to report conduct involving a "misrepresentation" under Rule 8.4(c), his belief was objectively unreasonable given his admission that any supposed ethical "violations" consisted of statements to the court that Straus and Perry (as well as Joffe himself) thought were true at the time they were made. *See* Black's Law Dictionary (11th ed. 2019) (defining "misrepresentation" as "The act or an instance of making a false or misleading assertion about something, ***usu. with the intent to deceive***.") (emphasis added).

Similarly, it was objectively unreasonable for Joffe to believe that unintentionally false statements could constitute "conduct that is prejudicial to the administration of justice" under Rule 8.4(d). *See* Comment [3] to Rule 8.4 ("The prohibition on conduct prejudicial to the administration of justice is generally invoked to punish conduct, whether or not it violates another ethics rule, that results in **substantial harm to the justice system** comparable to those caused by obstruction of justice, such as advising a client to testify falsely, paying a witness to be unavailable, altering documents, repeatedly disrupting a proceeding, or failing to cooperate in an attorney disciplinary investigation or proceeding.") (emphasis added). None of the inadvertent false statements identified by Joffe is even remotely comparable to the examples given in this comment. Moreover, Joffe has not elicited any evidence that any of the statements made or positions taken by the K&S lawyers in the ZTE case impacted any decision by Judge Kaplan or otherwise did any harm (much less "substantial harm") to the justice system. It was, therefore, objectively unreasonable for Joffe to believe that they constituted "conduct that is prejudicial to the administration of justice."[23]

Any purported belief by Joffe that he had a duty to report ethical concerns in 2015 was also objectively unreasonable for an additional independent reason. Every alleged "ethical violation"

---

[23] Trial Tr. 174:16-20 ("Q. Did you then personally believe at the time that King & Spalding's conduct in the case as a whole, as you said, amounted to obstruction? A. I personally thought that the answer was no, but I was -- THE COURT: OK. That's your answer. No, you did not.").

7

was known to Judge Kaplan.[24] In fact, Joffe has repeatedly said that Judge Kaplan's criticisms and warnings about possible sanctions were precisely what caused him to have concerns. Paradoxically, Joffe also testified that he did not realize at the time that Judge Kaplan was himself "a tribunal or other authority empowered to investigate or act upon such violation," which makes no sense given Judge Kaplan's role, his comments and the fact that he himself was empowered both with the authority to award sanctions and to make a referral to another disciplinary authority. Joffe's testimony that he only later learned that this is true from his ethics counsel (after he left K&S) and now understands that this is a "reasonable understanding is telling. Even the slightest consideration of the question by Joffe in 2015 would have caused him to realize that he had no reporting obligation in these circumstances."[25] It should go without saying that Joffe could not have had a duty to report purported ethical violations to a tribunal which was already aware of same. *See* Nassau Cty. Ethics Op. 2013-3 ("violative conduct [in the course of litigation] … will by its very nature be brought to the attention of the tribunal in which the case is filed … this will satisfy any reporting obligation inquiry counsel may have"). Nor could Joffe have reasonably believed that he had an obligation to report any "near misses," as any such incidents were not ethical violations.[26]

---

[24] Trial Tr. 603:7-10 (Q. So those were all things that anyone who wanted to learn about the case could learn just by going through the docket and reading pleadings and transcripts, right? A. Those things would be viewable on the public docket, yes."), 609:22-618:25 (Joffe admitted that Judge Kaplan was aware of each of the incidents constituting the purported "ethical violations" that he believed he had a duty to report). Although Joffe claimed that he was not sure whether Judge Kaplan was aware of the disclosure to Google by August 2015, the Court can take judicial notice of the docket in the ZTE matter for the fact that Vringo informed Judge Kaplan of the Google disclosure no later than July 30, 2015 when it referenced it in a motion to compel filed on that day. *See Vringo v. ZTE Corporation*, 14-cv-4988 (LAK), Dkt. No. 178 at 2 ("After reviewing ZTE's July 2015 production, Vringo uncovered that ZTE provided Vringo's key NDA material – its settlement offer – not only to (1) the Shenzhen Court, and (2)the NDRC, but also ***to*** (3) ***Google***; (Exh. B); and (4) more than 115 ZTE employees, including executives and PR staff … .") (emphasis added).

[25] Trial Tr. 619:14-621:6.

[26] As the Court noted during the Charge Conference, "the reality is a near miss is a near miss[,] [t]he planes don't collide, thank goodness." Trial Tr. 1095:6-7.

In sum, no reasonable juror could conclude that Joffe had an objectively reasonable belief that he had duty to report any purported ethical concerns in 2015.

### C. Joffe Did Not Actually Report Any Ethical Concerns in 2015.

The Court should also grant judgment as a matter of law because no reasonable juror can find that Joffe made any "report" in 2015. In order to constitute protected activity under *Wieder*, Joffe is required to prove, by a preponderance of the evidence, that he made a report that was sufficiently specific to make it clear to the people to whom he was communicating that he was reporting suspected unethical conduct. Joffe's own testimony makes it clear that he failed to do so.

As an initial matter, Joffe did not initiate any reporting to anyone in 2015. To the contrary, Joffe testified that Straus and Perry reached out to Bob Thornton, the General Counsel of K&S, after Judge Kaplan issued the Order to Cause, and Thornton then engaged outside counsel Philip Forlenza of Patterson Belknap Webb & Tyler LLP in connection with same.[27] Joffe subsequently answered Forlenza's detailed and probing questions about the history of ZTE matter during five or six lengthy telephone conversations with Forlenza and Straus, one of which was joined by Thornton.[28]

Moreover, and fatal to Joffe's claim, Joffe never suggested during any of those conversations that he had any concerns about potential ethical misconduct.[29] To the contrary, although he

---

[27] Trial Tr. 224:2-11, 492:12-16.

[28] Trial Tr. 228:11-22, 230:10-20, 231:10-14, 624:15-19

[29] Trial Tr. 233:6-14 (Q. Mr. Joffe, did you directly state or suggest at any point during these conversations that you have concerns about potential ethical misconduct? A. If I had stated that, it would sound like there is an echo in the room, so I did not personally say this. MR. BAUMGARTEN: I'm going to ask that that be stricken. THE COURT: Yes, disregard that. The answer to the question was no."), 627:14-21 ("THE COURT: What is the answer to the question, Mr. Joffe? Is the answer that you confirmed that you did not say it or are you trying to testify now that you suggested it during the conversations with Mr. Forlenza? THE WITNESS: I did not disagree with the suggestion. I guess I did not personally suggest that, for the same reason, it would sound like there's an echo in the room, that I had concerns about potential ethical misconduct."); *see also* 1334:25-1335:4 (Forlenza testimony: "Q. Did Mr. Joffe say

9

purports to be a whistleblower, Joffe testified that he did not want to convey any information about events in the case that would have "personalized it vis-à-vis Paul Straus." Instead, he assumed that Forlenza would be able to "connect the dots" and that Forlenza and Thornton would not be "shy" about contacting him with any questions.[30] Joffe also never made any report to the Bar because he was confident that Forlenza and Thornton would act appropriately if they felt that any of the facts about the ZTE case shared by Joffe implicated any ethical issues.[31] Indeed, Joffe acknowledged that Forlenza thoroughly looked into every aspect of the ZTE case and did not try to sweep anything under the rug,[32] and that Joffe was not discouraged from sharing any information.[33]

In sum, Joffe did not report any suspected ethical violations in 2015. If Joffe's motivation was to report ethical violations, his own testimony makes clear that he did not share any such concerns with Thornton or Forlenza and left it to them to "connect the dots" based on his reporting of the facts. Because K&S cannot possess knowledge of something that was only in Joffe's head,

---

anything that caused you to think that he was raising any concerns with you about ethical obligations or possible ethical breaches in connection with the way the case had been handled? A. No, sir.").

[30] Trial Tr. 234:22-237:24, 624:20-625:20.

[31] Trial Tr. 237:25-238:7 ("Q. Why did you report to Mr. Forlenza and Mr. Thornton rather than directly to the New York State Bar? A. Because Mr. Forlenza was a more experienced -- was far more experienced than I was, and because Mr. Forlenza wasn't himself involved. So I thought that he and Mr. Thornton would have a better understanding or better ability to decide whether this conduct, which I was sure was unethical, crossed the line into conduct that is required to be reported."), 490:16-491:1 ("Q. Well, did you have any concern about whether if the firm didn't make a report, you would be required to? A. I believed that it wouldn't -- I thought that Mr. Thornton and Mr. Forlenza would make the right decision about that, and I didn't -- I didn't have concern at the time that they – I thought that they would take care of -- properly take care of that issue. And I didn't feel -- I didn't feel like it was my place to follow up rightly or wrongly during that fall period. It felt like something that was done -- you know, I reported internally, and I felt like they were more experienced, they would make that call.").

[32] Trial Tr. 492:2-11 ("Q. When you referred to the thoroughness of Mr. Forlenza's questioning, what do you mean? A. The conversations that we had, the granularity with which he delved into the prior year of the ZTE matter. It was a feeling of very much, like, turn over every stone to the point where there were things -- I wouldn't want to reveal privilege -- but there were things I remember asking, like, why is he getting into so much detail, into even minutia. But the impression I had that it was that he wanted, like, a very complete, very thorough understanding.").

[33] Trial Tr. 230:3 ("No one told me don't leave a paper trial.").

10

no reasonable juror can find that Joffe made a sufficiently specific "report" in 2015 to place K&S on notice that he intended to raise concerns about potential ethical misconduct.[34]

## II. JOFFE HAS FAILED TO PROVE THAT HIS TERMINATION IN 2016 WAS RETALIATORY.

### A. Joffe Has Failed To Prove That His Alleged Protected Activity Was the But For Cause of His Termination in 2016.

Joffe has also failed to produce any evidence that Tetrick's decision to terminate his employment in 2016 was motivated, even in part, by any alleged ethical concerns raised by Joffe, much less that any alleged protected activity engaged in by Joffe in 2016 was the "but for" cause of his termination.

As in prior years, a practice plan was due in late July and Joffe was told of the July 27 due date six weeks in advance.[35] Although Joffe was aware that he had been taken off partnership track a year earlier in substantial part because of his failure to submit a practice plan, he again failed to submit a practice plan. There is no evidence in the record that he even attempted to prepare one.[36] Instead, Joffe wrote a cryptic note—repeated multiple times—that his response was somehow contingent on receiving a response to his July 25 email to Tetrick.[37]

It is hardly a surprise that Joffe's actions were taken by K&S for exactly what they were – an intentional failure (again) to submit a practice plan. On August 11, Michelle Carter asked Joffe (again) for his submission and Joffe responded (more than 24 hours later) that Carter's note had

---

[34] *See Soliman v. Deutsche Bank AG*, No. 03-cv-104, 2004 WL 1124689, at *13 (S.D.N.Y. May 20, 2004) ("[W]here a plaintiff's complaint is vague or ambiguous and does not sufficiently articulate the nature of [the unlawful conduct], courts hold that a plaintiff has not engaged in a protected activity.") (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)); *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-cv-5528, 2014 WL 4773975, at *20-21 (E.D.N.Y. Sept. 24, 2014) (discussing ambiguous complaints that do not amount to protected activity and collecting cases).

[35] D-61, D-63.

[36] On the day the practice plan was due, Joffe forwarded the template instructions to his personal gmail account. (D-66). He could provide no explanation in his testimony. (Tr. 558-562).

[37] P-81.

11

been sent in error.[38] That email was forwarded to partners Ashley Parrish and Tetrick with Carter's cover email stating "David intentionally did not submit his [practice plan]." Tetrick at that point understood that Joffe had granted himself a unilateral extension of the time to submit his practice plan.[39]

Tetrick was clear with Joffe that his actions backfired, telling him point blank in his September 23 email and again in Joffe's October 14 review meeting that Joffe had made a "misjudgment" and that Tetrick did not understand how anything raised in the July 25 email rendered him unable to submit a practice plan.[40] At his termination meeting in December, Tetrick reiterated the point.

As Tetrick explained to Joffe during the December 7, 2016 termination meeting, the decision to terminate Joffe's employment was based on a number of reasons, including:

- Joffe was the only on-track associate in the AEC process in the entire firm who failed to submit a practice plan in both 2014 and 2015;
- Despite being told both years of the importance of business planning, Joffe again failed to submit a practice plan in 2016, for the third year in a row;
- Joffe's failure to meaningfully participate in his own career development was inconsistent with the firm's expectations for associates of Joffe's seniority; and
- Joffe was working primarily on three matters, which were wrapping up, and the firm did not foresee any realistic possibility of him being staffed on new matters.[41]

---

[38] D-69. Oddly, Joffe forwarded Carter's email to his gmail account shortly after receiving it (D-67) but did not respond to her until the evening of the next day. (Tr. 562-566).

[39] Tr. 1038-1039.

[40] J-16, J18. The October 14 meeting also included a discussion of the mixed reviews from partners, which included reservations expressed by two partners about using Joffe on certain matters and a review by one of the partners in his Practice Group that Joffe's performance was "below expectations."

[41] J-23; Trial Tr. 1005:22-1006:17.

12

Joffe has failed to carry his burden of proof to establish that his supposed report of ethical concerns was the "but for" cause of his termination[42], as opposed to the legitimate non-retaliatory reasons explained to him by Tetrick, and no reasonable juror could conclude otherwise.

### B. Joffe's Purported Belief That He Had a Duty to Report Ethical Concerns in 2016 Was Not Reasonable or in Good Faith.

To the extent Joffe claims that his July 25, 2016 email to Tetrick was an attempt to report "ethical concerns," Joffe could not have had a good faith or objectively reasonable belief that he was required to report anything about the ZTE matter to anyone in 2016 because, as Joffe *repeatedly* testified, he believed that he had already discharged his reporting obligation in 2015.[43] Joffe has not even attempted to explain why he believed he had an obligation to report ethical concerns in July 2016 relating to a case on which he had stopped working close to a year earlier.[44]

### C. Joffe Did Not Actually Report Any Ethical Concerns in 2016.

No reasonable juror could conclude that Joffe reported any ethical concerns in 2016. Joffe's claim that he sought to "reraise" his concerns in his July 25, 2016 email to Tetrick ignores the context and content of the email.

The July 25 email was part of an email exchange that began in April 2016, when Joffe wrote to Tetrick with questions about his compensation. J-14. Joffe's April 15, 2016 email (with

---

[42] Tetrick never heard about Joffe's threat to report Straus to the Bar. (Tr. 1034).

[43] Trial Tr. 232:7-10 ("Q. You testified earlier that you believe you fulfilled your obligation to report specific ethics misconduct by reporting to Mr. Forlenza and Mr. Thornton, correct? A. Yes, that was my belief at the time."), 237:10-18 ("Q. Did you believe that you fulfilled your obligation, notwithstanding the omission from what you reported of matters that you said would personalize, what you reported as between you and the partners? … A. Yes, because I was -- THE COURT: That's it. The answer is yes."), 242:18-24 ("At the time that the ZTE matter concluded, did you believe that you fulfilled your shall report obligation under Rule 8.3(a)? A. At the time that the ZTE matter concluded, yes, I did believe that I had fulfilled my reporting obligation by reporting internally to Mr. Forlenza and Mr. Thornton, yes, at that time."), 491:2-10 ("I didn't think that the same thing needed to be reported twice. . . So I thought that I would -- I had fulfilled the duty that I had by reporting to ethics counsel hired for an ethics investigation. I thought that was the point.").

[44] Trial Tr. 239:10-240:6 (Joffe did no substantive work on the ZTE case after September 2015).

13

the subject line "Compensation") made no mention of the ZTE case or about any "ethical issues."

*Id.* Tetrick responded on May 4. *Id.* On July 25, Joffe responded with a lengthy email making it clear again that his concern was compensation. The memo began with the following paragraph:

> I continue to have concerns . . . with respect to my compensation. Specifically, I find the Firm's decision to award me a zero-bonus for 2015 to be, under the circumstances, inexplicable. I also find inexplicable the Firm's decision, communicated to me in the April 12, 2016 memorandum referenced below, to freeze my salary for the current year. Thus, to the extent the relevant circumstances were not known or considered by the respective decisionmakers, I believe it would be helpful if I set them forth below.

*Id.* The email recounted Joffe's employment history with K&S, noting that the firm's decision to seek to withdraw from the ZTE case in September 2015 had "led to a temporary drop-off in my billable hours," which Joffe asserted "more than accounts for the extent to which my total hours for 2015 fell slightly short of the annual threshold." *Id.* Though Joffe referred obliquely (without any elaboration) to "several instances of poor judgment by the partners, in the face of every more glaring red flags," he prefaced that comment with the unequivocal statement:

> To be clear, I do not believe that Bob or Paul intentionally misled the Court, nor that they engaged in any other culpable conduct.

*Id.* In his conclusion, Joffe made clear what he was requesting, *i.e.*, money:

> In short, I strongly believe that the circumstances set forth above, both individually and especially in their totality, are vitally relevant to any exercise by the Firm of its good-faith discretion in setting: (i) my 2015 bonus; (ii) my current salary; and (iii) my compensation going forward.

*Id.*

No reasonable juror could conclude that this was a report of a suspected ethical violation. Rather, it was Joffe's brief in support of his request for higher compensation. Joffe did not threaten to report an ethical violation; he did not request that K&S report any ethical violation; and he did not request that the firm undertake any investigation with respect to the ZTE case (in which the firm's involvement had ended almost a year earlier). While Tetrick was understandably concerned

14

about Joffe's reference to a lack of "judgment" on the part of Straus and Perry, it is hardly surprising that Tetrick testified that he did not view the email as raising concerns that anyone at K&S had committed *ethical* violations.[45]

Moreover, Joffe's own testimony makes clear that he never made any other "attempt" to report his purported ethical concerns in 2016, including at the October 14, 2016 performance review meeting with Tetrick and Wendy Waszmer,[46] or in any subsequent conversations.[47]

---

[45] Trial Tr. 888:6-16 ("Q. Did you believe the email raised only compensation-related issues? A. I believed that everything in this email was related to compensation, just as the introduction led me to believe. Q. Did you believe that what you learned about the ZTE matter in this email related only to compensation? A. I thought you were telling me about this so I could reconsider the 2015 bonus decision. Q. So you didn't think that it raised any issues about ethics concerns, right? A. No. Q. Didn't cross your mind? A. No."), 1036:4-7 (Q. Did you read the July 25 email as Mr. Joffe reporting serious ethical concerns about the way Mr. Perry and Mr. Straus had handled the ZTE case? A. No.").

[46] Trial Tr. 348:8-15 (Joffe testimony: "Why not raise ethics concerns right then and there at that meeting? A. One, because I wasn't sure what I could raise in front of Ms. Waszmer. And, two, I had timed -- that part of the conversation had been close to half an hour, and I didn't think that I should launch into this when, you know, another associate is about to come in for their review. So I thought December is only six weeks away at that point."), *see also* 1020:17-20 (Tetrick testimony: "Q. Did he say anything at the October 14 meeting to indicate that he wanted to communicate with you about any ethical concerns in relation to the ZTE case? A. No."), 360:11-15 ("Q. Did you think to bring up your ethics concerns about the ZTE matter? A. I had intended to do that. I thought that was the purpose of the meeting before. But once I got this news, that sort of fell by the wayside at that meeting."); 605:12-16 ("Q. Now you had come prepared to talk about concerns you had about the ZTE case in that meeting? A. Yes, that was what I intended to raise. Q. And you didn't raise it at the meeting, correct? A. No.").

[47] Trial Tr. 605:12-16 (Joffe testimony: "Q. Now you had come prepared to talk about concerns you had about the ZTE case in that [December 7, 2016] meeting? A. Yes, that was what I intended to raise. Q. And you didn't raise it at the meeting, correct? A. No."), *see also* 1052:3-9 (Tetrick testimony: "Q. In any of those conversations when you were talking with him about actual client work, did he say anything along the lines of, David, can we just spend a few minutes talking about something else, because I have some concerns about ethical issues in connection with the ZTE case that I want to either talk to you or find out who's the right person to talk to? A. No.").

## **CONCLUSION**

For the foregoing reasons, the Court should enter judgment as a matter of law in favor of Defendant on Plaintiff's *Wieder* claim.

Dated: November 21, 2021　　　　　　　　　PROSKAUER ROSE LLP
　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　　By: /s/ Joseph Baumgarten

　　　　　　　　　　　　　　　　　　　　　Joseph Baumgarten
　　　　　　　　　　　　　　　　　　　　　Pinchos Goldberg
　　　　　　　　　　　　　　　　　　　　　Eleven Times Square
　　　　　　　　　　　　　　　　　　　　　New York, New York 10036
　　　　　　　　　　　　　　　　　　　　　(212) 969-3000
　　　　　　　　　　　　　　　　　　　　　jbaumgarten@proskauer.com
　　　　　　　　　　　　　　　　　　　　　pgoldberg@proskauer.com

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendant*