**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**DAVID A. JOFFE,**

      **Plaintiff,**

**v.**

**KING & SPALDING LLP**,

      **Defendant.**

**Case No. 17-cv-3392 (VEC) (SDA)**

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 50(a)**

---

David A. Joffe, Esq. (pro se)
155 Christopher Columbus Drive
Jersey City, NJ 07302
516-695-7086
davidajoffe@gmail.com

## PRELIMINARY STATEMENT

The table of contents in King & Spalding's motion for judgment as a matter of law (Doc. No. 323) quickly confirms that, per usual, Defendant comes armed with every argument. More telling, though, in light of the Firm's seeming thoroughness, is that its heavily-pincited brief **(i)** omits any mention that "the standard for judgment as a matter of law is the same as the standard for summary judgment," Kerman v. City of N.Y., 374 F.3d 93, 118 (2d Cir. 2004), just like its brief **(ii)** omits any mention of this Court's Summary Judgment Opinion (see Doc. No. 74). These omissions are telling because, as Defendant presumably recognizes, in the Summary Judgment Opinion this Court already rejected the exact same arguments raised here under the exact same standard, and nothing in the trial record provides a basis to revisit the Court's well-considered ruling that this case presents a question of fact for the jury. If anything, the record as adduced at trial points even more strongly and consistently in the undersigned's favor than it did at the summary judgment stage. Accordingly, for the reasons Defendant's first summary-judgment motion was denied by the Court in June 2018, its second should be denied now a fortiori.

## ARGUMENT

**I.    THE PARTNER-TRACK REMOVAL SHORTLY FOLLOWED THE END OF THE ZTE MATTER AND LACKS A NON-RETALIATORY JUSTIFICATION**

### A. The Jury Is Entitled to Draw the Same Factual Inferences Previously Described by This Court

This Court previously held that a jury may infer that the undersigned's partner-track removal was retaliatory because:

> The evidence shows that Joffe was removed from the partnership track shortly after the ZTE case settled. At the time, Joffe's reviews were overwhelmingly positive—with the sole exception of Meredith Moss, who acknowledged that her experience with Joffe was limited. It may be that Moss's opprobrium was so

damning that Joffe was demoted on the basis of her feedback alone, but, if true, that is not King & Spalding's contention.  In explaining Joffe's demotion, Tetrick primarily cited administrative shortcomings, such as Joffe's failure to turn in a practice plan and to enter his time sheets on schedule.  If Joffe had truly been demoted for failing to turn in his time or failing to submit a practice plan, he would be the only associate at King & Spalding to have been demoted for those reasons.  The fact that Joffe was promoted to senior associate in 2015 despite having failed to submit a practice plan that year casts additional doubt on this explanation.

Summ. J. Op. at 20.

Each of the predicates in the above-quoted portion of the Summary Judgment Opinion has also been adduced at trial, and, accordingly, the evidence creates an issue of fact for the same reasons previously identified by this Court.

Indeed, the evidence at trial has only confirmed that Ms. Moss's opprobrium was, in fact, decidedly **_not_** so "damning that Joffe was demoted on the basis of her feedback alone," or even in substantial part.  Specifically, Mr. Tetrick was asked by defense counsel:

Q.  And who is the person or who were the persons who made decision to remove Mr. Joffe from partnership track at the end of 2015?

A.  I made that decision, and I made it in conjunction with conversations with Mr. Ciatti, who was the chair of the [Associate Evaluation Committee], and with Ms. Keyes, who was the partner development partner, and Mr. Marooney.

* * *

*Q.  What role, if any, did Ms. Moss play in the decision?*

*A.  Very little.  Very little.*

Nov. 18, 2021 Trial Tr. 1028:25-1029:12.

### B. Whether the Partners' Conduct Triggered the Rule 8.3 Reporting Duty Was at Least a "Close Call"

King & Spalding argues, exactly like before, that "Joffe testified that he did not believe that anyone at K&S, including himself, was aware of the real reason for Guo's reluctance to

2

travel to [the] U.S. at the time that K&S submitted its opposition to Vringo's motion to compel

Guo's deposition" and that "Joffe testified that he wrote the first draft of the opposition to Judge

Kaplan's Order to Show Cause."  (Def.'s Mot. (Doc. No. 323) at 9.)  This Court has dealt with

this all already:

> King & Spalding notes that Joffe participated in the firm's defense in front of
> Judge Kaplan and points to his testimony that he did not believe Straus or Perry
> intentionally misled the court.  Joffe's involvement in defending King & Spalding
> is not inconsistent with his belief that King & Spalding partners may have
> engaged in unethical conduct.  To state the obvious, Joffe could believe the
> partners' conduct was ethically questionable and also cooperate in advocating on
> behalf of King & Spalding relative to sanctions.  King & Spalding's reliance on
> Joffe's repeated acknowledgment that he did not think Straus and Perry acted
> intentionally or were unfit to be lawyers masks the nuance in Joffe's testimony.
> Joffe explained that he believed the partners did not act intentionally—the
> concern expressed by Judge Kaplan—but also believed that they had engaged in
> reckless or negligent conduct that was potentially reportable.  There is, at a
> minimum, a question of fact whether Joffe was acting in good faith relative to his
> ethical concerns.

Summ. J. Op. at 19-20.

Defendant also resurrects its old argument that the K&S partners could not have violated

New York Rule of Professional Conduct 8.4(c)'s prohibition on conduct involving

"misrepresentation" because they did not know for a fact that the false statements they were

making were false, see Def.'s Mot. at 7, this time relying on a Black's Law Dictionary definition

of "misrepresentation" as something "usually" involving intent to deceive, see id. (citing Black's

Law Dictionary).  But reading "misrepresentation" in Rule 8.4(c) to requite deceit would not be

reasonable, since that rule prohibits "conduct involving dishonesty, fraud, deceit or

misrepresentation."  If, as K&S would have it, deceit were a prerequisite for misrepresentation,

then the latter term as used in Rule 8.4(c) would be entirely superfluous.  And the notion that

"misrepresentation" in the ethics rules means something broader than intentional deception is

further confirmed by New York Rule of Professional Conduct 1.0(i), which defines "Fraud" as

conduct contemplating as an element "scienter, deceit, intent to mislead, or <u>knowing</u> <u>failure</u> <u>to</u> <u>correct</u> <u>misrepresentations</u>."  If, as Defendant would have it, "misrepresentations" in the ethics rules means "[<u>intentional</u>] misrepresentations," then Rule 1.0(i) would mean that the "knowing failure to correct [<u>unwitting</u>] misrepresentation" that an attorney later comes to know are false would still fall outside the definition of "fraud."  Because such a definition of "fraud" would be absurd, the only reasonable way to read "misrepresentation" as used in the New York Rules of Professional Conduct is that it encompasses non-deceitful false statements too.

Finally, King & Spalding is simply incorrect that "[e]very alleged 'ethical violation' was known to Judge Kaplan."  Def.'s Mot. at 8.  To the contrary, at the time of the internal investigation conducted by Mr. Forlenza and Mr. Thornton, Judge Kaplan was not aware of, <u>e.g.</u>, the disclosures by ZTE to Google; the troublingly hands-off process that the partners established for reviewing ZTE's Chinese documents; the effort to obtain and submit the "Deekin Declaration" at the last minute; and the fact that ZTE's disclosure of Confidential Information to Edelman in apparent violation of the TRO had already been known to K&S for several weeks before it was disclosed to Judge Kaplan—by K&S's replacement counsel Clifford Chance.

### C.  The Undersigned Reported Ethics Issues All Over the Place to Mr. Forlenza

King & Spalding had previously asserted blanket privilege over its internal ethics investigation and its communications with Mr. Forlenza, preventing the undersigned from testifying about them at his deposition and refusing to produce a single document from the time period of the investigation.  Accordingly, in his trial testimony the undersigned was careful not to invade K&S's claimed privilege, and instead confined his testimony to the subject matters discussed and to the assertion that ***the*** ***undersigned*** did not say ***to*** ***Mr.*** ***Forlenza*** that "there are ethics issues" or "there are ethics issues all over the place" because, had ***the*** ***undersigned*** said

4

those words, it would sound like there is a large echo in the room—i.e., the undersigned (and Mr.

Straus) were being told in no uncertain terms *by Mr. Forlenza* that there are ethics issues and

there are ethics issues all over the place.  What more does K&S think the law requires in that

situation?  Does the associate have to start screaming back, "Yes, yes, there are ethics issues, I

say so too"?  The facts that have been adduced are sufficient for a jury to conclude that the

undersigned reported or attempted to report ethics concerns in 2015.

To the extent, however, that the undersigned's testimony about his reporting to Mr.

Forlenza was insufficiently detailed in light of K&S's gamesmanlike invocation-then-withdrawal

of privilege, the undersigned respectfully requests the opportunity to cure via supplemental

testimony about his reporting efforts in 2015 over which K&S now does not claim attorney-

client privilege.  See Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 286 (2d

Cir. 1998) (purpose of Rule 50(a) procedure is to give "[non-moving] party an opportunity to

cure the defects in proof that might otherwise preclude him from taking the case to the jury")

(internal quotation omitted).

## II.   THE UNDERSIGNED WAS FIRED FOR RAISING "GLARING RED FLAGS"

### A.  The Jury Is Entitled to Draw the Same Causal Inferences Previously Described by This Court

Defendant asks the Court to find that the undersigned's failure to submit a practice plan

was the but-for cause of his termination as a matter of law.  This Court has already considered

and rejected that argument:

> It is true that Joffe failed to submit practice plans in 2014, 2015, and 2016 and
> submitted his self-evaluation late in 2015, but there is conflicting evidence
> whether these documents were of such importance at King & Spalding that Joffe's
> failure to do so was grounds to demote and then fire him.  At the time, King &
> Spalding did not even keep track of which associates failed to submit self-
> evaluations or practice plans—Tetrick had to task an employee with generating
> this data for purposes of Joffe's review.  King & Spalding's head of HR testified

that he was unaware of any attorney—other than Joffe—who had been disciplined
for failing to submit a practice plan.  Moreover, Joffe received a positive review
for 2014, and was promoted to senior associate, despite having failed to submit a
practice plan for the year.  During his 2014 review, King & Spalding "flagged"
the issue, but "certainly didn't say it was required."

Summ. J. Op. at 10.

Moreover, the evidence adduced at trial only further confirms that K&S's efforts to

"track [] which associates failed to submit self-evaluations or practice plans" in certain years

were in fact initiated purely for the purpose of tracking <u>one</u> <u>and</u> <u>only</u> <u>one</u> associate in particular:

the undersigned, who had recently sent the July 25, 2016 Email in which he raised Glaring Red

Flags and had just addressed that very email to Mr. Thornton one day prior.  Per Ms. Keyes's

testimony:

Q.  OK.  Why did Ms. Carter and Ms. Frechette look at plans over the past for the
AEC over the past three years?

A.  Because we were asked if other individuals had failed to turn in practice plans
and how often.

Q.  When you say other individuals, you mean other individuals other than me?

A.  Yes. ... Including you.

***

Q.  OK.  But Ms. Carter writes, based on everything I can find, we never received
one for David for either 2014 and 2015? ...

A.  They also looked at 2016. ...  And your name was not there because it had
already been verified that one was not received separately.  We had now gone
back to '14 and '15 in this e-mail.

Q.  So this chart was created for the purpose of looking at whether other
associates had missing practice plans the same years I did?

A.  Yes.

Nov. 18, 2021 Trial Tr. 1071:20-1072:23.

And the Court has similarly rejected K&S's request to treat as undisputable the Firm's mishmash of "reasons" for the undersigned's termination as set forth in Mr. Tetrick's "December 7 Talking Points" document:

> According to Tetrick, Joffe was fired because the partners in New York were unwilling to work with him. This justification is belied by the facts that: each of the partners who reviewed Joffe in 2016 said that he would staff Joffe again; four of five rated his performance as "meets expectations;" and his hours in 2016 were above King & Spalding's bonus threshold. The timing of Tetrick's decision to fire Joffe also raises an inference of retaliation. Tetrick first discussed Joffe's employment with King & Spalding's head of HR shortly after Joffe sent the July 25, 2016, Email, and Tetrick requested access to Joffe's hourly reports at about the same time. Although Tetrick told Joffe he was fired because the firm did not believe he could return to full utilization, at the time Tetrick made the decision to fire Joffe (in September 2016), Joffe was staffed on at least three active matters and was on track to bill at or near King & Spalding's bonus threshold.

Summ. J. Op. at 21.

### B. The Undersigned Had a Reasonable, Good Faith Basis to Reraise His Ethics Concerns in 2016

The undersigned, contrary to K&S's assertion, see Def.'s Mot. at 13, in fact explained at length in his testimony exactly "why he believed he had an obligation to report ethical concerns in July 2016." Specifically, the undersigned explained that the series of bad things that started happening to him as soon as the ZTE Matter ended—including King & Spalding's decision to award a zero-bonus for 2015, which this Court noted "was unusually punitive," Summ. J. Op. at 10—caused the undersigned to believe that he was being singled out for blame for the ZTE Matter and that, necessarily, the ethics concerns the undersigned thought he had raised must have gone either unheard or unaddressed. See Nov. 16, 2021 Trial Tr. at 512:21-513:7 ("Q. So the third item you wanted to raise was whether ... the ethics concerns that you had reported had actually been reported or addressed, do I have that right? A. Yes. It's either one or the other. Either, yes, it seemed like, if I was being blamed for what happened, either what I reported

hadn't been correctly expressed, or it hadn't been correctly considered or swept under the rug, but it had to be one of those.  Because, again, I don't see how a good faith investigation would come to the conclusion of Joffe is to blame."); id. at 511:24-512:3 ("The fact that I raised what I thought I had reported, if the conclusion was that I'm to blame, then it seemed like no, that can't have been the conclusion of a good faith investigation, if the people investigating accurately knew the facts, that I'm the one to blame.").  Defendant provides no basis for concluding as a matter of law that the undersigned's explanation is fanciful or far-fetched, and, accordingly, the undersigned is entitled to have the jury credit this explanation in determining whether the undersigned had a good faith and reasonable belief that he was required to reraise his ethics concerns.

### C. The Red Flags Email Says the Same Thing Today as When the Court Denied Summary Judgment

K&S again repeats that the July 25, 2016 Email in which the undersigned referred to "ever more glaring red flags" and to the fact that he "had raised his concerns with the partners throughout that period" is unequivocally not an attempt to report ethics concerns.  See Def.'s Mot. at 14.  But the Court already held in the Summary Judgment Opinion that the July 25, 2016 Email may reasonably be interpreted as just such an attempt.  See Summ. J. Op. at 6-7.  Because the July 25, 2016 Email "is open to [both sides'] interpretation" in the same way it was in June 2018 when the Court issued its Summary Judgment Opinion, it cannot provide a basis for granting judgment as a matter of law now.  And, in any case, the additional evidence adduced at trial only further belies K&S's claim that Defendant viewed Red Flags Email as solely concerning compensation.  Per Ms. Keyes:

Q.  Did you consider the July 25 e-mail to be about my compensation?

A.  I didn't -- well, no. I mean, I didn't read it.  ***None of us who were involved in compensation would have read that at that time***, so no.

Nov. 18, 2021 Trial Tr. 1197:6-10.

And K&S's tacked-on argument that the undersigned's testimony "makes clear that he never made any other 'attempt' to report" after sending the July 25, 2016 Email blatantly misreads the record.  In fact, the undersigned testified—and Mr. Tetrick confirmed—that after sending the July 25, 2016 email the undersigned followed up with both Mr. Tetrick and Mr. Thornton concerning "the ZTE situation," that he was instructed by Mr. Tetrick to put a "ring" around the ZTE Matter, and that at his October 14, 2016 "performance review" the undersigned made reference to Judge Kaplan after Mr. Tetrick told him not to share "what you [i.e., the undersigned] refer to as the ... 'yellow flags,' was it?"  Moreover, the undersigned testified that he was told he could raise these (in Mr. Tetrick's words) "yellow flags" only at a subsequent check-in meeting with Mr. Tetrick in December—although the undersigned did not get to do that because, when he came to that meeting, he learned that K&S had just turned off his email and was about to throw him out of the building like the trash.

## CONCLUSION

For the reasons set forth herein, the undersigned respectfully requests that this Court deny in its entirety Defendant's motion for judgment as a matter of law on the undersigned's claim under Wieder v. Skala.

Dated: November 21, 2021                          By:      */s/ David A. Joffe*

David A. Joffe, Esq. (pro se)
155 Christopher Columbus Drive
Jersey City, NJ 07302
516-695-7086
davidajoffe@gmail.com

9