UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID A. JOFFE,<br><br>  Plaintiff,<br><br>v.<br><br>KING & SPALDING LLP,<br><br>  Defendant. | Case No. 17-cv-3392 (VEC) (SDA) |

**MEMORANDUM OF LAW CONCERNING DAMAGES**

David A. Joffe, Esq. (pro se)
155 Christopher Columbus Drive
Jersey City, NJ 07302
516-695-7086
davidajoffe@gmail.com

## **PRELIMINARY STATEMENT**

King & Spalding has spent the better part of the last two weeks attempting to paint the undersigned as a transparent money-grubber who made up his ethics concerns post hoc.  If the Firm is right, then it has nothing to worry about on Monday—the jury will see through the undersigned's story too, and the instant briefing will be moot.

If, however, the undersigned is fortunate enough to prevail at the liability phase—at a trial where, pre-bifurcation, his relevant-only-to-damages "dirty laundry" has already been strewn by Defendant all over Courtroom 443—then, the undersigned respectfully submits, this Court should not preclude the damages calculations of the undersigned's expert Ms. Kristin Kucsma reflecting the possibility of promotion to partner or counsel at King & Spalding or any other firm (see Pl.'s Ex. P-197):

*First*, Ms. Kucsma's previously-admitted calculations provide a stable foundation for a reasonable estimate of lost earnings to a reasonable degree of economic certainty, and that is all the law requires.

*Second*, the calculations in P-197 were previously admitted based on the same factual predicates as were adduced at trial, and the calculations' sufficiency under Daubert is therefore the law of the case.

*Third*, the trial record amply confirms the assumption underlying P-197 that the undersigned had a non-speculative chance of promotion to partner or counsel.

*Finally*, to the extent Ms. Kucsma's calculations in P-197 fall short of perfection—e.g., they do not drill down to the level of where a K&S partner is likely to stand relative to the partnership's average in any given year of their career—that is because (and only because) one side but not the other has access to the data, and that side unapologetically, to this day, refuses to share.  It is "a well-known and ancient doctrine that when a party frustrates proof of damages ...

by withholding facts ... any doubts about the actual assessment of damages will be resolved ***against that party***, and the fact-finder may calculate damages at the ***highest reasonably ascertainable value***." Chesa Int'l, Ltd. v. Fashion Assocs., 425 F. Supp. 234, 238 (S.D.N.Y. 1997) (emphasis added).  If King & Spalding is permitted to stonewall on the precise earnings of its partners and counsel and then at the end of trial use its own stonewalling to throw out damages for K&S partner and counsel earnings as insufficiently precise—then that would mean the Firm had nothing to worry about all along: win or lose, impunity is guaranteed.  And the message to every law-firm associate who is following this case will be clear: if you see something, keep your own mouth shut.

The undersigned respectfully submits that this Court should avoid such a palpably inequitable result, should permit damages calculations reflecting promotion to partner or counsel to be shown to the jury, and should permit Ms. Kucsma to testify concerning those calculations.

## ARGUMENT

### I.   The Law Requires Reasonableness Not Theoretical Perfection

New York law broadly divides contract damages into general and consequential damages. The New York Court of Appeals has noted that the application of this distinction "to specific contracts and controversies is usually [] elusive"—"[l]ost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are 'the direct and immediate fruits of the contract.'"  Biotronik v. Conor Medsystems, 22 N.Y.3d 799, 806, 11 N.E.3d 676, 680 (2014).  "[A] party claiming general damages need [] provide a stable foundation for a reasonable estimate of damages," while "a party claiming consequential damages must prove the amount of damage with 'reasonable certainty.'"  Design Partners, Inc. v. Five Star Elec. Corp., No. 12-CV-2949 (PKC)(VMS), 2016 U.S. Dist. LEXIS

2

41913, at *46 (E.D.N.Y. Mar. 29, 2016) (quoting, inter alia, Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007)).  Ms. Kucsma's damages calculations in P-197 meet both of these standards.

Specifically, the calculations in P-197 are based on published figures reflecting the average compensation of all partners and counsel at K&S, with equal weight assigned to the lowest- and highest-earning partner or counsel at each year in the But-For World.  This average figure, because it is an input for a forensic-damages model, does not represent—and does not purport to represent—that in the But-For World a K&S partner or counsel would actually earn exactly the partnership's average compensation at every year of their career.  Rather, this figure is a simplifying assumption—based on the best data available—that provides a reasonable total estimate with a reasonable degree of economic certainty, because the use of an average over a thirty-year span means that career-years where a K&S partner or counsel would earn less than the average (i.e., where the earnings are overstated) are offset by other career-years where a K&S partner would earn more than the average (i.e., where the earnings are understated).

Such use of an agnostic average as an approximation when more-precise data is unavailable is frequently acknowledged as a reliable method of calculating lost earnings.

> [B]y its very nature the calculation of an award for lost earnings must be a rough approximation.  Because the lost stream can never be predicted with complete confidence, any lump sum represents only a "rough and ready" effort to put the plaintiff in the position he would have been in had he not been injured.

Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 546 (1983); see also, e.g., Volkman v. United Transp. Union, 770 F. Supp. 1455, 1472 (D. Kansas 1991) ("The court believes that the average earnings of the off-line plaintiffs who were below them on the seniority roster should be used as the approximation for the mitigation of damages requirement."); Garcia v. Columbia Med. Ctr., 996 F. Supp. 617, 623 (E.D. Tex. 1998) ("It is a commonly accepted practice in the field of economics to calculate future lost earnings based upon a worker's worklife probability and then adjust these figures for growth and inflation.").'

3

Indeed, Ms. Kucsma's damages calculations have been admitted in other cases on just this basis. See, e.g., Kohl v. Young, No. 8:17-cv-692 (BKS/CFH), 2018 U.S. Dist. LEXIS 104639, at *5 (N.D.N.Y. June 22, 2018) (admitting Ms. Kucsma's calculations of lost future income based on "the average median earnings for mental health counselors and expected annual wage growth"). And, to the extent using an average compensation figure at each career-year means that years where the earnings are overstated are front-loaded (i.e., because a newly-minted partner would earn less than the average), the calculations in P-197 can be adjusted—and, in Defendant's rebuttal expert's charts, are adjusted—to account for any resulting skew.

Moreover, particularly with respect to damages in lieu of promotion to partner or counsel at King & Spalding, excluding the calculations in P-197 would mean that both Wieder v. Skala and Hishon v. King & Spalding provide a right for which there is no remedy. In Wieder, the New York Court of Appeals specifically held that associates at law firms are protected if they observe and seek to report ethical misconduct. And as the evidence adduced at trial has confirmed, a more senior associate who is closer to promotion to partner or counsel is the most likely to have a "360 degree view" of the cases on which they are working, and, accordingly, such an associate would be the most likely to observe potentially reportable misconduct. But, if a senior associate could not claim damages for thwarted promotion prospects because the defendant-firm's compensation practices cannot be precisely-enough quantified, then such an associate would also be least likely to be made whole if they are retaliated against for reporting. And in Hishon, Chief Justice Burger's opinion specifically noted that a King & Spalding associate whom Defendant refuses for prohibited reasons to "consider [] for partnership" has a claim for "damages in lieu of promotion to partnership," and that such associate's "[employment] contract ... would lead to the same result." Hishon v. King & Spalding, 467 U.S.

69, 75 (1984).  Here too, exclusion of Ms. Kucsma's damages calculations reflecting promotion at King & Spalding—on the basis of insufficient access to data that is available to King & Spalding—would mean that the claim recognized in Hishon confers a right without any possibility of a remedy.  But surely that is not what Court of Appeals in Wieder and a unanimous Supreme Court in Hishon had in mind.

**II.      The Calculations in P-197 Are Admissible Under the Law of the Case**

"The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case."  Aramony v. United Way of Am., 254 F.3d 403, 410 (2d Cir. 2001).  This doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality."  United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009).  In its Opinion and Order dated September 24, 2019 (Doc. No. 183) ("Expert Opinion"), this Court held that Ms. Kucsma's damages calculations reflecting three alternative but-for scenarios as set forth in P-197 are admissible—including the simplifying assumption that the undersigned "would reach average partner compensation within three years of promotion."  Expert Opinion at 19.  Because the factual predicates underlying this Court's previous ruling about Ms. Kucsma's calculations are exactly the same as the factual predicates that were adduced at trial—and because there was no clear error or manifest injustice in that prior ruling—under the law of the case doctrine this Court should not revisit its Expert Opinion but should instead permit Ms. Kucsma's calculations that have already been admitted to be shown to the jury.

Specifically with respect to Ms. Kucsma's assumptions about average partner compensation and average counsel compensation within three years of promotion, as this Court noted at trial, the undersigned's vocational expert Mr. Gordon Kamisar did not specify in his

5

testimony how soon after promotion a hypothetical partner or counsel would reach a firm's average level of compensation. See Nov. 22, 2021 Trial Tr. 1401:6-19. But this was perfectly well known two years ago when this Court issued its Expert Opinion admitting Ms. Kucsma's calculations, since Mr. Kamisar's then-proffered expert report stated:

> Firm compensation policies vary, and multiple factors come into play, so ***it is impossible to pinpoint* what Mr. Joffe's compensation would have been upon promotion to a partner or counsel position, *or predict* how gradually or sharply his compensation would have risen in the few years after his promotion**.

See Kamisar Report (Pl.'s Ex. P-135) at 16 (emphasis added).

Thus, Mr. Kamisar's testimony at trial merely confirmed the same thing that had already been in his expert report the whole time. See Nov. 19, 2021 Trial Tr. at 1245:11-1247:7.

Because Ms. Kucsma's damages calculations were admitted in the Expert Opinion notwithstanding Mr. Kamisar's inability to pinpoint a partner's compensation relative to a firm's average in any given year—and notwithstanding the exclusion of Mr. Kamisar's testimony about K&S-specific compensation and promotion practices ***in toto***—under the law of the case doctrine, Ms. Kucsma's same calculations, made against the exact same background predicates and factual limitations, should also be admitted now.

**III. The Evidence Adduced at Trial Confirms the Predicates for Ms. Kucsma's Calculations**

All of the bases that made Ms. Kucsma's calculations in P-197 admissible at the time of the Expert Opinion were also amply adduced at trial:

Thus, the evidence established that the undersigned was hired by King & Spalding for a partner-track associate position that specifically contemplated promotion to partner or counsel, see Joint Ex. J-3 (offer letter) ("you would first become eligible, under our current system, for election as a partner in the Fall of 2015"), and that the undersigned's promotion to Senior

6

Associate in 2014 meant that there is a reasonable chance of his further promotion to partner or counsel within the next few years, see Nov. 17, 2021 Trial Tr. 746:19-24 ("[Mr. Tetrick:]. A senior associate at King & Spalding is a lawyer who has been practicing for at least six years and has a reasonable possibility of being promoted within the next three years. Q. And what do you mean by promoted, to be clear? A. What I mean is promoted to either partner or a position that we call counsel.").

The adduced evidence also showed that, even after the undersigned was removed from the Firm's partnership track, under K&S's stated policies—and as was represented at the time—the undersigned remained eligible for consideration for such promotion. See id. at 747:14-17 ("Q. Do you remember telling me that returning to partnership track was a possibility? [Mr. Tetrick:] Yes."); see also Def.'s Ex. D-53 at 1 ("In order to be an off-track attorney (either a senior attorney or off-track associate[]), a lawyer must satisfy the following criteria ... ***This position can lead to future consideration for partnership or counsel***, assuming the lawyer satisfies the criteria for promotion.") (emphasis added).

Further, the data points revealed at trial concerning specific lawyers' tenures at King & Spalding confirm that it is common for those who are promoted by the Firm to partner or counsel to remain in that position for decades going forward. See Nov. 19, 2021 Trial Tr. at 1157:3-4 ("Q. How long have you been at the King & Spalding? [Ms. Keyes:] Since 1997."); Nov. 22, 2021 Trial Tr. at 1420:14-15 ("Q. How long have you been a partner? [Mr. Straus:] I've been a partner since 2006."); id. at 1495:4-5 ("Q. And how long have you been with King & Spalding? [Mr. Thornton:] I began in 1976 and have been here since then.").

And, finally, Mr. Kamisar's testimony at trial exhaustively explained—in the face of intense questioning by both defense counsel and this Court—why the undersigned would have

had a strong possibility of lateraling into a partner-track position at an Am Law 100 or Am Law 200 or similar firm had his career prospects not been destroyed by the manner in which King & Spalding terminated his employment.

These predicates provide an adequate, non-speculative basis for admitting the three alternative scenarios—(i) promotion to partner at K&S or another Am Law 100 firm; (ii) promotion to counsel at K&S or another Am Law 100 firm; and (iii) promotion to partner at an Am Law 200 or similar firm—that are reflected in Ms. Kucsma's calculations in P-197.

Indeed, the evidence adduced at trial also established that one scenario that ***does*** appear to be unduly speculative—unlike the three aforementioned scenarios in Ms. Kucsma's calculations—is the notion that in the But-For World the undersigned would remain permanently in the position of associate. As King & Spalding had previously noted, the record contains no evidence that "a 'permanent senior associate' position even exists at K&S," Def.'s Mot. to Exclude [Kamisar] at (Doc. No. 147) at 12, and the trial testimony of Defendant's witnesses confirmed that there is no support for a scenario in the But-For World where the undersigned remains an associate for an indefinite length of time, see Nov. 19, 2021 Trial Tr. at 1160:24-1161:6 ("Q. Does the firm have a practice of keeping career associates, in other words, associates who remain as an associate position for their entire careers? [Ms. Keyes:] It would be very rare. I would never say never, but ... it would have to be somebody super specialized, probably, and something that nobody else could do or wants to do, I suppose.").

Because the calculations set forth in P-197 are supported by the evidence that came out at trial just like they were supported by the evidence available at the expert discovery stage, they should again be admitted here.

**IV.   King & Spalding Should Not Profit From Its Own Stonewalling on Compensation Data**

King & Spalding obviously possesses exhaustive data about the compensation earned by its partners and counsel at all career stages, both for all individuals in any given year (i.e., cross-sectional data) and for any individual in all given years (i.e., longitudinal data). This data would permit Ms. Kucsma to create a near-theoretically perfect damages appraisal reflecting the undersigned's lost earnings as a result of thwarted promotion prospects at K&S. And, as the Court confirmed during trial, during discovery in this case the undersigned requested from the Firm that very data—i.e., King & Spalding's policies and practices with respect to partner and counsel compensation—but Defendant objected to the undersigned's request and agreed only to produce documents concerning compensation practices for associates and senior associates in the business litigation group. See Nov. 22 Trial Tr. at 1394:1-1395:22. Thereafter, the Firm has continued to refuse to provide data in its possession concerning its partner and counsel compensation, withholding it even from its own vocational expert Ms. Sweeney and its damages expert Professor Hubbard. And, despite being permitted by this Court to introduce brand-new, never-previously-disclosed evidence throughout trial, Defendant unapologetically still declines to share the maximally-precise partner and counsel compensation data at its disposal with anyone else. Yet, at the same time, the Firm seeks to exclude the undersigned's expert's damages calculations on the ground that they are insufficiently precise.

Under basic notions of fair play, the Firm cannot have it both ways. That is, King & Spalding cannot both stonewall on damages and then use its own stonewalling as a justification to avoid damages. It is a longstanding principle of equity that, where as here it is the defendant's own conduct that makes it impossible for the plaintiff to ascertain damages with greater

9

precision, the burden of the uncertainty "shall rest upon the wrongdoer":

> ***It is a bitter response for the court to say to the innocent party, 'You have failed to make the necessary proof ... for the party knows, and the court must see, that such a requirement is impossible to be complied with.*** The proper remedy to be applied in such cases is that ... [a]ll the inconvenience of the confusion is thrown upon the party who produces it.

Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co., 225 U.S. 604, 621-622 (1912) (emphasis added); accord Chesa Int'l, 425 F. Supp. at 238 ("when a party frustrates proof of damages, either by withholding facts or through inaccurate record-keeping, any doubts about the actual assessment of damages will be resolved against that party, and the fact-finder may calculate damages at the highest reasonably ascertainable value"); Project Strategies Corp. v. National Comms. Corp., 948 F. Supp. 218, 222 (E.D.N.Y. 1996) ("Unless the defendants produce reliable evidence of deductions to which they would be entitled, we should presume the strongest against them."); Shapiro, Bernstein & Co. v. Remington Records, Inc., 265 F.2d 263, 272 (2d Cir. 1959) (permitting plaintiff to "resort to expert opinion testimony, which testimony was ***necessarily hypothetical and to a degree speculative and uncertain***," because uncertainty was a result of the defendant's own acts) (emphasis added).

Here too, any speculativeness and imprecision in Ms. Kucsma's calculations in P-197 reflecting partner and counsel earnings at King & Spalding is solely the result of the Firm's deliberate choice to withhold data about those very earnings to which it has unfettered access. And, here too, the Court should avoid the "bitter response" of punishing the undersigned for K&S's stonewalling by making the undersigned comply with obviously impossible requirements at the risk of having all damages thrown out completely. Instead, this Court should apply the "proper remedy" by either making King & Spalding produce the data that the Firm claims is needed to approximate lost earnings, or otherwise by resolving any doubts about that data against King & Spalding.

## **CONCLUSION**

For the reasons set forth herein, the undersigned respectfully requests that this Court permit damages calculations reflecting partner and counsel promotion to be shown to the jury, permit Ms. Kucsma to testify concerning those calculations, and grant such other relief as the Court deems proper.

Dated: November 27, 2021             By:     */s/ David A. Joffe*
                                                              David A. Joffe, Esq. (pro se)
                                                              155 Christopher Columbus Drive
                                                              Jersey City, NJ 07302
                                                              516-695-7086
                                                              davidajoffe@gmail.com